UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,

                v.

David Cartu, Jonathan Cartu, Joshua Cartu,
Ryan Masten, Leeav Peretz, Nati Peretz, All
Out Marketing Limited, BareIt Media LLC
d/b/a SignalPush, Blue Moon Investments
Ltd., and Orlando Union Inc.,

                Defendants.

Case No.:1:20-cv-908

Hon._____

---

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC"), an independent federal agency, alleges as follows:

## I.  SUMMARY

1.      Beginning in or before May 1, 2013 and continuing to at least April 29, 2018 (the "Relevant Period"), Defendants David Cartu ("David"), Jonathan Cartu ("Jonathan"), and Joshua Cartu ("Josh") (collectively, the "Cartu Brothers"), acting individually, in concert with each other, and through dozens of off-shore entities they ultimately owned and controlled, operated a massive fraudulent "binary options" trading scheme.

2.      First, the Cartu Brothers, acting in concert with Defendants Leeav Peretz ("Leeav") and Nati Peretz ("Nati") (collectively, the "Peretz Brothers"), offered illegal, off-exchange binary option trading on currency pairs, oil, and other commodities on internet

websites through customer-facing brands they owned and operated including "BeeOptions," "Glenridge Capital," and "Rumelia" (collectively, the "Cartu Brands").

3.      The Cartu Brothers and Peretz Brothers, along with their agents, employees, and representatives who solicited and sold binary options on behalf of the Cartu Brands (the "brokers"), made material misrepresentations and omissions to individuals located in the United States and elsewhere ("customers") in order to entice them to deposit funds to trade binary options.  On the Cartu Brands' websites and in emails, telephone calls, and other communications with customers and prospective customers, the Cartu Brothers, Peretz Brothers, and the individual brokers promised "quick" returns of "60-85%," even though the substantial majority of customers lost money.  They falsely stated that the interests of the Cartu Brands were aligned with the interest of customers and failed to disclose that the Cartu Brands (and the Cartu Brothers and Peretz Brothers themselves) profited from customer losses.  Further, at the direction of the Cartu Brothers and Peretz Brothers, the brokers misrepresented their financial expertise, compensation structure, physical location, and identity.

4.      During at least part of the Relevant Period, Defendants BareIt Media LLC d/b/a SignalPush ("BareIt"), while acting as an unregistered commodity trading advisor ("CTA"), and Ryan Masten ("Masten"), while acting as an unregistered Associated Person ("AP") of a CTA, provided trade signals and/or auto-trader services to customers of the Cartu Brands.

5.      Unbeknownst to customers, beginning on or before September 26, 2015, the binary option transactions offered by the Cartu Brands were executed on an Internet-based trading platform (the "Cartu Platform") operated by the Cartu Brothers and Masten, acting through and on behalf of Defendants All Out Marketing Limited ("All Out"), an entity owned and controlled by David; Blue Moon Investments, Ltd. ("Blue Moon"), an entity owned and

controlled by Jonathan; Orlando Union Inc. ("Orlando Union"), an entity owned and controlled

by Josh; and BareIt.  Customers of the Cartu Brands, and later customers of other binary options

brands operated by third-parties, accessed the Cartu Platform through each individual binary

brand's website, typically by logging in with their email address and password.

6.      In order to facilitate the transfer of funds from customers in the U.S. and

elsewhere for illegal, off-exchange binary option transactions, the Cartu Brothers operated

Greymountain Management Limited ("Greymountain"), a defunct "payment processor" that

maintained its principal place of business in Ireland.  During the Relevant Period, the Cartu

Brothers and their employees and agents, acting through Greymountain and other related entities,

processed over $165 million in credit card payments for binary option transactions offered by the

Cartu Brands and other brands operated by third-parties, including processing over $149 million

in credit card payments after September1, 2015.

7.      The Cartu Brothers and Masten also utilized Greymountain to distribute profits

generated by the Cartu Platform.  Between September 2014 and January 2017, Jonathan received

at least $9,292,043 from Greymountain through transfers to off-shore accounts in the name of

Blue Moon; Josh received at least $9,219,048 from Greymountain through transfers to off-shore

accounts in the name of Orlando Union; and David received at least $4,868,859 from

Greymountain through transfers to off-shore accounts in the name of All Out, as well as an

additional $4,146,028 through transfers to off-shore accounts in the name of Memox Services

Ltd. ("Memox"), another entity he ultimately owned and controlled.  Further, between July 2015

and January 2017, Masten received at least $1,448,209 from Greymountain through transfers to

BareIt.

8.      At least as of June 1, 2016, the Peretz Brothers also received funds generated by and through the Cartu Platform.  Thus, the Cartu Brothers, Peretz Brothers, Masten, All Out, Blue Moon, Orlando Union, and BareIt (collectively "Defendants") all profited from the fraudulent transactions executed on the Cartu Platform.

9.      During each stage of their fraudulent binary options scheme, Defendants violated the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2018), and accompanying regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2019).  Namely, by this conduct and further conduct described below, Defendants have engaged in acts and practices in violation of the following:

a.  Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.4, 17 C.F.R. § 32.4 (2019), which prohibit fraud in connection with commodity options transactions;

b.  Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019), which prohibit deceptive devices, schemes and/or artifices in connection with, among other things, swaps, and prohibit false statements; and

c.  7 U.S.C. § 6c(b) and Regulation 32.2, 17 C.F.R. § 32.2 (2019), which prohibit offering or entering into off-exchange transactions in commodity options.

10.     Further, Defendants Masten and BareIt have engaged in acts and practices in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), which prohibits BareIt from acting as a CTA unless registered as such, and Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2018), which prohibits Masten from acting as an AP of a CTA unless registered as such.

11.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel

Defendants' compliance with the Act and Regulations, and to further enjoin Defendants from engaging in certain commodity options and swaps-related activities.

12.     In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

14.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because Masten and BareIt are found in and inhabit the Western District of Texas, all Defendants transacted business in this District, and the acts and practices in violation of the Act and Regulations occurred within this District, among other places.

## III.     PARTIES

15.     Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") is the independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act and Regulations promulgated thereunder.

A.    **Individual Defendants**

16.    Defendant **David Cartu** was born in 1985 and is the youngest of the three Cartu Brothers.  David is a Canadian citizen and, upon information and belief, currently resides in Ontario, Canada.  During the Relevant Period, David lived in Israel, among other places, and frequently traveled to Ireland.  David has never been registered with the Commission in any capacity.

17.    Defendant **Jonathan Cartu** was born in 1983 and is the middle of the three Cartu Brothers.  Jonathan is a Canadian citizen.  Upon information and belief, Jonathan currently resides in Israel, where he also resided during the Relevant Period.  During at least part of the Relevant Period, and in connection with the acts and practices described herein, Jonathan used the alias Jonathan Cartier.  Jonathan has never been registered with the Commission in any capacity.

18.    Defendant **Joshua Cartu** was born in 1979 and is the eldest of the three Cartu Brothers.  Josh is a Canadian citizen.  Upon information and belief, Josh currently resides in Budapest, Hungary.  Josh has never been registered with the Commission in any capacity.

19.    Defendant **Ryan Masten** was born in 1985 and is an American citizen.  Masten currently resides in or around Austin, Texas.  During at least part of the Relevant Period, and in connection with the acts and practices described herein, Masten used the alias Jax Navarro.  Masten has been registered with the Commission as an AP and principal of a CTA since June 13, 2017, and was registered as an AP and principal of an Introducing Broker from approximately May 2017 to March 2018.

20.    Defendant **Leeav Peretz** is from Windsor, Ontario, Canada.  Upon information and belief, Leeav currently resides in Israel.  During the Relevant Period, and in connection with

the acts and practices described herein, Leeav used the alias Lee Cole.  Leeav has never been registered with the Commission in any capacity.

21.     Defendant **Nati Peretz** is, like his brother Leeav, from Windsor, Ontario, Canada. Upon information and belief, Nati currently resides in Israel.  During the Relevant Period, and in connection with the acts and practices described herein, Nati used the alias Steven (or Steve) Grey.  Nati has never been registered with the Commission in any capacity.

**B.     Corporate Defendants**

22.     Defendant **All Out Marketing Limited** was incorporated in the British Virgin Islands on April 16, 2010.  Throughout the Relevant Period, David has owned and controlled All Out, and has used it to operate the Cartu Platform, including opening accounts and/or entering into agreements on behalf of the Cartu Platform; and to transfer, hold, and conceal funds obtained in connection with Defendants' fraudulent binary options scheme.  All Out has never been registered with the Commission in any capacity.

23.     Defendant **BareIt Media LLC, d/b/a SignalPush,** is a Texas LLC incorporated on March 27, 2012 with its principal place of business in Lakeway, Texas.  BareIt has done business as "SignalPush" since at least October 2, 2012 and has used the website www.signalpush.com.  Throughout the Relevant Period, Masten, along with his wife, has owned and controlled BareIt, and Masten has used BareIt to operate the Cartu Platform, including opening accounts and/or entering into agreements on behalf of the Cartu Platform; and to transfer, hold, and conceal funds obtained in connection with Defendants' fraudulent binary options scheme.  During a portion of the Relevant Period, BareIt and Masten d/b/a SignalPush, offered trade signals and auto-trader services for the Cartu Brands.  BareIt has never been registered with the Commission in any capacity.

24.     Defendant **Blue Moon Investments Ltd**. was incorporated in the Seychelles on December 6, 2012.  Throughout the Relevant Period, Jonathan has owned and controlled Blue Moon, and has used it to operate the Cartu Platform, including opening accounts and/or entering into agreements on behalf of the Cartu Platform; and to transfer, hold, and conceal funds obtained in connection with Defendants' fraudulent binary options scheme.  Blue Moon has never been registered with the Commission in any capacity.

25.     Defendant **Orlando Union Inc.** was incorporated in Belize on October 18, 2010. Throughout the Relevant Period, Josh has owned and controlled Orlando Union, and has used it to operate the Cartu Platform, including opening accounts and/or entering into agreements on behalf of the Cartu Platform; and to transfer, hold, and conceal funds obtained in connection with Defendants' fraudulent binary options scheme and to open accounts and/or enter into agreements on behalf of the Cartu Platform.  Orlando Union has never been registered with the Commission in any capacity.

**C.     Related Entities and Fictitious Binary Brands**

26.     Atmosphere Management IR Ltd. ("Atmosphere") was incorporated in Ireland on February 25, 2015, and maintained an office in Dublin, Ireland.  During the Relevant Period, David Cartu owned and operated Atmosphere.  Atmosphere has never been registered with the Commission in any capacity.

27.     Greymountain Management Limited was incorporated under the laws of Ireland on May 20, 2014, and entered into liquidation effective July 13, 2017.  David Cartu owned and operated Greymountain.  Upon information and belief, Jonathan and Josh invested in, and were partial owners of, Greymountain.  During the Relevant Period, Greymountain offered payment processing services through various subsidiaries, successor entities and/or fictitious entities, including without limitation SnowCharge and SnowPay.  At various times during the Relevant

Period, Greymountain also offered "white label solutions", a type of software product, for the Cartu Brands and other third-party binary option brands.  Greymountain has never been registered with the Commission in any capacity.

28.     Mega Optimization Limited d/b/a MegaCharge ("MegaCharge") was incorporated in Ireland on or around March 24, 2016, and has maintained offices in Dublin, Ireland and, upon information and belief, in Berlin, Germany.  David Cartu is the sole shareholder and one of the directors of MegaCharge.  Upon information and belief, Jonathan and Josh invested in, and are partial owners of, MegaCharge, and MegaCharge is a subsidiary or successor entity to Greymountain.  MegaCharge has never been registered with the Commission in any capacity.

29.     Memox Services Ltd. ("Memox") was incorporated in England and Wales on July 9, 2012.  Since at least May 27, 2015, David Cartu has been the Director and sole shareholder of Memox.  Upon information and belief, David operated and controlled Memox throughout the Relevant Period.  On July 31, 2018, Memox changed its name to Slingshot Investments Limited.  Upon information and belief, the company is no longer active.  Memox has never been registered with the Commission in any capacity.

30.     Tracy P.A.I. Management Ltd. a/k/a Tracy PAI Management Ltd. ("Tracy PAI") was incorporated in Israel on or before April 16, 2012.  During the Relevant Period, Tracy PAI operated out of an office in Tel Aviv, Israel, and employed the individual brokers who solicited and sold binary options on behalf of the Cartu Brands.  Prior to June 2016, Tracy PAI was owned, operated, and controlled by Jonathan and David.  On or around June 1, 2016, Leeav and Nati, who had previously been senior managers at the company, purchased at least a portion of Tracy PAI and took over the business' day-today operations.  Tracy PAI has never been registered with the Commission in any capacity.

31.     UKTVM Limited ("UKTVM") was incorporated in the United Kingdom on October 8, 2012, and dissolved on December 18, 2018.  David Cartu owned and operated UKTVM.  Upon information and belief, UKTVM providing payment processing services for the Cartu Brands in 2013 and 2014.  UKTVM has never been registered with the Commission in any capacity.

32.     BeeOptions ("BeeOptions") is a binary options brand.  At various times during the Relevant Period, the Cartu Brothers have used Tracy PAI and UKTVM, among other entities, to enter into agreements, open accounts, hire individual brokers, and engage in other activities in the name of or on behalf of BeeOptions.

33.     Glenridge Capital ("Glenridge") is a  binary options brand.  At various times during the Relevant Period, the Cartu Brothers have used Greymountain, Tracy PAI and UKTVM, among other entities, to enter into agreements, open accounts, hire individual brokers, and engage in other activities in the name of or on behalf of Glenridge.

34.     Rumelia Capital ("Rumelia") is a binary options brand.  At various times during the Relevant Period, the Cartu Brothers have used Tracy PAI and UKTVM, among other entities, to enter into agreements, open accounts, hire individual brokers, and engage in other activities in the name of or on behalf of Rumelia.

## IV.      STATUTORY BACKGROUND

### A.      Prohibitions Against Off-Exchange Options Trading

35.     Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A) (2018), defines "swap" to include, among other things, any agreement, contract, or transaction that:  (a) is a put, call, cap, floor, collar, or similar option of any kind; (b) provides for payment dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency; or (c)

provides on an executory basis for payments based on the value or level of one or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, without also conveying an ownership interest in any asset or liability.

36.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, inter alia, an "option", "bid", "offer", "put", or "call", contrary to any rule, regulation or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.  Thus, through 7 U.S.C. § 6c(b), Congress has given the Commission jurisdiction and plenary rulemaking authority over all commodity option transactions.

**B.     Prohibitions Against Fraud**

37.     The Act and Regulations contains numerous anti-fraud provisions applicable to various categories of entities or transactions.

**i.     Options Fraud**

38.     Regulation 32.2, 17 C.F.R. § 32.2 (2019), states in relevant part:

> [I]t shall be unlawful for any person or group of persons to offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity option transaction, unless:
>
> (a) Such transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any other swap, or
>
> (b) Such transaction is conducted pursuant to § 32.3[1].

---

[1] Regulation 32.3, 17 C.F.R. § 32.3 (2019), applies to certain transactions offered to a producer, processor, or commercial user that are intended to be physically settled and requires that every counter

39.     Regulation 32.4, 17 C.F.R. § 32.4 (2019), promulgated under 7 U.S.C. § 6c(b), provides that:

> In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person, directly or indirectly:
>
> (a) To cheat or defraud or attempt to cheat or defraud any other person;
>
> (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or
>
> (c) To deceive or attempt to deceive any other person by any means whatsoever.

**ii.     Swaps Fraud**

40.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), makes it unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate.

41.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019), provides in relevant part, that it shall be unlawful for any person, directly or indirectly:

> In connection with any swap . . . to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of materials fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

---

party to such transaction that is not a swap dealer or major swap participant obtain a legal entity identifier pursuant to Regulation 45.6, 17 C.F.R. § 45.6 (2019).

C.      **Registration Requirements**

42.      Section 1a(12) of the Act, 7 U.S.C. § 1a(12) (2018), defines a commodity trading advisor or CTA as any person who for compensation or profit, engages in the business of advising others, either directly or through publications, writings or electronic media, as to the value or advisability of trading in any commodity option, among other products.

43.      An "Associated Person" or AP of a CTA is defined in Regulation 1.3, 17 C.F.R. 1.3 (2019), as any person who is associated with a CTA as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:  (i) the solicitation of a client's or prospective client's discretionary account, or (ii) the supervision of any person or persons so engaged.

44.      Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), makes it unlawful for any CTA, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CTA.

45.      Section 4k(3) of the Act, 7 U.S.C. § 6k(3) (2018), makes it unlawful for any person to associated with a CTA as a partner, officer, employee, consultant or agent (or any other person occupying a similar status or performing similar functions), in any capacity which involves:  (i) the solicitation of a client's or prospective client's discretionary account or (ii) the supervision of any person or persons so engaged, unless such person is registered with the CFTC.

## V.      FACTS

**A.  Overview of Binary Options and Relevant Terms**

46.      A binary option is a type of options contract in which the payment depends entirely on the outcome of a discrete event—typically a "yes/no" proposition.  A binary options

customer enters into a trade that predicts the price of an underlying asset by a pre-determined date and time, commonly referred to as the "expiration" or "expiry." The price of the option at expiry is commonly referred to as the "strike price." Basic binary options involve a prediction as to the direction that the underlying asset's price will take relative to the price of entry, while binary option pairs involve a prediction as to whether one asset will outperform another.

47.    Binary option "brands" sell and market binary options. Typically, a binary option customer enters into a trade through a trading "platform" accessed through the brand's website.

48.    Frequently, binary option brands rely on "affiliate marketers" to disseminate solicitations to prospective customers through targeted campaigns advising them to open and fund off-exchange binary option trading accounts. Affiliate marketing is a form of performance-based marketing that is predominantly conducted via email solicitations and promotional materials, including videos, made available on internet websites. Affiliate marketers may also offer "trade signals" or "auto-trader" functions that purport to assist customers by providing recommendations as to specific trades or automatically executing a trade at so-called opportune market conditions.

49.    Once the customer acquires a binary option, there is no further decision for the holder to make as to whether or not to exercise or trade the binary option, as binary options exercise automatically at expiry. The expiration date and time are typically determined at the time the customer enters into a binary option trade.

50.    Binary options involve a variety of underlying assets, including currency pairs (e.g., EUR/USD); commodities such as oil, gold, and platinum; equity indices (e.g., the Down Jones Industrial Index); and stocks (e.g., Google, Nike, etc.). However, unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying

asset.  Instead, binary options are "cash settled."  When the binary option expires, if the customer

has correctly predicted the asset's movement, the customer is "in the money" and entitled to a

payout of a pre-determined amount of money.  If the customer has made an incorrect prediction,

he or she is "out of the money," loses the premium paid (i.e., the amount of the trade), and gets

nothing.

51.    There are only three designated contract markets ("DCMs") currently authorized

to offer binary options that are commodity options transactions to retail customers in the United

States:  Cantor Exchange LP, Chicago Mercantile Exchange, Inc., and the North American

Derivatives Exchange, Inc.  All other entities offering binary options in the U.S. or to U.S.

customers are doing so illegally.

**B.    Overview of the Cartu Enterprise**

52.    Defendants engaged in fraudulent activity at each stage of a typical binary option

transaction.  Often, a potential U.S. customer first encountered Defendants after a fraudulent

email solicitation or video created and disseminated by an affiliate marketer directed the

customer to one of the Cartu Brands to open and fund a binary option trading account.  The

customer was then contacted by a broker who solicited the customer to open and fund a trading

account with one of the Cartu Brands.  If the customer chose to pay by credit card, those

payments were usually charged to and processed by Greymountain, and therefore Greymountain,

as opposed to the specific Cartu Brand, would appear as the merchant on the customer's credit

card bill.  Customers entered into binary options trades through the Cartu Brand websites, and

those trades were executed on the Cartu Platform.  The Cartu Brothers and Masten, acting

through and on behalf of All Out, Blue Moon, Orlando Union, and BareIt, controlled those

transactions and, at times, manipulated the results of those trades to force customer losses.  The

Cartu Brands and the Cartu Platform shared in the resulting profits.

15

53.     The Cartu Brothers and Peretz Brothers marketed, offered, and sold binary options to retail customers, including customers in the United States, through one or more internet trading websites, including www.beeoptions.com and www.beeoptions.us (collectively, the "BeeOptions website"); www.glenridgecapital.com (the "Glenridge website"); and www.rumeliacapital.com (the "Rumelia website") (collectively, the "Cartu Brand websites"). Tracy PAI registered the BeeOptions website, Greymountain registered the Glenridge website, and Atmosphere registered the Rumelia website.

54.     During at least part of the Relevant Period, Masten and BareIt also offered trade signals and auto-trading for customers to use when entering into transactions on the Cartu Brand websites.  At least certain customers received an email advising them that the Cartu Brands had a "partnership with a company called SignalPush" that "offer[ed] trade signals and auto-trader services" and directing them to the website www.signalpush.com (the "SignalPush website") to open an account with SignalPush.  Masten registered and operated the SignalPush website.

55.     Between January 2014 and August 2017, MasterCard processed a total of $69,107 in transactions for SignalPush.  Between May 2016 and July 2017, Visa processed a total of $15,855 in transactions for SignalPush.

56.     In addition to the Cartu Brand websites, Defendants utilized other websites in connection with their fraudulent binary option trading scheme, including www.greymountainmanagement.com; www.megacharge.com, www.megacharge.net and megaoptimization.com; as well as www.tracypai.com (the "Tracy PAI website").  At various times during the Relevant Period Masten was responsible for managing and administering the Tracy PAI website, among others.

57.     Further, the Cartu Brothers, through Greymountain, accepted and processed payments for binary option transactions offered by third-parties; and the Cartu Brothers and Masten, along with defendant entities they control, have offered and accepted binary option transactions through the Cartu Platform with at least ten unique binary option brands, including brands operated by third-parties.

58.     The binary options Defendants marketed, offered, and sold, were not offered on an authorized DCM and most, if not all, of the customers who entered into binary option transactions with Defendants were not "Eligible Contract Participants" or ECPs, defined in Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi) (2018).

59.     When offered on a DCM or other regulated exchange, customers on opposite sides of each binary option transaction are typically matched, meaning that for each customer who correctly predicts an asset's price movement and is in the money, there is an customer who made an incorrect prediction and is out of the money.  The binary option exchange earns a commission on the trade, but otherwise has no interest in its outcome.

60.     The binary options marketed, offered, and sold by Defendants did not operate like those on regulated exchanges.  Defendants did not connect customers to legitimate binary options exchanges or otherwise match buyers and sellers of binary options.  The Cartu Brands were the counterparties to each transaction and acted in a manner similar to that of a casino or sports book by taking the opposite position on each trade, while the Cartu Platform "executed" the trade and received a percentage of each customer's net deposits.

61.     The binary options marketed, offered, and sold by Defendants are not actual transactions, but rather book entries that gave the appearance of actual transactions.  Defendants' binary options did not result in the transfer of money from one segregated, customer account to

another account at expiry.  No funds actually changed hands at the conclusion of any given binary option transaction with the Cartu Brands.

**C.      Operation of the Cartu Brands**

62.     Beginning in or before April 2013, Jonathan, and others acting on behalf and under the direction of the Cartu Brothers, began soliciting individuals in the United States and elsewhere to trade illegal, off-exchange binary options through the BeeOptions website.  At that time, BeeOptions operated out of a conference room in the offices of an Israeli-based gaming company owned by Josh and David.

63.     At least by May 2014, the Peretz Brothers were responsible for supervising the individual brokers who solicited customers to trade with BeeOptions and, thereafter, Glenridge and/or Rumelia.  At various times during the Relevant Period, Nati supervised the individual brokers responsible for soliciting prospective customers and obtaining an initial deposit and Leeav supervised the individual brokers responsible for soliciting customers to make additional deposits.

64.     Beginning in or around December 2014, the Cartu Brothers and Peretz Brothers began soliciting individuals in the United States and elsewhere to trade illegal, off-exchange binary options through the Glenridge website; and beginning in or around January 2015, the Cartu Brothers and Peretz Brothers began soliciting individuals in the United States and elsewhere to trade illegal, off-exchange binary options through the Rumelia website.  The BeeOptions website expired on May 11, 2017, the Glenridge website expired on April 29, 2018, and the Rumelia website expired on December 24, 2017.

65.     The Cartu Brands utilized affiliate marketers to identify potential customers by creating and disseminating fraudulent marketing campaigns that advise prospective customers to

open and fund binary option trading accounts.  Upon information and belief, Masten and BareIt first became involved with the Cartu Brothers as an affiliate marketer for BeeOptions.

66.     Beginning in or before July 2013, Masten and his company, BareIt, d/b/a SignalPush, entered into a partnership with the Cartu Brothers to provide trading signals for customers of the Cartu Brands.  An email sent to at least certain BeeOptions customers during the Relevant Period introduced SignalPush as an auto-trading network or "essentially a computer program based on a complex algorithm that works in conjunction with emanating trade signals. It is able to execute trades on behalf of the trader, at moments of opportune market conditions . . . can be customized according to the trader's desired level of financial risk . . . [and] allows trades to be executed when the trader is away."

67.     BareIt and Masten solicited individuals in the U.S. and elsewhere to open a SignalPush account and receive trading recommendations from "top notch" "signal providers" for transactions with binary options brands, including the Cartu Brands.  On the SignalPush website, BareIt and Masten represented that they had "interview[ed]" potential signal providers to gain information about "their strategies, amount of clients, [and] money management," reviewed six months of performance records and required "the potential provider submit certain legal documents" before approving them.  Upon information and belief, each of these representations was false.

68.     Upon information and belief, the trading recommendations provided to customers by SignalPush were not designed to generate profits for the customer as advertised, nor were they generated by vetted and experienced money managers or financial professionals.  Further, at least certain customers lost money due to trades executed by SignalPush.

69.     The Cartu Brands began utilizing Greymountain for payment processing in or around September 2014.  On October 2, 2014, Jonathan sent an email to BeeOptions brokers and other employees of Defendants informing them that "All of you work for Tracy PAI . . . an online B2B and B2C service provider" that has "taken on a new account, Greymountain Management."  In that same email, Jonathan stated that "Tracy PAI broke the $1,500,000.00 target set us by our previous clients and surpassed even $1,600,000.00" and shared his plan to "go out and find us more business to represent.  You can be confident that your fortunes will not rest on one far away company doing unregulated business forever, and neither will mine."

70.     On or before June 1, 2016, the Peretz Brothers purchased Tracy PAI and took over ownership of the Cartu Brands.

**D.      Defendants' Fraudulent Misrepresentations and Deception**

71.     Defendants David, Jonathan, Josh, Leeav, and Nati, have misrepresented the fundamental nature of the binary option transactions offered to customers on the Cartu Brands' websites and in emails, telephone calls, and other communications with customers and prospective customers.

72.     The Cartu Brothers and Peretz Brothers, along with their employees, agents, and others acting on their behalf, have misrepresented the profitability of trading binary options with the Cartu Brands.  When communicating with customers, brokers promised returns "between 60-85%" and the Cartu Brand websites promoted "knowledgeable account executives who will walk you through the 5-step process of trading assets online . . . so you can increase your returns up to 85%."

73.     At least in 2016 and 2017 the Glenridge website offered a "warm welcome" to the

brands' customers from "Vincent Glenn, CEO":

> . . .Your fiscal achievement is important to us, therefore you can
> count on Glenridge Capital to help you reach a profitable financial future.
> After all, we know that in order for us to succeed, you must succeed.  That
> is why we have become the foremost binary options trading platform in
> the industry. . . .
>
> We understand that the financial market can be a challenge to
> navigate in today's rapidly changing world, thus I left my job as a
> financial broker in order to further develop online trading with a team of
> close colleagues and associates. . . .  With a simple touch of a button, you
> can predict whether an asset will increase (call) or decrease (put) by expiry
> time.  It is so easy, that it is practically intuitive.
>
> Further, we take pride in our friendly atmosphere and individual
> attention to traders.  We have created a place where you can build
> relationships as you increase your revenue. . . .  Our knowledgeable
> account executives will walk you through the 5-step process of trading
> assets online with easy to understand language and educational
> opportunities so you can increase your returns up to 85%.  Rest assured
> that [you] will get fast withdrawals with conventional and alternative
> payment methods for your convenience.

The Glenridge website did not disclose that binary option transaction were executed on the Cartu

Platform, and it did not disclose that the brand (and its owners, the Cartu Brothers and Peretz

Brothers) were on the opposite side of each transaction and actually benefitted from customer

losses.  Further, upon information and belief, Vincent Glenn is entirely fictional.

74.     In emails and telephone communications the brokers, along with other employees

and agents acting on behalf and at the direction of the Cartu Brothers and Peretz Brothers, would

falsely represent that their interests were aligned with the interest of customers, when in fact the

Cartu Brands were the counterparty to each customer and profited from customer losses.  For

example, one broker routinely told customers that "BeeOptions pays me to help you make

money."

75.     At the direction of the Cartu Brothers and, later, the Peretz Brothers, the individual brokers employees who solicited customers to trade binary options with the Cartu Brands and certain other employees used alias or stage names when interacting with customers and prospective customers, including those located in the U.S., and would misrepresent their location, educational background, and financial expertise.

76.     Defendants also utilized various manipulative or deceptive devices, including so-called "bonuses" and "risk free trades" to entice Cartu Brand customers to deposit additional funds and then prevent customers from withdrawing funds.  The Cartu Brothers and Masten, acting through and on behalf of the various entities they controlled, including All Out, BareIt, Blue Moon and Orlando Union, designed the Cartu Platform to provide the functionality needed for the Cartu Brands, and other binary option brands, to offer bonuses and risk free trades. Jonathan and the Peretz Brothers mandated that Cartu Brand brokers pitch bonuses to customers as being helpful, and informed the brokers that bonuses were actually a tool to keep money in the system by preventing withdrawals and therefore increasing the brand's profits.

77.     As used by Defendants, the term bonus is misleading as it suggests that it provided a benefit to customers, when in fact the bonus was designed to limit customers' ability to withdraw funds.  Typically, a bonus required customers to trade 30-times the amount of the bonus plus any accompanying deposit (known as the "turnover requirement") before any funds could be withdrawn.  By way of example, if a customer received a $5,000 bonus on a $10,000 deposit with one of the Cartu Brands, that customer would have been required to trade $450,000 (30 x $15,000) before any funds could be withdrawn.  Similarly, a risk free trade, which was typically offered as a "refund" for trading losses questioned by a customer or to entice an additional deposit, typically had a turnover requirement of 10-times the refunded amount.  The

bonuses and risk free trades offered by Defendants did not involve the transfer of actual funds to a customer or customer's account.

**E.      The Cartu Brothers and Masten Developed the Cartu Platform**

78.      At the beginning of the Relevant Period, the Cartu Brothers utilized a trading platform and related software operated by third-parties (the "Spot Platform") to perpetuate their fraudulent binary options scheme.  Customers would access the platform through the Cartu Brands' websites, typically by logging in with their email and password.  The Spot Platform customer relationship management or "CRM" software system allowed Defendants' employees and agents to see customer names and contact information, including their geographic location, as well as the customer's account history, trades attempted, and withdrawal requests.  In at least certain instances, the Spot Platform CRM also identified a customer's risk level–i.e., the risk that the customer would meet their turnover requirement and be able to withdraw funds from their account.

79.      Unbeknownst to customers, the results of binary option transactions could be manipulated on the Spot Platform, for example, by changing the strike price of a trade just before expiry.  For at least part of the Relevant Period, Jonathan and/or the Peretz Brothers typically approved requests to alter trading outcomes for customers of the Cartu Brands.

80.      By at least September 2014, Masten and the Cartu Brothers began developing the Cartu Platform.  Upon information and belief, Masten owned 30% of the Cartu Platform and the Cartu Brothers owned 70% of the platform.  Masten was the lead developer for the Cartu Platform.  Between July 2015 and January 2017, Masten received at least $1,448,209 from Greymountain through transfers to BareIt.  Upon information and belief, those funds represent only a small percentage of the revenue Masten received in connection with the development and operation of the Cartu Platform.  David, along with Masten and Jonathan, made decisions

23

regarding platform functionality on behalf of the Cartu Brands and participated in pre-release testing of the Cartu Platform.  The Cartu Platform went through numerous updates and iterations, and has been referred to at various times during the Relevant Period as the "Glenridge platform" "Novustra Binary Trading Platform" and "Inovesto platform."

81.     The Cartu Platform "went live" in or around September 2015.  Thereafter, Defendants used the Cartu Platform to offer and execute binary option transactions, including currency pairs and commodities; to track customer information including deposits; generate commission reports for individual brokers; and control at least certain customer transactions.

82.     Unbeknownst to the individuals who traded binary options with the Cartu Brands, the Cartu Platform included functionality to "manage risk" associated with a customer, including by altering the pre-set spread or strike price of a trade and delaying execution of a trade.  It also allowed binary brands to limit a customer's open volume or number of trades, without disclosure to the customer, or to limit the brand's maximum daily loss.  Increasing the risk setting allowed the Cartu Brands (and other third-parties brands that utilized the Cartu Platform) to decrease the number of winning trades, thereby increasing customer loses–and their own profits

83.     By March 2016, at least ten binary options brands offered and entered into illegal, off-exchange binary option transactions with their customers through the Cartu Platform.  Upon information and belief, Greymountain provided payment processing services for all of the brands that utilized the Cartu Platform.

84.     David, Jonathan, Josh, and Masten shared the revenues generated by the Cartu Platform and utilized various entities they owned and controlled, most notably All Out, BareIt, Blue Moon, and Orlando Union, to open accounts and enter into agreements on behalf of the Cartu Platform, and to transfer and conceal revenue generated through the Cartu Platform.  At

least after June 1, 2016, the Peretz Brothers received funds generated by and through the Cartu Platform in connection with their ownership of the Cartu Brands.

85.     In telephone calls and other solicitations, the brokers, as well as other employees and agents acting on behalf of the Cartu Brands and at the direction of Jonathan or the Peretz Brothers, among others, falsely represented to customers and prospective customers that their funds were held in regulated financial institutions.

86.     In fact, Defendants individually and collectively utilized dozens of off-shore entities and accounts to hold, transfer, and conceal funds received from customers of the Cartu Brands and other brands that utilized the Cartu Platform, and/or Greymountain's payment processing services.

87.     Credit card companies typically prohibit financial institutions that accept and process credit and debit card transactions from engaging in or supporting activity that is illegal or reflects negatively on the credit card brand.  In order to limit the risk that banks and credit card companies would refuse to transfer customer funds to the Cartu Brands due to suspected fraud, Defendants developed Greymountain as their own payment service processor for credit card transactions.

88.     On or around May 20, 2014, David caused Greymountain to be incorporated as a single member private company under the laws of Ireland.  During the Relevant Period, Greymountain held itself out as providing "customer support, call center agents, graphic design, compliance/ risk management, account management, tech support and affiliation" for "Binary Options brands . . . and other entities operating in the binary options space" including "Tracy PAI, based out of Ramat Gan in Israel."

89.     At various times during the Relevant Period, the Cartu Brothers opened accounts on behalf of Greymountain the name of All Out, Blue Moon, Orlando, and the Related Entities, and used those accounts to accept, hold, and transfer customer funds in connection with illegal off-exchange binary options transactions.

90.     During the Relevant Period, Greymountain received and processed over $165 million in connection with illegal off-exchange binary options transactions.  Between September 1, 2015 and November 6, 2017, the Greymountain bank account at Allied Irish Bank received deposits totaling $149,555,575.

91.     According to Greymountain, 60% of the transactions it processed were for individuals located in the United States or Canada, along with 20% for individuals in Africa, 10% for individuals in Europe, 5% for individuals in Australia and Oceania, and 5% for individuals in the Commonwealth of Independent States, consisting of post-Soviet republics in Eurasia.

92.     Between January 2014 and August 2017, MasterCard processed a total of $38,334,722 in transactions for Cartu Brands on behalf of U.S. customers.

93.     Between May 2016 and July 2017, Visa processed a total of $19,757,074in transactions for Cartu Brands on behalf of U.S. customers.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.4, 17 C.F.R. § 32.4 (2019)**

### Commodity Options Fraud

94.     The allegations set forth in the paragraphs above are realleged and incorporated herein by reference.

95.     During the Relevant Period, Defendants, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, directly and indirectly:  (a) cheated or defrauded, and attempted or cheat and defraud, customers and prospective customers; (b) made or caused to be made to customers and prospective customers false reports or statements; and (c) deceived or attempted to deceive customers and prospective customers in connection with commodity option transactions, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.  Defendants did so by engaging in the conduct alleged in the foregoing paragraphs, including by:

     a.   As to Cartu Brothers and Peretz Brothers, misrepresenting:  (1) the risk, cost, and profit potential of binary option transactions offered to customers by the Cartu Brands; (2) that the financial interests of the Cartu Brands were aligned with the customers' financial interest, and failing to disclose that they profited from customer losses; and (3) the financial experience and expertise, as well as the identity and physical location, of their employees and agents; and

     b.   As to all Defendants, making or causing to be made false reports regarding the binary option transactions offered to customers by the Cartu Brands and executed on the Cartu Platform.

96.     Each of Defendants participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 committed by other Defendants .

97.     David has exercised direct and indirect control over All Out and either did not act in good faith or knowingly induced All Out's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b) (2018), for All Out's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

98.     Masten had and exercised direct and indirect control over BareIt and either did not act in good faith or knowingly induced BareIt's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for BareIt's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

99.     Jonathan has exercised direct and indirect control over Blue Moon and either did not act in good faith or knowingly induced Blue Moon's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Blue Moon's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

100.     Josh has exercised direct and indirect control over Orlando Union and either did not act in good faith or knowingly induced Orlando Union's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Orlando Union's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

101.     Each act of:  (a) cheating or defrauding, and attempting to cheat and defraud, customers and prospective customers; (b) making or causing to be made to customers and prospective customers false reports or statements; and (c) deceiving or attempting to deceive customers and prospective customers, is alleged as a separate and distinct violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

## COUNT TWO

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018) and
Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2019)**

### Fraud by Deceptive Device or Contrivance

102.     The allegations set forth in the paragraphs above are realleged and incorporated herein by reference.

103.     The binary option transactions offered by Defendants are swaps, as defined by Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A) (2018).

104.     During the Relevant Period, Defendants intentionally or recklessly used or employed, or attempted to use or employ, manipulative or deceptive devices or contrivances in connection with contracts of sale of swaps, in violation of 7 U.S.C. § 9(1) and 17 C.F.R.

§ 180.1(a)(1)-(3).  Defendants did so by engaging in the conduct alleged in the foregoing

paragraphs, including by:

     a.   As to Cartu Brothers and Peretz Brothers, misrepresenting:  (1) the risk, cost, and profit potential of binary option transactions offered to customers by the Cartu Brands; (2) that the financial interests of the Cartu Brands were aligned with the customers' financial interest and failing to disclose that they profited from customer losses; and (3) the financial experience and expertise, as well as the identity and physical location, of their employees and agents;

     b.   As to all Defendants, making or causing to be made false reports regarding the binary option transactions offered to customers by the Cartu Brands and executed on the Cartu Platform; and

     c.   As to all Defendants, using manipulative and deceptive devices, including bonuses and risk free trades, to entice customers to deposit additional funds and prevent them from withdrawing funds.

105.    During the Relevant Period, by the conduct alleged in the foregoing paragraphs,

Defendants, directly or indirectly in connection with swaps, intentionally or recklessly:  (a) used

or employed, or attempted to use or employ, manipulative devices, schemes, and artifices to

defraud; (b) made, or attempted to make, untrue or misleading statements of material facts; (c)

omitted to state material facts necessary in order to make statements made not untrue or

misleading; and (d) engaged, or attempted to engage, in acts, practices, and courses of business,

which operated or would operate as a fraud or deceit upon customers or prospective customers,

in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

106.    Each of Defendants participated in the unlawful acts and practices described in

this Complaint and are therefore jointly and severally liable for the violations of 7 U.S.C. § 9(1)

and 17 C.F.R. § 180.1(a)(1)-(3) committed by other Defendants.

107.    David has exercised direct and indirect control over All Out and either did not act

in good faith or knowingly induced All Out's violations and is therefore liable, pursuant to

7 U.S.C. § 13c(b), for All Out's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

108.     Masten had and exercised direct and indirect control over BareIt and either did not act in good faith or knowingly induced BareIt's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for BareIt's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

109.     Jonathan has exercised direct and indirect control over Blue Moon and either did not act in good faith or knowingly induced Blue Moon's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Blue Moon's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

110.     Josh has exercised direct and indirect control over Orlando Union and either did not act in good faith or knowingly induced Orlando Union's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Orlando Union's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

111.     Each act of:  (a) using or employing, or attempting to use or employ, manipulative devices, schemes, and artifices to defraud; (b) making, or attempting to make, untrue or misleading statements of material facts; (c) omitting to state material facts necessary in order to make statements made not untrue or misleading; and (d) engaging or attempting to engage, in acts, practices, and courses of business, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## COUNT THREE

### Violations of Sections 4k(3) and 4m(1) of the Act, 7 U.S.C. §§ 6k(3) and 6m(1) (2018)

### Failure to Register as a CTA (BareIt) and
### Failure to Register as an AP of a CTA (Masten)

112.     The allegations set forth in the paragraphs above are realleged and incorporated herein by reference.

113.    During the Relevant Period, BareIt acted as a CTA by advising customers on trading binary options for compensation or profit.  By engaging in this activity without having registered as a CTA, BareIt violated 7 U.S.C. § 6m(1).

114.    Each use by BareIt of the mails or any means or instrumentality of interstate commerce in connection with its business as a CTA without proper registration, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6m(1).

115.    Masten held and exercised direct and indirect control over BareIt and either did not act in good faith or knowingly induced, directly or indirectly, BareIt's violations of 7 U.S.C. § 6m(1) and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for BareIt's violations of 7 U.S.C. § 6m(1).

116.    During the Relevant Period, Masten was associated with the unregistered CTA BareIt and acted as a partner, officer or agent in a capacity that involved the solicitation of customer or prospective customer accounts and/or solicitation of such persons so engaged, while failing to register with the CFTC as an AP of the CTO, in violation of 7 U.S.C. § 6k(3).

117.    Each act of soliciting a customer or prospective customer's account by Masten, including those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6k(3).

118.    The foregoing acts, omissions, and failures by Masten, and other officers, employees, and agents of BareIt occurred within the course or scope of their employment or office with BareIt.  Pursuant to 7 U.S.C. § 2(a)(1)(B) (2018) and 17 C.F.R. § 1.2 (2019), BareIt is liable as a principals for its officers, employees, and agents' acts, omissions, and failures, including by not limited to those of Masten, in violation of 7 U.S.C. § 6k(3).

## COUNT FOUR

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2018), and Regulation 32.2, 17 C.F.R. § 32.2 (2019)**

### Illegal Off-Exchange Commodity Options

119.     The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

120.     During the Relevant Period, Defendants have offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to commodity option transactions in interstate commerce.

121.     The commodity options that Defendants have offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to, were not executed on any registered exchange nor have Defendants sought registration as an exempt foreign exchange.

122.     Defendants, by the conduct alleged in the foregoing paragraphs, and by offering to enter into, entering into, confirming the execution of, maintaining a position in, or otherwise conducting activity related to commodity options, other than on a registered exchange, have violated 7 U.S.C. § 6c(b) and Regulation 32.2, 17 C.F.R. § 32.2 (2019).

123.     Each of Defendants participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2 committed by other Defendants.

124.     David has exercised direct and indirect control over All Out and either did not act in good faith or knowingly induced All Out's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for All Out's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

125.     Masten had and exercised direct and indirect control over BareIt and either did not act in good faith or knowingly induced BareIt's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for BareIt's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

126.     Jonathan has exercised direct and indirect control over Blue Moon and either did not act in good faith or knowingly induced Blue Moon's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Blue Moon's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

127.     Josh has exercised direct and indirect control over Orlando Union and either did not act in good faith or knowingly induced Orlando Union's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Orlando Union's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.

128.     Each act of offering to enter into, entering into, confirming the execution of, maintaining a position in, or otherwise conducting activity related to commodity options, other than on a registered exchange, is alleged as a separate and distinct violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

## VII.     RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to the Court's own equitable powers:

A.     Find that Defendants David Cartu, Jonathan Cartu, Joshua Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, All Out Marketing Limited, BareIt Media LLC d/b/a SignalPush, Blue Moon Investments Ltd., and Orlando Union Inc., violated Sections 4c(b) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(b) and 9(1) (2018), and Regulations 32.2, 32.4, and

180.1(a)(1)-(3), 17 C.F.R. §§ 32.2, 32.4, and 180.1(a)(1)-(3) (2019), and that Defendants

Masten and BareIt also violated Sections 4k(3) and 4m(1) of the Act, 7 U.S.C. §§ 6k(3) and

6m(1) (2018);

B.      Enter an order of permanent injunction enjoining Defendants, their affiliates,

agents, servants, employees, successors, assigns, attorneys, and all persons in active concert

with them, who receives actual notice of such order by personal service or otherwise, from

engaging in the conduct described above, in violation of 7 U.S.C. §§ 6c(b) and 9(1) and 17

C.F.R. §§ 32.2, 32.4, 180.1(a)(1)-(3), and, as to Masten and BareIt, 7 U.S.C. §§ 6k(3) and

6m(1);

C.      Enter an order of permanent injunction prohibiting all Defendants and any of

their affiliates, agents, servants, employees, assigns, attorneys, and persons in active concert

or participation with them, from directly or indirectly:

    i.   Trading on or subject to the rules of any registered entity (as that term is defined
       in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018);

    ii.  Entering into any transactions involving "commodity interests" (as that term is
       defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)) for accounts held in the name
       of any Defendants or for accounts in which any Defendant has a direct or indirect
       interest;

    iii. Having any commodity interests, traded on any Defendant's behalf;

    iv.  Controlling or directing the trading for or on behalf of any other person or entity,
       whether by power of attorney or otherwise, in any account involving commodity
       interests;

    v.   Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

    vi.  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and

    vii.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent or any other officer or employee of any person  registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

D.    Enter an order directing David Cartu, Jonathan Cartu, Joshua Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, All Out Marketing Limited, BareIt Media LLC d/b/a SignalPush, Blue Moon Investments Ltd., and Orlando Union Inc., as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, real and personal property and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and the Regulations as described herein , including pre- and post-judgment interest;

E.    Enter an order requiring David Cartu, Jonathan Cartu, Joshua Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, All Out Marketing Limited, BareIt Media LLC d/b/a SignalPush, Blue Moon Investments Ltd., and Orlando Union Inc., as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted

violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest;

      F.      Enter an order directing David Cartu, Jonathan Cartu, Joshua Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, All Out Marketing Limited, BareIt Media LLC d/b/a SignalPush, Blue Moon Investments Ltd., and Orlando Union Inc., to pay a civil monetary penalty, assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584 (2015), tit. VII, § 701, 129 Stat. 584. 599-600,*see* Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act and Regulations,  as described herein;

      G.      Enter an order requiring David Cartu, Jonathan Cartu, Joshua Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, All Out Marketing Limited, BareIt Media LLC d/b/a SignalPush, Blue Moon Investments Ltd., and Orlando Union Inc., to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2018); and

      H.      Enter an Order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated:  September 2, 2020         Respectfully submitted,

         /s/ Elizabeth N. Pendleton

         Elizabeth N. Pendleton
         Benjamin Sedrish
         Elizabeth M. Streit

Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe St
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
*ependleton@cftc.gov*
*bsedrish@cftc.gov*
*estreit@cftc.gov*