**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **COMMODITY FUTURES**<br>**TRADING COMMISSION,** | |
| **Plaintiff,** | **Case No: 1:20-CV-908-RP** |
| **v.** | |
| **DAVID CARTU, JONATHAN CARTU,**<br>**JOSHUA CARTU, RYAN MASTEN, LEEAV**<br>**PERETZ, NATI PERETZ, ALL OUT**<br>**MARKETING LIMITED, BAREIT MEDIA**<br>**LLC D/B/A SIGNALPUSH, AND ORLANDO**<br>**UNION, INC.** | |
| **Defendants.** | |

**PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S**
**MEMORANDUM OF LAW IN OPPOSITION TO THE**
**CARTU DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

RELEVANT FACTUAL & PROCEDURAL BACKGROUND ............................................. 1

ARGUMENT ...................................................................................................................... 6

I.    THIS COURT HAS PERSONAL JURISDICTION OVER THE CARTUS ................ 6

II.   THE COMPLAINT STATES CLAIMS FOR RELIEF .......................................... 9

  A.   The Complaint Satisfies Rule 8 .......................................................................... 10

     1.   The Complaint Alleges the Cartus Acted as a Common Enterprise ....................... 10

     2.   The Complaint Pleads Control Person Liability ......................................... 13

     3.   The Complaint Alleges the Elements of Each Claim ................................... 16

  B.   The Complaint Pleads Fraud with Sufficient Particularity ......................................... 17

  C.   Counts One, Two, and Four Apply to the Cartus' Conduct Abroad .......................... 23

     1.   The Act Applies Extraterritorially to Swaps and Options ....................................... 23

     2.   The Cartus' Conduct has a Direct and Significant Connection with Activities in the United States .................................................. 25

     3.   The Cartus' Reliance on *Morrison* is Misplaced ....................................... 27

III. VENUE IS PROPER IN THIS DISTRICT ..................................................... 28

IV. THE MOTIONS TO DISMISS PORTIONS OF THE PRAYER FOR RELIEF ARE PREMATURE AND UNSUPPORTED ............................................................ 30

V.   JOSH CARTU WAS PROPERLY SERVED .................................................. 32

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) ....................... 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................... 9

*Bae Sys. Resolution, Inc. v. Mission Transp., LLC*, 2020 WL 7482035 (W.D. Tex. Aug. 13, 2020) .......................................................................................................................... 32

*Berry v. Indianapolis Life Ins. Co.*, 2011 WL 3555869 (N.D. Tex. Aug. 11, 2011) ................... 22

*Brown v. Flowers Indus., Inc.*, 688 F.2d 328 (5th Cir. 1982) ......................................................... 7

*Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*, 406 U.S. 706 (1972) ................................. 29

*Buholtz v. Sogamoso*, 2020 WL 9936209 (E.D. Tex. Mar. 16, 2020) .......................................... 34

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .................................................................. 8

*Busch v. Buchman, Buchman & O'Brien Law Firm*, 11 F.3d 1255 (5th Cir. 1994) ...................... 6

*CFTC v. Garofalo*, 2010 WL 112454420 (N.D. Ill. Dec. 21, 2010) ............................................ 24

*CFTC v. Gibraltar Monetary Corp.*, 2006 WL 1789018 (S.D. Fla. May 30, 2006) ................... 20

*CFTC v. Giddens*, 2012 WL 603592 (N.D. Ga. Feb. 24, 2012) .................................................. 21

*CFTC v. Gramalegui*, 2018 WL 4610953 (D. Colo. Sept. 26, 2018) ........................................... 31

*CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311 (S.D. Fla. 2014) ........................ 14

*CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317 (S.D. Fla. 2014) ...................... 18

*CFTC v. Johnson*, 408 F. Supp. 2d 259 (S.D. Tex. 2005) ........................................................... 16

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) ...................................... 18

*CFTC v. Lake Shore Asset Mgmt. Ltd.*, 2007 WL 2659990 (N.D. Ill. Aug. 28, 2007) ............... 12

*CFTC v. Leben*, 2016 WL 7354359 (D.S.C. Aug. 5, 2016) ......................................................... 20

*CFTC v. M25 Invests. Inc.*, 2010 WL 769367 (N.D. Tex. Mar. 6, 2010) ............................... 18, 19

*CFTC v. McDonnell*, 332 F. Supp. 3d 641 (E.D.N.Y. 2018)........................................................ 20

*CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321 (11th Cir. 2002)................................. 14, 18

*CFTC v. Rosenber*g, 85 F. Supp. 2d 424 (D.N.J. 2000) ..................................................... 18

*CFTC v. So. Tr. Metals, Inc.*, 2017 WL 10440763 (S.D. Fla. July 6, 2017) ............................ 31

*CFTC v. Tayeh*, 848 F. App'x 827 (11th Cir. 2021)........................................................ 32

*CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371 (S.D.N.Y. 2019)................................................ 6

*CFTC v. Total Call Grp., Inc.*, 2012 WL 1642196 (E.D. Tex. Mar. 30, 2012).......................... 16

*CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d. 29 (D.D.C. 2015)............................. 11, 17

*CFTC v. US Coin Bullion LLC*, 2021 WL 4935728 (M.D. Fla. July 13, 2021) .......................... 16

*CFTC v. Vision Fin. Partners, LLC*, 190 F. Supp. 3d 1126 (S.D. Fla. 2016)........................... 17

*CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260 (D. Kan. 2003)............................. 11

*Cuvillier v. Taylor*, 503 F.3d 397 (5th Cir. 2007)............................................................. 9

*De La Hoya v. Coldwell Banker Mexico, Inc.*, 125 F. App'x 533 (5th Cir. 2005)..................... 11

*Del Castillo v. PMI Holdings N. Am. Inc.*, 2016 WL 3745953 (S.D. Tex. July 13, 2016).......... 13

*Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008) .................................... 21

*Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007 (S.D. Tex. 2018) ................................... 7

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014)........................................... 11

*FTC v. Educare Centre Servs., Inc.*, 414 F. Supp. 3d 960 (W.D. Tex. 2019) ........................ 7, 8

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012)..................... 12

*FTC v. On Point Capital Partners LLC*, 17 F.4th 1066 (11th Cir. 2021).................................. 12

*FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461 (S.D.N.Y. 2014)........................................... 11

*Gilmour, Tr. for Grantor Trusts of Victory Med. Ctr. Craig Ranch, LP v. Blue Cross & Blue Shield of Ala.*, 2021 WL 1196272 (E.D. Tex. Mar. 30, 2021) ........................................... 21

*Hill v. Aramark Healthcare Mgmt. Serv.*, 2006 WL 8437490 (N.D. Tex. Apr. 20, 2006).......... 11

*In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018) ........................................................ 29

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007) ............................... 9

*In re Venator Materials PLC Litig.*, 547 F. Supp. 3d. 624 (S.D. Tex. 2021) ............................. 22

*Iraheta v. Experian Info. Solutions, Inc.*, 2014 WL 12877275 (W.D. Tex. Apr. 9, 2014) .......... 32

*Jensen v. Rollinger*, 2015 WL 13796692 (W.D. Tex. Dec. 11, 2015) ......................................... 34

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) ........................................................................ 31

*Lasslett v. Tetra Tech, Inc.*, 2015 WL 13805181 (W.D. Tex. Sept. 30, 2015) ........................... 30

*Lewis v. Fresne*, 252 F.3d 352 (5th Cir. 2001) ............................................................... 7

*Liu v. SEC*, 140 S. Ct. 1936 (2020) ........................................................................... 31

*Loginovskaya v. Batrachenko*, 936 F. Supp. 2d 357 (S.D.N.Y. 2013) ......................................... 27

*Luv N'care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465 (5th Cir. 2006) ......................................... 6

*Miller v. Doe*, 422 F. Supp. 3d 1176 (W.D. Tex. 2019) .................................................... 10

*Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1993) ............................................................ 9

*Morrison v. National Australian Bank*, 561 U.S. 247 (2010) ........................................... 23, 27, 28

*Mott's LLP v. Commercializadora Eloro, S.A.*, 507 F. Supp. 3d 780 (W.D. Tex. 2020) ............. 30

*Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019) ......................................... 25

*Ramzan v. GDS Holdings Ltd.*, 2019 WL 4748001 (E.D. Tex. Sept. 30, 2019) .......................... 29

*RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016) ......................................... 23

*Sec. Indus. & Fin. Mkts. Ass'n v. CFTC,* 67 F. Supp. 3d 373 (D.D.C. 2014) ...................... 24, 26

*Small Ventures USA, LP v. Rizvi Traverse Mgmt., LLC*, 2012 WL 4621130 (S.D. Tex. Oct. 2, 2012) ........................................................................................................... 7

*Southampton, Ltd. v. Le Norman*, 2019 WL 7902959 (N.D. Tex. Sept. 3, 2019) ...................... 29

*Southland Securities Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) ...... 18, 19

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514 (2017) .......................... 29

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998) ..................................................................................................................... 21

*United States v. Bases*, 2020 WL 2557342 (N.D. Ill. May 20, 2020) ......................................... 31

*Veliz v. Rimax Contractors, Inc.*, 2016 WL 1704496 (E.D. La. Apr. 28, 2016) ........................ 34

*Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) .................................................. 22

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235 (5th Cir. 2008) ............ 8

*Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999) .................................................... 8

*WSOU Investments, LLC v. OnePlus Tech. (Shenzhen) Co., Ltd.*, 2021 WL 2870679 (W.D. Tex. July 8, 2021) .......................................................................................................................... 35

**Statutes**

28 U.S.C. § 1391(c)(3) ................................................................................................................. 29

7 U.S.C. § 13a-1(d)(3)(B) ........................................................................................................... 32

7 U.S.C. § 13c(b) ........................................................................................................................ 13

7 U.S.C. § 1a(36) ........................................................................................................................ 16

7 U.S.C. § 1a(47)(A) ................................................................................................................... 17

7 U.S.C. § 2(i)(1) ........................................................................................................................ 24

7 U.S.C. § 6c(b) ............................................................................................................................ 4

Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ............................................................................................................................. 24

**Other Authorities**

14D Wright & Miller, Federal Practice and Procedure § 3810 (4th ed. 2021) .................... 29

5B Wright & Miller, Federal Practice and Procedure § 1357 (3d ed. 2004) ...................... 30

Commodity Options (Final Rule), 77 Fed. Reg. 25320, 25338 (2012) ........................................ 24

Cross-Border Application of Certain Swaps Provisions of the Commodity Exchange Act, 77 Fed. Reg. 41214, 41234 (2012) .................................................................................................. 26

Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap
    Regulations, 78 Fed. Reg. 45292, 45300 (2013) ...................................................................... 26

## INTRODUCTION

Plaintiff Commodity Futures Trading Commission ("CFTC") submits this memorandum of law in response to the motions to dismiss filed by Josh, David, and Jonathan Cartu (ECF Nos. 58, 59 and 60).[1]  Because the Cartus' arguments are almost completely coextensive, each section of this memorandum addresses the brothers' arguments together.  As set forth below, the Cartus' arguments are without merit, and the motions should be denied in their entirety.

## RELEVANT FACTUAL & PROCEDURAL BACKGROUND

### *Factual Allegations*

On September 2, 2020, the CFTC filed the Complaint in this action against the Cartus and three entities the Cartus owned and controlled, specifically All Out Marketing Limited, Blue Moon Investments, and Orlando Union, Inc., as well as Leeav Peretz, Nati Peretz, Ryan Masten, and BareIt Media LLC d/b/a SignalPush.  The Complaint alleges that beginning on or before May 1, 2013, and continuing at least until April 29, 2018, the Cartus used dozens of off-shore entities they owned and controlled to operate a fraudulent binary options trading scheme. (Compl.[2] ¶ 1.)  The Cartus marketed, offered, and sold binary options on currency pairs, oil, and other commodities to retail customers in the U.S. and elsewhere through customer-facing brands they owned and operated, including BeeOptions, Glenridge Capital, and Rumelia (the "Cartu Brands"), and "executed" those binary options on a platform the Cartus designed and operated that functioned in a manner similar to that of a casino or sportsbook, not a legitimate, regulated

---

[1] In the interests of brevity and simplicity, each of the Cartu defendants is referred to by his first name, and the three of them are referred to collectively as "the Cartus."  In addition, citations to their respective motions to dismiss will use only their first name.  (*E.g.*, a citation to "Josh § II" refers to the second section of Josh Cartu's Motion to Dismiss (ECF No. 58).)

[2] Citations to "Compl." refer to the Complaint for Injunctive Relief, Civil Monetary Penalties, and Other Equitable Relief filed by the CFTC on September 2, 2020.  (ECF No. 1.)

exchange.  (*Id.* ¶¶ 2, 58–61.)  To accomplish this scheme, the Cartus used a web of off-shore

entities and agents, employees, and representatives, including Defendants Leeav and Nati Peretz,

at every step of the scheme.  (*Id.* ¶¶ 1–3, 84.)

To start, the Cartus and the individual brokers they ultimately employed and others acting

on their behalf disseminated—via websites, emails, telephone calls, and other communications—

material misrepresentations to individuals in the United States and elsewhere to entice them to

deposit funds to trade binary options.  (*Id.* ¶ 3.)  Although physically located in Israel, the

brokers primarily targeted individuals located in the U.S. or Canada, as well as Africa, Europe,

and Australia, and there are no allegations the Cartus marketed, offered, or sold binary options to

Israelis.  (*Id.* ¶ 62.)[3] The Cartus used email solicitations or videos created by affiliate marketers

to direct potential U.S. customers to one of the Cartu Brands websites to open and fund a binary

options trading account.  (*Id.* ¶ 52.)  A broker employed by the Cartu brands would solicit

funding of the account, which, if done by credit card, would be processed by Greymountain

Management Limited, a payment processor maintained by the Cartus.  (*Id.* ¶¶ 7, 52.)

As charged, the Cartus fraudulently solicited individuals in the United States and

elsewhere from at least May 2013 to April 2018 (the "Relevant Period").  (*Id.* ¶ 1.)  These

brokers, acting at the direction of the Cartus and, at times, the Peretzes, made material

misstatements to customers and potential customers, including promises of "quick" returns of

60-85%, assurances that the Cartus' interests were aligned with those of customers, and

---

[3] The unregulated binary options industry began flourishing in Israel in or around 2013 and almost exclusively targeted individuals located outside of Israel.  *See https://www.timesofisrael.com/the-wolves-of-tel-aviv-israels-vast-amoral-binary-options-scam-exposed/*; CFTC/SEC Investor Alert: Binary Options and Fraud, *https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/fraudadv_binaryoptions.html* In October 2017, after significant public pressure, the Israeli Knesset unanimously voted to ban the industry effective January 2018.  *https://www.timesofisrael.com/israel-bans-entire-binary-options-industry-finally-closing-vast-10-year-fraud/*.

misrepresentations of brokers' financial expertise, compensation structure, location, and identity. (*Id.* ¶¶ 3, 63, 71, 72, 74.)  In addition, brokers and other employees and agents acting on behalf of the Cartu Brands and at the direction of Jonathan falsely represented to customers and prospective customers that their funds were held in regulated financial institutions, when in fact they were held in dozens of off-shore entities.  (*Id.* ¶¶ 85, 86.)

The binary options advertised by the Cartus were executed on an Internet-based trading platform (the "Cartu Platform") designed, operated, and owned by the Cartus, along with defendants Ryan Masten, a resident of this District, and BareIt Media, a Texas limited liability company with its principal place of business in this District.  (*Id.* ¶¶ 5, 19, 20, 77.)  The Cartus and Masten began developing the Cartu Platform by at least September 2014.  (*Id.* ¶ 80.)  David, Jonathan, and Masten built the platform and executed the desired functionality and features, including the alleged deceptive devices that limited customers' ability to withdraw funds.  (*Id.* ¶¶ 76, 80.)  The platform went live in or around September 2015, after which it was used to offer and execute binary options transactions, track customer information, generate commission reports for brokers, and control at least some customer transactions.  (*Id.* ¶¶ 81, 82.)

Unbeknownst to customers, the Cartu Brands were the counterparties on each binary options transaction, taking the opposite position on each trade entered into by customers.  (*Id.* ¶¶ 60, 74.)  The Cartus and Masten, in concert and through All Out, Blue Moon, Orland Union, and BareIt, controlled the binary options transactions, and at times, manipulated the trades to force customer losses.  (*Id.* ¶¶ 52, 82.)  Moreover, the transactions advertised and purportedly executed by Defendants were not actual transactions, but book entries that gave the appearance of transactions, with no transfer of money from one segregated customer account to another at expiry.  (*Id.* ¶ 61.)  To accomplish this scheme, the Cartus used dozens of entities they controlled

to open accounts and enter into agreements on behalf of the Cartu Platform, and to transfer and conceal revenue generated by the Platform.  (*Id.* ¶¶ 1, 22–31, 84.)

The Cartu Brands generated substantial sums of money.  For example, according to an email from Jonathan to certain Cartu employees, the BeeOptions brand generated over $1.6 million in September 2014 alone.  (*Id.* ¶ 69.)  The Cartus operated Greymountain to process the transfer of funds from customers in the United States and elsewhere to the Cartu Brands, and later other binary options brands, and thereafter to distribute profits.  (*Id.* ¶ 6.)  In aggregate, Greymountain received and processed over $165 million in connection with illegal, off-exchange binary options transactions including, according to the Cartus' own statements, approximately $100 million from United States individuals.  (*Id.* ¶¶ 90–91.)  Between September 2014 and January 2017, Greymountain transferred at least $9.2 million to Jonathan through Blue Moon Investments, a Seychelles corporation he owned and controlled.  (*Id.* ¶¶ 7, 24.)  During the same period, Greymountain transferred at least $4.8 million to Josh through Orlando Union, a Belize corporation he owned and controlled (*id.* ¶¶ 7, 25), and at least $4.8 million to David through All Out Marketing, a British Virgin Islands corporation he owned and controlled.  (*Id.* ¶¶ 7, 22.)

The Complaint asserts three counts against the Cartus.  Count One alleges that all Defendants committed commodity options fraud in violation of Section 4c(b) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4 (2021). Count Two alleges that all Defendants committed fraud by deceptive device or contrivance in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021).  Count Four alleges that all Defendants offered illegal off-exchange commodity options in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2 (2021).

The Prayer for Relief seeks a number of remedies against the Cartus, including entry of an order requiring Defendants to disgorge "all benefits received" from the scheme, and an order requiring Defendants to make restitution to every person or entity whose funds they received in connection with the fraudulent scheme.

***Procedural History***

The CFTC filed the Complaint on September 2, 2020 and promptly began efforts to locate and serve the Cartus and other defendants.[4]  Beginning on November 18, 2020, the CFTC requested additional time to file a proposed scheduling order because eight of the ten defendants, including the Cartus, are citizens of foreign jurisdictions, and the CFTC was engaged in effecting service via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention").  (ECF Nos. 20, 22, 23.)

Unable to serve the foreign defendants under the Hague Convention, the CFTC sought permission from the Court to serve them by alternate means, as well as an extension of time to effect service.  (ECF No. 29.)  On July 28, 2021, the Court granted the CFTC's motion, ordering it to serve the defendants by (1) ordinary mail to each foreign defendant's last address, (2) email to accounts used in connection with the fraud, and (3) publication of notice in the Times of Israel and the Toronto Star.  (ECF No. 32 at 4–5.)  David executed a Waiver of Service of Summons on August 25, 2021, and Jonathan did so on September 7, 2021.  (ECF Nos. 33, 34.)  Josh executed the waiver on October 8, 2021.  (ECF No. 38.)

The CFTC subsequently moved for entry of default against Leeav Peretz, Nati Peretz, Blue Moon Investments Ltd., and Orlando Union Inc., and default pursuant to Rule 55(a) was entered on November 2, 2021.  (ECF Nos. 44, 45, 46.)  On January 3, 2022, the CFTC

---

[4] Non-moving Defendants Ryan Masten and BareIt Media LLC filed an Answer on November 9, 2020, which they amended on November 30, 2020.  (ECF Nos. 19, 21.)

voluntarily dismissed All Out Marketing Limited, which had dissolved.  (ECF Nos. 52, 53.)

Accordingly, only the following parties remain active in this litigation:  Ryan Masten and BareIt

Media LLC, who answered the Complaint, and the Cartus, who filed these motions to dismiss.

## ARGUMENT

### I.   THIS COURT HAS PERSONAL JURISDICTION OVER THE CARTUS

The Cartus argue, pursuant to Rule 12(b)(2), that the Court lacks personal jurisdiction

over them.  (Josh § 1; David § 1; Jonathan § 1.)  For a court to have specific personal jurisdiction

over a defendant, the defendant must have "'minimum contacts' with the forum state such that

imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'"

*Luv N'care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (quoting *Int'l Shoe v.*

*Washington*, 326 U.S. 310, 316 (1945)).  The Cartus concede (*see* Jonathan at 6) that when, as

here, a suit is based upon a federal statute providing for nationwide service of process, "the

relevant inquiry is whether the defendant has had minimum contacts with the United States."

*Busch v. Buchman, Buchman & O'Brien Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994); *see also*

*CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 381 (S.D.N.Y. 2019) (applying the same holding

to the Act); Fed. R. Civ. P. 4(k)(2) (for claims arising under federal law, personal jurisdiction

established if "defendant is not subject to jurisdiction in any state's courts of general

jurisdiction" and jurisdiction consistent with Constitution).  Courts assessing personal

jurisdiction must determine: "(1) whether the defendant . . . purposely directed its activities

toward the forum state or purposely availed itself of the privileges of conducting activities there;

(2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-

related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Id.*

Here, each of the Cartus purposely directed his activities—*i.e.*, the solicitation of customers and offering and entry of binary options transactions—to the United States.  To start, the Cartus and others acting on their behalf directed emails, telephone calls, and other communications containing material misrepresentations to individuals in the United States to entice them to deposit funds to purportedly trade binary options.[5]  (Compl. ¶ 3.)  The Cartus also contracted with a U.S. resident and U.S. company to effectuate its fraudulent scheme.  (*Id.* ¶¶ 4, 19, 23, 54).  This is sufficient, particularly for intentional misconduct.  *FTC v. Educare Centre Servs., Inc.*, 414 F. Supp. 3d 960, 970 (W.D. Tex. 2019) ("By alleging that [defendant] caused [co-defendant company's] telemarketing calls to U.S. consumers, Plaintiffs alleged that [defendant] purposefully availed himself of the privilege of conducting significant activity in the United States."); *see also Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001) (minimum contacts established where defendant sent documents to Texas and "participated in a telephone conversation" and "failed to correct allegedly false statements made by [a co-defendant] during that phone call"); *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332–34 (5th Cir. 1982) (single long distance phone call to forum sufficient for personal jurisdiction where call constituted intentional tort); *Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007, 1019–21 (S.D. Tex. 2018) (call and emails directed to Texas company sufficient for personal jurisdiction); *Small Ventures USA, LP v. Rizvi Traverse Mgmt., LLC*, 2012 WL 4621130, at *5 (S.D. Tex. Oct. 2, 2012) (defendants demonstrated minimum contacts where they "dialed the phone numbers of Plaintiff's representatives and directed emails to the email accounts of the Houston company" containing misrepresentations).

---

[5] Although the Cartus argue that their maintenance of a website is insufficient to establish personal jurisdiction, the CFTC does not rely on the website to demonstrate U.S.-directed activity.

The Cartus contend that the allegations against them are insufficiently particularized to establish minimum contacts.  But, as set forth *infra* at Section II(A)–(B), the Complaint adequately alleges that the Cartus controlled the web of companies they used to effectuate their scheme, and the Complaint alleges that the Cartus directed agents and representatives to engage in activity targeting the United States.  *See, e.g.*, *Educare*, 414 F. Supp. at 976 (allegations that defendant controlled the "acts and practices" of a co-defendant, combined with specific allegations about what the co-defendant did, were sufficient).

Further, exercise of jurisdiction over the Cartus does not "offend traditional notions of fair play and substantial justice."  *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir. 2008).  To determine whether jurisdiction offends fair play and substantial justice, courts examine five factors:  (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).  As a proxy for balancing those factors, the Fifth Circuit has held that "[i]f a cause of action for fraud committed against a resident of the forum is directly related to the tortious activities that give rise to personal jurisdiction, an exercise of jurisdiction likely comports with the due process clause, given the obvious interests of the plaintiff and the forum state."  *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (personal jurisdiction over German citizen permissible because "once minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant"); *Walk Haydel*, 517 F.3d at 245 (holding the presumption applicable in case involving fraud and breach of attorney-

client relationship because "the forum state has a substantial interest in protecting its residents"). Here, the U.S. customer injuries alleged were proximately caused by the unlawful conduct.

For the reasons set forth above, this Court has personal jurisdiction over each of the Cartus, and their motions to dismiss under Rule 12(b)(2) should be denied. In the alternative, if the Court believes more evidence is necessary to establish personal jurisdiction, the CFTC respectfully requests that the Court order limited jurisdictional discovery.

## II.   THE COMPLAINT STATES CLAIMS FOR RELIEF

The Cartus argue, pursuant to Rule 12(b)(6), that the Complaint fails to state a claim against them in three ways, namely that: (1) the Complaint fails to meet the pleading standards of Rule 8(a); (2) that the fraud-related counts do not satisfy Rule 9(b); and (3) that the CFTC has failed to demonstrate that Counts One, Two, and Four should reach their conduct abroad.

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." In deciding motions brought under this rule, "a court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted). To survive a motion to dismiss, "a complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Accordingly, a plaintiff need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] motion to dismiss under 12(b)(6) is viewed with disfavor and is rarely granted." *Miller v. Doe*, 422 F. Supp. 3d 1176, 1183 (W.D. Tex.

2019) (Pitman, J.) (quoting *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011)).  Under Rule 9(b), a party must "must state with particularity the circumstances constituting fraud or mistake."

### A.      The Complaint Satisfies Rule 8

The crux of the Cartus' argument is that the CFTC "improperly lumps all defendants together" and therefore fails to plead facts plausibly supporting any cause of action under Rule 8(a)(2).  (David at 15–16; Josh at 4–5, 7–14; Jonathan at 14–22.)  Accepting as true the well-pleaded allegations in the Complaint, as the Court must at this stage, establishes that the Cartus offered illegal-office exchange binary options and engaged in fraudulent activity in violation of the Act and Regulations as charged.

### 1.      The Complaint Alleges the Cartus Acted as a Common Enterprise

The Cartus ask the Court to dismiss the Complaint on the basis that there are insufficient allegations that Jonathan, Josh, and David individually and directly engaged in many of the actions alleged.  (Josh at 4; David at 15–16; Jonathan at 15.)  The Cartus are not alleged to have acted solely on their own behalf and in their own name.  Rather, the Complaint specifically charges the Cartus with "acting individually, in concert with each other, and through dozens of off-shore entities they ultimately owned and controlled," twelve of which are identified in the Complaint, and seeks to hold each of the Cartus jointly and severally liable for the actions of this common enterprise (the "Cartu Enterprise").  (Compl. ¶¶ 22, 24–34.)  Thus, as alleged, the Cartus elected to use a maze of corporate and fictitious entities to offer illegal, off-exchange binary options transactions; hire the individual brokers who, at their direction, made material misrepresentations; operate the Cartu Brand websites; develop and market the Cartu Platform, and use the platform to prevent customer withdrawals; and hold and conceal funds obtained in connection with their fraudulent binary options scheme, among other activities.  (*Id.* ¶¶ 22, 24–

34, 84, 71–77, 86–87.)  The Court should not to allow the Cartus to rely on the web of entities

they created to avoid liability, especially as the well-pleaded allegations show that the CFTC is

entitled to relief.  *See, e.g.*, *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 637 (6th Cir. 2014)

(affirming joint and several liability on common enterprise theory where each of the corporate

and individual defendants made up a "messy maze of interrelated business entities").[6]

It is well established that when entities and individuals operate as a common enterprise,

each may be held jointly and severally liable under the Act for the unlawful acts and practices of

other members of the enterprise.  *See, e.g.*, *CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d

1260, 1271 (D. Kan. 2003) (individual and others held to be part of a common enterprise for

purposes of CEA where each of them operate as a "single economic entity"); *CFTC v. Trade*

*Exch. Network Ltd.*, 117 F. Supp. 3d 29, 39 (D.D.C. 2015) (granting summary judgment against

members of common enterprise).  In determining whether a common enterprise exists, courts

look to a variety of factors, including whether businesses: "(1) maintain officers and employees

in common, (2) operate under common control, (3) share offices, (4) commingle funds, and

(5) share advertising and marketing."  *Trade Exch. Network*, 117 F. Supp. 3d at 38–39; *see also*

*FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014) (same).

Here, the detailed factual allegations of the Complaint sufficiently notify the Cartus of

their role in the fraudulent scheme and establish a common enterprise.  As alleged, the Cartus

solicited individuals in the U.S. to trade illegal binary options with the Cartu Brands—

---

[6] The Complaint need not use magic words like "common enterprise" to advance this theory of liability. *See, e.g.*, *Hill v. Aramark Healthcare Mgmt. Servs.*, 2006 WL 8437490, at *3 (N.D. Tex. Apr. 20, 2006) (holding that despite not advancing a common enterprise theory by name, petition adequately notified defendants that plaintiff intended to pursue all available theories of joint corporate liability); *see also De La Hoya v. Coldwell Banker Mexico, Inc.*, 125 F. App'x 533, 537–38 (5th Cir. 2005) (plaintiffs could rely on single business enterprise theory to defeat removal where complaint referred to all defendants by a single name and alleged that they were engaged in a joint enterprise even though a single business enterprise theory was not specifically pleaded in the complaint).

BeeOptions, Glenridge, and Rumelia, each a fictitious binary options brand that defendants controlled through websites the Cartus owned and operated. (Compl. ¶¶ 2–3, 53, 62, 64.) The Cartu Brands operated out of a shared office space and had common employees. (*Id.* ¶ 30 ("Tracy PAI operated out of an office in Tel Aviv" and "employed the individual brokers who solicited and sold binary options on behalf of the Cartu Brands").) The Cartus used entities they controlled, including Tracy PAI and UKTVM, to hire the brokers who solicited in the name of or on behalf of the Cartu Brands (*id*. ¶¶ 30–34), and those same brokers solicited customers to trade with each of the Cartu Brands. (*Id.* ¶ 63.) The brokers, acting at the direction of the Cartus and others, made the same marketing pitches, including for example falsely promising returns "between 60-85%." (*Id.* ¶¶ 72–77.) The Cartus also commingled funds from their fraudulent binary options enterprise and "collectively utilized dozens of off-shore entities and accounts to hold, transfer and conceal funds received from customers of the Cartu Brands." (*Id.* ¶ 86.)

Thus, the Complaint includes detailed allegations establishing the common enterprise. *See, e.g.*, *FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1083 (11th Cir. 2021) (affirming finding of common enterprise based on common control, shared office space and employees, and commingled funds); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012) (common enterprise pleaded where no dispute that corporate defendants were controlled by same persons and shared the business address and office space); *CFTC v. Lake Shore Asset Mgmt. Ltd.*, 2007 WL 2659990, at *24 (N.D. Ill. Aug. 28, 2007) ("Corporate formalities are not binding when a corporation is part of a common enterprise[.]").

The Cartus do not directly address common enterprise liability in their motions. However, in arguing that the CFTC failed to satisfy the requirements of Rule 8, both David and Jonathan rely on *Del Castillo v. PMI Holdings North America Inc*., where the court held a fourth

amended complaint insufficient when the plaintiffs made only "bald assertions" the entities "are so intertwined so as to be essentially one company" and generally alleged a negligence claim without any factual enhancement.  2016 WL 3745953, at *12–13 (S.D. Tex. July 13, 2016).  (*See* David at 15, 18; Jonathan at 15.)  In contrast, the Complaint provides notice as to specific violative acts by the Cartus or done at their direction, as detailed above.

### 2.    The Complaint Pleads Control Person Liability

Jonathan and Josh further argue that dismissal is warranted because the Complaint fails to allege that they had control over any entities that operated the Cartu Brands or the Cartu Platform (Josh at 12; Jonathan at 22), while David asserts that he cannot be held liable as a control person because the CFTC has dismissed its claim against All Out, an argument for which he provides no support[7] (David at 17).  Because the Complaint provides fair notice to the Cartus of their involvement in the wrongdoing by pleading that they own, operate, and control the entities that make up the Cartu Enterprise and hire and control the individual brokers and employees, this argument also fails.

Under Section 13(b) of the Act, 7 U.S.C. § 13c(b), any person who, "directly or indirectly, controls any person who has violated any provision of the Act, or any of the rules, regulations, or orders issued" pursuant to the Act, "may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person" if the CFTC can establish that the controlling person "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation."  The purpose of Section 13(b) is to empower the CFTC to reach individual wrongdoers including those who, as alleged here, operate as a

---

[7] Perhaps there was no support for this argument because of the obvious bad incentives it creates: individuals could escape control person liability by merely dissolving the corporate entity they used to commit fraud.

common enterprise. *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F. 3d 1321, 1334 (11th Cir. 2002) ("A fundamental purpose of Section 13(b) is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself.") (quoting *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir.1995)); *CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311, 1322–25 (S.D. Fla. 2014) (finding individual defendants controlled their respective companies and did not act in good faith); *see also Monieson v. CFTC*, 996 F.2d 852, 859–60 (7th Cir. 1993) (declining to limit Section 13(b) to cases where the corporation was a "dummy" or "alter ego" of the individual defendant and recognizing the statues broad application to a "person" not merely a corporation or firm).

As Josh acknowledges (Josh at 12), control person liability will attach where a person "possesse[d] the power or ability to control the specific transaction or activity upon which the primary violation was predicated, *even if such power was not exercised*." *Monieson*, 996 F.2d at 859 (emphasis added). Here, the Complaint alleges that the Cartus controlled each stage of the binary options scheme through the web of entities comprising the Cartu Enterprise, and that they:

- "marketed, offered, and sold" illegal-off exchange binary options to retail customers, including those in the U.S, through the Cartu Brand websites (¶ 53);

- controlled the binary options transactions and, at times, "manipulated the results of those trades to force customer losses" (¶ 52); and

- "accepted and processed payments for binary options transactions" and "offered and accepted binary options transactions through the Cartu Platform" (¶ 57).

Ignoring allegations of the Cartus' widespread involvement, Josh asserts, without citing any supporting authority, that that the CFTC "must allege that Orlando Union possessed control over the binary options business in order for Josh to be found liable" as a controlling person. (Josh at 12.) Josh's argument also ignores the unambiguous allegations that he used Orlando

14

Union to operate the Cartu Platform, including opening accounts and/or entering into agreements on behalf of the Cartu Platform; and to transfer, hold, and conceal funds obtained in connection with Defendants' fraudulent binary options scheme.  (Compl. ¶ 25; *see also id.* ¶ 22 (parallel allegations as to David's control and operation of All Out); *id.* ¶ 24 (parallel allegations as to Jonathan's control and operation of Blue Moon).)

Selectively citing only to the prayer for relief for each count, Josh, again joined by Jonathan, falsely argues that the Complaint "wholly lacks" allegations as to their "involvement in the supposed business" and only conclusorily states that he "did not act in good faith."  (Josh at 13.)  In fact, the Complaint notifies each of the Cartus that he is liable for the actions of the Cartu Enterprise as controlling persons and sufficiently alleges that they did not act in good faith and/or knowingly induced the violative acts.  Among other allegations, the Complaint charges that: "The Cartu Brothers . . . acting through and on behalf of the various entities they controlled, including All Out, . . .  Blue Moon and Orlando Union, designed the Cartu Platform to provide the functionality needed for the Cartu Brands, and other binary options brands to offer bonuses and risk free trades."  (Compl. ¶ 76.)  As described in the Complaint, bonuses and risk free trades were manipulative and deceptive devices used to "entice Cartu Brand customers to deposit additional funds and then prevent customers from withdrawing funds."  (*Id.*)  Jonathan and others mandated that "brokers pitch bonuses to customers as being helpful, and informed the brokers that bonuses were actually a tool to keep money in the system by preventing withdrawals and therefore increasing the brands' profits."  *Id*.

The Complaint also alleges that "David, Jonathan, [and] Josh . . . shared the revenues generated by the Cartu Platform and utilized various entities they owned and controlled, most notably All Out, . . . Blue Moon, and Orlando Union, to open accounts and enter into agreements

on behalf of the Cartu Platform, and to transfer and conceal revenue generated through the Cartu Platform." (*Id.* ¶ 84.) These allegations, taken as true, are more than sufficient to establish control person liability. *See, e.g.*, *CFTC v. Johnson*, 408 F. Supp. 2d 259, 269–70 (S.D. Tex. 2005) (denying dismissal of controlling person liability where complaint alleged that defendant was head of trading desk and responsible for the actions and conduct of the employees, was aware of the price reporting activities in violation of company policy, and did not take steps to prevent these activities); *CFTC v. Total Call Grp., Inc.*, 2012 WL 1642196, at *9–10 (E.D. Tex. Mar. 30, 2012) (entering default judgment and holding that individual defendants were liable as control persons where complaint alleged they were the sole principals of defendant entity and together were responsible for all of the corporation's acts).[8]

### 3.    The Complaint Alleges the Elements of Each Claim

Josh briefly asserts that the CFTC has not alleged adequately that the binary options at issue are commodity options (Count One) or swaps (Count Two) as defined in the Act. (Josh at 9–11.) The Act defines "option" as "an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an option . . . ." 7 U.S.C. § 1a(36). Here, the Complaint is replete with allegations that the Cartus' scheme involved offering and selling binary options, and it contains a (very) long explanation of that binary options are options. (Compl. ¶¶ 46–51.) Even the case cited by Josh acknowledges that binary options are options under the Act. *See CFTC v. Vision Fin. Partners, LLC*, 190 F. Supp. 3d 1126, 1130 (S.D. Fla.

---

[8] Josh also argues that he should not be held jointly and severally liable due to the purported deficiencies in the control person allegations because they are conterminous. (Josh at 14.) In support, he cites *CFTC v. US Coin Bullion LLC*, 2021 WL 4935728 (M.D. Fla. July 13, 2021), an opinion that instructed the CFTC to file an amended motion for default judgment based on a unique discrepancy, specifically that the complaint alleged two individuals as controlling persons who should be held jointly and severally liable, while the then-pending motion stated that one of the individual defendants should be held jointly and severally liable for the actions of the entity defendant. *Id.* at *7. That limited holding has no bearing here.

2016) (holding that binary options are commodity options within the meaning of Section 4c(b));
*see also Trade Exch. Network*, 117 F. Supp. 3d at 37–38 (holding binary options on gold and currency pairs constituted commodity options).[9]

Likewise for swaps.  Swaps, as defined in Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A), include binary options traded on currency pairs or commodities.  The allegations that "currency pairs and commodities" were the basis of the binary options here are sufficient. (Compl. ¶ 81.)  Indeed, Josh concedes that "[c]ourts have determined that binary options typically qualify as swaps."  (Josh at 10 (citing *CFTC v. Fingerhut*, 2021 WL 65069, at *10 (S.D. Fla. Jan. 7, 2021).)  But Josh appears to argue (without support) that the CFTC should have detailed at least one specific transaction to meet its burden.  (Josh at 10.)  This is unnecessary, particularly where the Complaint alleges that "currency pairs and commodities" were the basis of the binary options at issue.

Finally, Josh's argument that the Complaint fails to allege sufficiently that he offered illegal off-exchange options fails for the reasons set forth in Section II(A)(1)–(2), namely, that the Complaint adequately alleges a common enterprise and joint and several liability.

### B.    The Complaint Pleads Fraud with Sufficient Particularity

The Complaint charges the Cartus, along with the other defendants, with commodity options fraud in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 (Count One) and fraud by deceptive device or contrivance in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) (Count Two).  Fraud involving commodity options is established when a person:  (1) makes a misrepresentation, misleading statement, or a deceptive omission; (2) acts with scienter; and

---

[9] The Cartus make a half-hearted "void for vagueness" argument about the Act's definition of "options." (Josh at 9 n.3; David at 16 n.7.)  They produce no support for this argument, and, in any event, that portion of the definition is unnecessary to conclude that binary options are commodity options.  *Vision Fin. Partners, LLC*, 190 F. Supp. 3d at 1130.

(3) the misrepresentation or omission is material.  *R.J. Fitzgerald*, 310 F. 3d at 1328.  As to

Count Two, fraud by a deceptive device will be found where a person:  (1) engages in prohibited

conduct (*i.e.*, employs a fraudulent scheme, makes material misrepresentations or omissions, or

engages in fraudulent business practices); (2) in connection with the sale of a commodity in

interstate commerce; (3) with scienter.  *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d

1317, 1347 (S.D. Fla. 2014).  The level of scienter required to plead a cause of action is reckless

or intentional.  *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1007 (N.D. Ill. 2015).[10]

   The Cartus assert parallel arguments that the CFTC impermissibly relies on group

pleading and fails to allege any element of fraud as to each individual defendant.  (David at 21;

Jonathan at 18.)  In support, the brothers cite several cases articulating the general proposition

that that a complaint must specify the fraudulent statements, typically by alleging the "who,

what, when, and where," and sufficiently allege scienter by setting forth specific facts to support

an inference of fraud, a standard that the Commission does not contest.  (*See* David at 19–20;

Jonathan at 16–17.)  The Cartus then assert that the Complaint does not comport with Rule 9(b)'s

heightened pleading standard as it purportedly: (1) impermissibly relies on group pleading,

(2) does not include allegations particularized as to time, and (3) does not sufficiently allege

particularized facts as to scienter.  None of the arguments has merit.

   First, the Cartus rely on *Southland Securities Corp. v. Inspire Ins. Solutions, Inc.*, 365

F.3d 353 (5th Cir. 2004), and *CFTC v. M25 Inv. Inc.*, 2010 WL 769367 (N.D. Tex. Mar. 6,

2010), in support of their assertion that allegations of fraud perpetuated by a common enterprise,

---

[10] Relying on *Kraft*, both David and Jonathan ask that the Court instead require the CFTC to allege "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and *what effect the scheme had on the market for the commodities at issue.*"  (David at 19–20; Jonathan at 17 (citing *Kraft*, 153 F. Supp. 3d at 1012 (emphasis added).)  *Kraft* is inapposite, as the complaint there involved market manipulation, which is not alleged here.

as charged here, cannot meet Rule 9(b)'s heightened pleading standard.  In *Southland*, the Fifth Circuit affirmed the dismissal of the plaintiffs' second amended complaint under the "strong inference" standard of the Private Securities Litigation Act (not applicable here) where the fraud claim relied on "group pleading" that could not meet the PSLA state of mind requirement of severe recklessness or actual knowledge.  365 F.3d at 363–65.  The *M25* court, relying on *Southland,* granted defendants' motions for a more definite statement where the complaint contained only general allegations that "defendants, directly and through others fraudulent solicited customers" or "defendants concealed their trading losses."  2010 WL 769367, at *3. Notably, the court recognized that the CFTC "may properly use group pleading to attribute statements to business entities through principles of agency or corporate law and may appropriately group the two entities alleged to be a common enterprise when it is unable to separate the allegations against them," but held that, unlike here, the *M25* complaint "goes too far and combines all defendants and sometimes unspecified representatives."  *Id.* at *4.

The Complaint details fraudulent misrepresentations consistently made to customers in the U.S. and elsewhere to offer and execute binary options transactions throughout the Relevant Period and charges the Cartus as individually liable, jointly and severally liable, and liable as controlling persons.  As alleged, many of the charged false statements were made on the Cartu Brands' websites ultimately owned, operated, and controlled by Jonathan and David (Compl. ¶¶ 53, 26, 27, 30), while others were made in telephone and email solicitations by the individual brokers ultimately employed by Jonathan and David (*id.* ¶ 30).  Among other statements, brokers routinely misrepresented the profitability of trading binary options with the Cartu Brands, including promising returns "between 60-85%"; told customers that their interests were aligned with the interests of customer, including that "BeeOptions pays me to help you make money";

and falsely stated that customer funds were held in regulated financial institutions.  (*Id*. ¶¶ 72, 74

85.)  The brokers also failed to disclose that the Cartus were on the opposite side of transactions

executed on the Cartu Platform and actually benefited from customer losses.  (*Id.* ¶ 73.)  Taken

as true, these allegations sufficiently set forth the details of the scheme and the basic transactions

upon which the fraud is alleged and establish the Cartus' liability for commodity options fraud

through false statements.  *See CFTC v. Gibraltar Monetary Corp.*, 2006 WL 1789018, at *15

(S.D. Fla. May 30, 2006) (holding that defendants' misrepresentations and omissions regarding

returns from commodity options established violation of 7 U.S.C. § 6c(b)).

These fraudulent statements also constitute fraud through deceptive device or contrivance

in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).  *CFTC v. McDonnell*, 332 F. Supp. 3d

641, 717–19 (E.D.N.Y. 2018) (finding defendants' misrepresentations, misleading statements,

and omissions were part of a scheme to defraud); *CFTC v. Leben*, 2016 WL 7354359, at *5

(D.S.C. Aug. 5, 2016) (summary judgment order holding that "[t]he misappropriation of funds

and issuance of false information concerning investors' accounts constitute violations of CEA §

9(1) and 17 C.F.R. § 180.1(a)(1)–(3).").  The Complaint further details the deceptive devices

relating to the binary options transactions, specifically the so-called "bonuses" and "risk free

trades" offered on the Cartu Platform, and alleges the Cartus not only "designed the Cartu

Platform to provide the functionality" needed to execute these devices, but that Jonathan also

mandated that the brokers ultimately employed by the Cartus "pitch bonuses to customers as

being helpful" "when in fact the bonus was designed to limit customers' ability to withdraw

funds."  (Compl. ¶¶ 76, 77.)

Next, the Cartus fault the Complaint for containing only "[v]ague allegations of conduct

occurring without as much as identifying a timeframe" for their ongoing fraudulent scheme that,

as charged, lasted approximately five years.  (Jonathan at 18; David at 22.)  As a preliminary

matter, where, as here, "the fraud alleged was complex and occurred over an extended period of

time, the requirements of Rule 9(b) are less stringently applied."  *Gilmour, Tr. for Grantor*

*Trusts of Victory Med. Ctr. Craig Ranch, LP v. Blue Cross & Blue Shield of Ala.*, 2021 WL

1196272, at *7 (E.D. Tex. Mar. 30, 2021) (quoting *United States ex rel. Johnson v. Shell Oil Co*.,

183 F.R.D. 204, 206 (E.D. Tex. 1998)); *see also United States ex rel. Thompson v.*

*Columbia/HCA Healthcare Corp*., 20 F. Supp. 2d 1017, 1039 (S.D. Tex. 1998) ("[W]here

allegations of fraudulent conduct are numerous or take place over an extended period of time,

less specificity is required to satisfy the pleading requirements of Rule 9(b).").

Further, even under the more traditional analysis, the Complaint contains sufficient

specific allegations of fraud to place the Cartus on notice.  (*See, e.g.*, Compl. ¶ 69 (Oct. 2, 2014

email from Jonathan acknowledging earning over $1.6 million through "unregulated business");

*id.* ¶ 72 (quoting specific misrepresentations on Cartu Brand website for all of 2016 and 2017,

including customers' purported ability to "increase your returns up to 85%" and "get fast

withdrawals").)  Consistent with the caselaw cited in the Cartus' own briefs, this is more than

sufficient.  *See, e.g.*, *CFTC v. Giddens*, 2012 WL 603592, at *5–6 (N.D. Ga. Feb. 24, 2012)

(granting motion for more definite statement in part and holding that allegation that a specific

fake promissory note was issued on a definitive date sufficiently alleged this category of fraud).

The Cartus also assert that the Complaint does not sufficiently allege that they acted with

scienter.  (David at 22–23; Jonathan at 19–20.)  "Alleged facts are sufficient to support such an

inference if they either (1) show a defendant's motive to commit [] fraud or (2) identify

circumstances that indicate conscious behavior on the part of the defendant."  *Dorsey v. Portfolio*

*Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008).  Here, the Complaint alleges that the Cartus

owned 70% of the platform, that the platform was designed to allow them and others to alter trading results to "decrease the number of winning trades, thereby increasing customer loses-and their own profits," and that they each received at least $9 million in profits generated by the Cartu Platform through transfers to off-shore accounts.  (Compl. ¶¶ 7, 80, 82, 84–86.)  These allegations are more than sufficient.  *See, e.g.*, *In re Venator Materials PLC Litig.*, 547 F. Supp. 3d. 624, 663–64 (S.D. Tex. 2021) (scienter alleged where plaintiff alleged defendants received regular reports, and failure to plead precise dates and contents of reports "not necessarily fatal at this juncture where there's a factual basis establishing that underlying specificity exists.")

Finally, the Cartus argue that Rule 9(b)'s heightened pleading standard applies to Count Four, which charges all Defendants with offering illegal off-exchange commodity options in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2, as those transactions are alleged to be part of the Cartus' fraudulent trading scheme.  (David at 19; Jonathan at 16.)  A charge is said to be "grounded in fraud," and subject to the heightened pleading standard, where a plaintiff alleges "a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim."  *Berry v. Indianapolis Life Ins. Co.*, 2011 WL 3555869, at *8 (N.D. Tex. Aug. 11, 2011) (quotations omitted); *see also Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ("[W]here fraud is not an essential element of a claim, only allegations . . . of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).  Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).").  The heightened standard does not apply to Count Four, as it is premised on merely the illegal offering of off-exchange options, not on fraudulent conduct or the Cartus' state of mind.  (*See* Compl. ¶¶ 35–36, 120–28 (outlining the elements of Count Four).)

## C.        Counts One, Two, and Four Apply to the Cartus' Conduct Abroad

Each of the Cartus contends that the Complaint must be dismissed because the Act does not apply extraterritorially, and the CFTC has failed to allege sufficient United States-focused activities to state a claim.  (Josh § II(B)(1); David § III(A); Jonathan § III(C)(1).)  The argument falls apart upon review of the Act, which contains an express extraterritoriality provision, notwithstanding the Cartus' confident assertions to the contrary.  In addition, the *Morrison*[11] test proffered by the Cartus has no application to the claims here because that test, articulated in connection with a particular provision of the federal securities laws not applicable here, concerns "transactions," which are not the basis of the CFTC's claims.  Whatever the test, the Complaint alleges activity directed at the United States, in concert with a United States person and company situated in the United States, resulting in transactions with United States persons totaling millions of dollars.  Accordingly, the Complaint sets forth domestic claims for fraud and the illegal offering of binary options and thus is not impermissibly extraterritorial.

### 1.        The Act Applies Extraterritorially to Swaps and Options

When assessing whether a statute applies extraterritorially, there is a two-step inquiry: first, courts look to whether "the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016).  If not, then courts must determine whether "the case involves a domestic application of the statute, and [courts] do this by looking to the statute's 'focus.'" *Id.*

The Cartus wrongly assert that the Act fails the first step.  In support of their claim that "[t]he CEA has no clear indication of extraterritorial application," the Cartus cite a 2010 decision

---

[11] *Morrison v. National Australian Bank, Ltd.*, 561 U.S. 247 (2010).

that, relying on a 1974 Seventh Circuit opinion, held that the Act does not apply extraterritorially. *CFTC v. Garofalo*, 2010 WL 112454420, at *5 (N.D. Ill. Dec. 21, 2010) (citing *Tamari v. Bache & Co. (Lebanon) S.A.L.*, 730 F.2d 1103, 1107 (7th Cir. 1984)). The decision, however, did not address the newly enacted Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), which expressly provides for the extraterritorial application of the Act to swaps.

Dodd–Frank added Section 2(i) to the Act, which states that provisions of the Act and Regulations relating to swaps apply to "activities outside the United States" if those activities have a "direct and significant connection with activities in, or effect on, commerce of the United States[.]" 7 U.S.C. § 2(i)(1); *see also Sec. Indus. & Fin. Mkts. Ass'n v. CFTC,* 67 F. Supp. 3d 373, 425–26 (D.D.C. 2014) ("*SIFMA*") ("The plain text of this provision clearly expresses Congress's affirmative intention to give extraterritorial effect" to Dodd–Frank's swaps provisions "whenever the provision's jurisdictional nexus is satisfied."). Thus, the claims in Count Two under 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a), which prohibit manipulative or deceptive devices "in connection with any swap," apply to foreign conduct with a direct and significant connection to the United States. *See also* Dodd–Frank 741(b), 749(h), 124 Stat. at 1731, 1748 (amending 7 U.S.C. § 9(1) to address swaps).

Commodity options, the subject of Counts One and Four, are also covered by Section 2(i). After Dodd–Frank was enacted, the CFTC issued 17 C.F.R. § 32.2, according to which any swaps-related provision of the Act, including any Commission rule, regulation, or order made thereunder, applies with equal force to commodity option transactions. *See also* Commodity Options (Final Rule), 77 Fed. Reg. 25320, 25338 (2012) (promulgating Regulations 32.2 and 32.4, among others). Thus, Section 2(i) also allows commodity option-related provisions of the

24

Act and Regulations to be enforced extraterritorially, provided the relevant conduct has the requisite connection to the United States.

As discussed *supra* at Section II(A)(3), the Complaint adequately alleges that the binary options at issue included swaps and commodity options.  Accordingly, Counts One, Two, and Four apply to the Cartus' activities outside the United States, provided that the conduct had "direct and significant connection with activities in, or effect on," commerce within it.

The Cartus' failure to mention the extraterritoriality provision is all the more puzzling because it was discussed in the only post-Dodd–Frank decision they cite (and, ultimately, misinterpret).  *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019).  They appear to suggest erroneously that the Second Circuit held in *Prime* that 7 U.S.C. § 9(1) has no extraterritorial application because it lacks a clear statement of extraterritorial effect.  (*See* Josh at 6.)  While the Court held that it has no **independent** extraterritorial application, the court did not consider whether **under Section 2(i)**, the prohibitions on fraud and manipulation applied to swaps-related activity abroad.  *Prime Int'l Trading*, 937 F.3d at 102–03.  It did not do so because the parties waived the argument by failing to make it in front of the district court.  *Id.* at 103.  Moreover, the conduct alleged there—manipulation of Brent crude and futures markets by submitting fraudulent bids, offers, and transactions to affect index prices—bears no resemblance to this conduct, which involves the offer and sale of swaps and commodity options to persons in the United States and elsewhere and by, in part, persons located in the United States.

### 2.   The Cartus' Conduct has a Direct and Significant Connection with Activities in the United States

The CFTC has provided interpretive guidance regarding Section 2(i)'s requirement that the relevant activities have a "direct and significant connection with activities in, or effect on,

commerce of the United States."  Broadly speaking, the CFTC has taken the position that U.S.

persons' swap activities outside the United States meet the Section 2(i) standard:

> In light of the significant extent of U.S. persons' swap activities
> outside the United States in today's global marketplace, the risks to
> U.S. persons and the financial system presented by such swap
> activities outside the United States have the requisite connection
> with or effect on U.S. commerce under section 2(i) to apply the
> swaps provisions of the CEA to such activities.

Cross-Border Application of Certain Swaps Provisions of the Commodity Exchange Act, 77 Fed.

Reg. 41214, 41234 (2012).  Such interpretations are afforded substantial deference.  *See, e.g.*,

*SIFMA*, 67 F. Supp. 3d at 399–400.

More specifically, the CFTC has issued guidance that interprets "direct" in Section 2(i) to

"require a reasonably proximate causal nexus and not to require foreseeability, substantiality, or

immediacy."  Interpretive Guidance and Policy Statement Regarding Compliance with Certain

Swap Regulations, 78 Fed. Reg. 45292, 45300 (2013) (internal quotation marks omitted).  The

CFTC has also interpreted "activities" to include effects and connections considered "in the

aggregate."  *Id.*; *see also SIFMA*, 67 F. Supp. 3d at 424–25 (holding that these interpretations are

"tightly drawn linguistically from the actual language of the statute") (citations omitted).

However Section 2(i) is interpreted, the allegations of the Complaint are clearly

sufficient.  The Complaint alleges that the Cartus engaged in a fraudulent scheme to offer and

sell binary options to customers in the United States and elsewhere, including by contacting U.S.

persons via websites, telephone calls, and emails.  (Compl. ¶¶ 6, 52, 53, 62, 64, 67, 75.)  They

contracted with a United States resident and United States-based company, also defendants in

this action, to operate that fraudulent scheme.  (*Id.* ¶¶ 22–23, 52–57, 66–84.)  They and their

companies received at least $60 million in transfers from the United States by inducing United

States persons to fund accounts and enter into binary options transactions.  (*Id.* ¶¶ 92–93.)  In

sum, the Cartus' conduct, acting in part through a United States person and entity working in the United States, induced Americans to enter into binary options contracts and led to the transfer of more than $60 million from the United States to the Cartus' various accounts abroad.  These facts are clearly sufficient to constitute "direct and substantial" activities in U.S. commerce.

### 3.    The Cartus' Reliance on *Morrison* is Misplaced

Not only does Section 2(i) doom the Cartus' argument, the primary authority on which they rely would be inapposite in any event.  In *Morrison*, a case brought by foreign plaintiffs under Section 10(b) of the Securities Exchange Act, the Supreme Court reaffirmed the presumption against extraterritorial application of U.S. law absent an indication that Congress intended a given provision to apply extraterritorially.  561 U.S. at 255, 261, 265.  With respect to the claims under the Exchange Act, the Court held that the congressional focus was the purchase-and-sale transactions of securities "'registered on a national securities exchange or any security not so registered.'"  *Id.* at 266–67 (quoting 15 U.S.C. § 78j(b)).[12]

Unlike *Morrison* and most of the cases that have applied its holding, liability for the violations alleged here does not depend on the occurrence of a "purchase or sale" of any product.  The claims in this case apply broadly to conduct beyond the "purchase or sale" of a security.  *Cf. Loginovskaya v. Batrachenko*, 936 F. Supp. 2d 357 (S.D.N.Y. 2013) (holding that because the terms in Section 4*o* of the Act are broader than the "purchase or sale" language of Section 10b, the transaction test was "not immediately applicable").  The claims here involve fraud or attempted fraud in connection with "offers" to enter into a commodity option transaction

---

[12] Many of the decisions applying *Morrison* to the Act concern private rights of action under Section 22, and at least one court has noted that the analysis for enforcement actions brought by the CFTC would differ because Section 22 imposes a separate transactional requirement that is not present in every provision of the Act.  *See Loginovskaya*, 764 F.3d at 273, 275 ("[A]pplying *Morrison* to CEA § 22 draws a distinction between private litigation and enforcement actions by the government . . . .").

or swaps (Counts One and Two), and offering to enter into commodity options transactions (Count Four).  Accordingly, the *Morrison* test does not fit neatly with the specific provisions of the Act and the focus of the provisions, as well as the specific allegations in this case.

Even stretching to apply *Morrison* to the scheme here, however, the Complaint's allegations are sufficient.  Under *Morrison*, the claims were deemed domestic applications of the Exchange Act if they involved "transactions in securities listed on domestic exchanges, and domestic transactions in other securities . . . ."  561 U.S. at 267.  A "domestic transaction" is one in which the parties to a transaction incur "irrevocable liability in the United States," meaning a U.S. person became "bound to effectuate the transaction" or "enter[ed] into a binding contract . . . ."  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67–68 (2d Cir. 2012).  Here, the Complaint alleges that the Cartus, as part of a common enterprise with each other and using employees and agents, solicited U.S. persons to enter into binary options transactions.  That is sufficient under *Morrison*.[13]

## III.   VENUE IS PROPER IN THIS DISTRICT

Pursuant to Rule 12(b)(3), the Cartus each contend that venue is not proper in this District because none of them is alleged to have lived, transacted business,[14] or violated the Act in the District.  (Josh § III; David § II; Jonathan § II.)  But the Complaint alleges—and the brothers do not contest—that each of them resides outside the United States (Compl. ¶¶ 16–18), and their argument therefore is foreclosed by the "alien-venue" rule, the "long-established rule that suits against aliens are wholly outside the operation of all the federal venue laws, general and special."

---

[13] Rehashing some earlier arguments as to the sufficiency of the Complaint, Josh contends that the allegations involving domestic activity are insufficiently particularized.  Not only are the common enterprise allegations sufficient, *see* discussion *supra* at Section II(A), he provides no support for applying other group pleading cases to the question of extraterritoriality.

[14] The Complaint includes numerous allegations that the Cartus transacted business in this District.  *See* Section II.

*Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*, 406 U.S. 706, 706 (1972).  Because "non-residents of the United States simply may not object to venue," 14D Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 3810 (4th ed. 2021), the Cartus' motion should be denied.

The "alien-venue" rule is now codified in 28 U.S.C. § 1391(c)(3):  "For all venue purposes . . . a defendant not resident in the United States may be sued in any judicial district, and the joinder of such defendant shall be disregarded in determining where the action may be brought with respect to other defendants."  *See also In re HTC Corp.*, 889 F.3d 1349, 1354–59 (Fed. Cir. 2018) (tracing history of the "alien-venue" rule from the Judiciary Act of 1789).  The rule is sensible:  for example, without it, the United States would have no appropriate venue to hold to account foreign violators of U.S. law who keep their misconduct outside the United States.  Here, the Complaint alleges that David resides in Canada, Jonathan resides in Israel, and Josh resides in Hungary.[15]  (Compl. ¶¶ 16–18.)  These allegations are themselves sufficient to establish venue in this District is proper as to these defendants.[16]  None of the cases cited by the Cartus even touches on the alien-venue rule or Section 1391(c), and, tellingly, none of the Cartus offers a suitable alternative venue.  Accordingly, the Cartus' motions should be denied.

---

[15] Although the Supreme Court recently held that the patent venue statute's definitions were not modified by the general venue statute, that decision did not modify the alien-venue rule set forth in Section 1391(c)(3).  *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1520 n.2 (2017) (expressly reserving the effect of its holding on foreign corporations and declining to express any opinion on the Court's holding in *Brunette*); *see also Ramzan v. GDS Holdings Ltd.*, 2019 WL 4748001, at *3 (E.D. Tex. Sept. 30, 2019) (holding that, even after *TC Heartland*, non-resident corporations and individuals could be sued in any district under Section 1391(c)(3)).

[16] The Cartus may point to the fact that the Complaint does not cite Section 1391(c)(3), but that is of no moment.  Defendants have identified no cases suggesting that the statute cited in the venue section is relevant to determining whether venue is proper.  As their own cases point out, in fact, plaintiffs need only allege facts sufficient to establish venue, not cite the precise venue rules or statutes applicable.  *See, e.g., Southampton, Ltd. v. Le Norman*, 2019 WL 7902959, at *3 (N.D. Tex. Sept. 3, 2019) ("[A] plaintiff may satisfy its burden *by presenting facts* that, taken as true, would establish venue.") (emphasis added).

## IV.     THE MOTIONS TO DISMISS PORTIONS OF THE PRAYER FOR RELIEF ARE PREMATURE AND UNSUPPORTED

Pursuant to Rule 12(b)(1) and 12(b)(6), the Cartus argue that the Complaint's prayer for relief should be partially dismissed in three ways.  First, they contend that the requests for disgorgement and restitution exceed the five-year statute of limitations set forth in the federal catch-all statute, 28 U.S.C. § 2462.  (Josh § V; David § IV; Jonathan § IV.)  Second, they argue that the Complaint's request for disgorgement is impermissibly broad, seeking disgorgement of all "benefits" Defendants received as a result of any illegal activity when, they argue, the Act authorizes disgorgement only of "gains."  (*Id.* (citing 7 U.S.C. § 13a-1(d)(3)(B).)  Finally, they contend that the request for "full restitution" should be limited to persons who sustained losses "proximately caused" by violations of the Act.  (*Id.*)

These arguments are premature.  Under Rule 12(b)(6), parties may challenge whether factual allegations set forth a "claim upon which relief can be granted," but the extent to which certain remedies are available is irrelevant to that analysis.  *See, e.g.*, *Mott's LLP v. Commercializadora Eloro, S.A.*, 507 F. Supp. 3d 780, 791 (W.D. Tex. 2020) ("Because statutory and treble damages are *remedies*, not causes of action, a Rule 12(b)(6) motion is an improper vehicle for dismissing these specific requests for relief."); *Lasslett v. Tetra Tech, Inc.*, 2015 WL 13805181, at *3 (W.D. Tex. Sept. 30, 2015) (rejecting motion to dismiss claim for exemplary damages as premature); 5B Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004) ("[I]t need not appear that the plaintiff can obtain the particular relief prayed for in the complaint, as long as the district judge can ascertain from what has been alleged that some relief may be granted by the court."); *cf.* Fed. R. Civ. P. 54(c) (judgments should "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings").  Adjudication of the purported defects in the prayer for relief is better suited to summary

judgment, when the parties have had the opportunity to develop all relevant facts.

The Cartus have offered no justification or case authority for holding otherwise, and the few cases they cite are not to the contrary. Indeed, in each of the three cases, the respective courts did not impose limitations on remedies at the pleading stage. In both *CFTC v. Gramalegui*, 2018 WL 4610953 (D. Colo. Sept. 26, 2018), and *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), the courts applied statutes of limitations *only after trial*, and in *Liu v. SEC*, 140 S. Ct. 1936 (2020), the limitation on disgorgement was imposed after the district court entered summary judgment against the defendants.

The disgorgement argument fails for another reason, namely the allegations of the Cartus' ongoing fraudulent scheme throughout the Relevant Period. (*See, e.g.*, Compl. ¶ 1.)[17] While the decision in *Liu* limited disgorgement to net profits, it noted that the Supreme Court "has carved out an exception when the 'entire profit of a business or undertaking' results from the wrongful activity." *Liu*, 140 S. Ct. at 1945 (quoting *Root v. Railway Co.*, 105 U.S. 189, 203 (1882)). Determining whether that exception applies "requires ascertaining whether expenses are legitimate or whether they are merely wrongful gains 'under another name.'" *Id*. Accordingly, while the Act does limit disgorgement to the "gains" received in connection with violations, development of the record may demonstrate that the Cartus' scheme was wholly fraudulent, permitting the Court to order disgorgement of gross profits rather than net profits.

---

[17] Moreover, it is unclear that the five-year limitations period applies to restitution or disgorgement. *Compare CFTC v. So. Tr. Metals, Inc.*, 2017 WL 10440763, at *4 (S.D. Fla. July 6, 2017) (holding restitution is not a penalty under the CEA so the limitations period does not apply), *with Gramalegui*, 2018 WL 4610953, at *30 (holding restitution serves a punitive purpose and determining the statute of limitations barred any restitution amounts predating the statutory period). In addition, the claims against the Cartus are "scheme offenses," stretching the limitations period to cover conduct pre-dating the limitations period. *See, e.g., United States v. Bases*, 2020 WL 2557342, at *11 (N.D. Ill. May 20, 2020). These questions are immaterial at this stage, however, when the CFTC need only demonstrate that it has pleaded an actionable claim for relief, not the precise contours of the available remedies.

*See CFTC v. Tayeh*, 848 F. App'x 827, 830 (11th Cir. 2021) (declining to set aside disgorgement awarded after trial because the defendant "failed to provide concrete and credible evidence to demonstrate . . . whether any of the business expenses were legitimate").

Finally, the Cartus' argument as to restitution is not only premature, but pointless. The Act allows the CFTC to seek "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)." 7 U.S.C. § 13a-1(d)(3)(B). The restitution request—for "full restitution to every person whose funds Defendants received or caused another person or entity to receive as a result of acts or and practices that constituted violations of the Act and Regulations" (Compl. Prayer ¶ E)—is not inconsistent with the terms of the Act. The Cartus' request is nothing more than semantic nit-picking and should be rejected.

## V.     JOSH CARTU WAS PROPERLY SERVED

Josh, alone among his brothers, makes one additional argument: despite the Court's Order allowing service by publication (the "Alternative Service Order," ECF No. 32), the Complaint should be dismissed against him under Rule 12(b)(5) because service was "untimely under Rules 4(m) and (f)." (Josh at 17.) But because service was timely under the terms of that Order, it appears that Josh actually is arguing that the Court's Alternative Service Order was wrongly decided. It is not clear that a Rule 12(b)(5) motion is the proper method to challenge the Alternative Service Order, and Josh provides no support for his apparent contention that it is, or that a remedy as drastic is dismissal is warranted. *See, e.g.*, *Iraheta v. Experian Info. Solutions, Inc.*, 2014 WL 12877275, at *2 (W.D. Tex. Apr. 9, 2014) (dismissal under Rule 12(b)(5) is "only warranted where there is no reasonably conceivable means of acquiring jurisdiction over the person of a defendant"); *see also Bae Sys. Resolution, Inc. v. Mission Transp., LLC*, 2020 WL 7482035, at *2 (W.D. Tex. Aug. 13, 2020) (court has broad discretion to

extend time for service, even in the absence of good cause).  Even if the request were
procedurally proper, the CFTC previously demonstrated reasonable diligence in its attempts to
serve the foreign defendants, including Josh, and the motion should be denied.

Perhaps not surprisingly, Josh relegates the Alternative Service Order to a footnote, but it
is worth exploring in more detail.  The Court issued its order after the CFTC filed a Motion for
an Order Directing Service Upon Foreign Defendants by Alternative Means **and Extending the
Time to Serve the Aforementioned Defendants** (the "Alternative Service Motion"), and
specifically requested that the Court "extend the time to serve the [foreign] defendants . . . for an
additional 60 days from the date of the Court's order on the motion . . . ."  (ECF No. 29 at 2.)
The Court, surely able to count the days between the filing of the Complaint and the filing of the
Alternative Service Motion, appears not to have agreed with Josh that the CFTC had been
"indolen[t]" in filing it, and granted the motion, permitting the CFTC to effect service by
publication, regular mail, and email.  (ECF No. 32 at 4–5.)  Accordingly, the Court already has
been presented with the chronology of the CFTC's attempts to serve Josh, and, based on those
facts, has resolved this question in favor of the CFTC.

Finally, Josh argues that the CFTC failed to explain why it waited so long to file the
Alternative Service Motion.  (Josh at 20–21.)  But in that motion, the CFTC noted that there was
good cause to extend the time to serve the foreign defendants because of "the multiple attempts
at service, as well as the logistical difficulties engendered by the Covid-19 pandemic" (ECF No.
29 at 14–15), and in prior motions noted how long Hague Convention service could take even in
the absence of a global pandemic.  (*See* ECF Nos. 20, 22.)  Nothing in the few cases cited by
Josh remotely approaches these circumstances.[18]

---

[18] Obviously, none of the cases cited by Josh involve issues of foreign service in the time of Covid-19, but
there are other stark differences.  In *Jensen v. Rollinger*, the plaintiff ignored for five months what was

Before reviewing the rest of Josh's argument, such as it is, it is worth pausing to note the chutzpah of his position. The Court issued its Alternative Service Order on July 28, 2021, and counsel for Josh first reached out to the CFTC about waiving service on or about September 14, 2021. Josh (through counsel) executed the waiver three weeks later on October 8, 2021. But rather than file a motion to reconsider or seek some other relief from the Alternative Service Order, he waited until February 7, 2022, more than 120 days, seeking to dismiss the entire Complaint because of **the CFTC's** "lack of reasonable diligence." Accordingly, Josh had ample opportunity to challenge the Court's order, but chose to wait four months to do so, and when he did, he failed to cite any support for the proposition that Rule 12(b)(5) is the proper procedural vehicle to attack a court's decision to extend the time for service.[19]

In any event, even assuming Josh's motion is both procedurally proper and timely, it is unconvincing. First, he contends that sending Josh the summons and complaint via United States Postal Service was improper under the Hague Convention, so it was insufficient on its own to constitute service. While this is a correct statement of law, it is immaterial to both the current argument and the Alternative Service Motion, as the CFTC did not rely on the USPS mailing to demonstrate that it had actually effected service under Rule 4. Instead, it was one fact among

---

essentially a directive from the court to provide additional evidence of service. 2015 WL 13796692, at *1 (W.D. Tex. Dec. 11, 2015). Nothing of the sort has happened here. Similarly, in *Buholtz v. Sogamoso*, the court granted an extension of time to serve defendant, then "admonished Plaintiff to proceed properly in serving Defendant or the Court would recommend the case be dismissed." 2020 WL 9936209, at *1 (E.D. Tex. Mar. 16, 2020). After the plaintiff tried and failed to effect service two months later, he failed to file anything at all for six months, and the court dismissed. *Id.* at *2. Here, in contrast, the CFTC has kept the Court apprised of its service efforts while proceeding to litigate the case. Finally, *Veliz v. Rimax Contractors, Inc.* is even less apt: there, the plaintiffs admitted that they did not even attempt service abroad under Rule 4(f). 2016 WL 1704496, at *2 (E.D. La. Apr. 28, 2016).

[19] Compounding the irony, Rule 4(d) also says that individuals have "a duty to avoid unnecessary expense of serving the summons," but Josh chose not to do so until the CFTC had expended considerable taxpayer money, including the costs of international shipping, translating documents into Hungarian, and buying advertisements in two foreign jurisdictions. Moreover, in exchange for saving this expense, parties are given extra time to respond to the complaint. Josh took that extra time and effectively gave nothing for it.

many demonstrating that the CFTC had made diligent efforts to apprise Josh of this litigation.

His second argument is even less compelling.  He contends that while the CFTC represented to the Court that it effected service via the Hague Convention, it "made no specific representation that it followed each of the requirements under the Hague Convention (for example, the requirement to include official Hungarian translations of the documents, along with their original English form), nor did the CFTC provide any supporting affidavit or other evidence that it followed these requirements."  (Josh at 20.)  Of course, implicit in a representation that the CFTC served documents "via the Hague Convention" is that service was done in accordance its requirements, as it was.[20]  In any event, Josh's demands for more proof that Hague Convention service was proper cannot justify so drastic a result as dismissal.

In sum, Josh would like to take advantage of the delay caused by the Hague Convention and the pandemic, while also ignoring:  his own decision not to accept service, the CFTC's efforts to ensure he was aware of the pending suit, and his delay in challenging the Alternative Service Order.  Nothing in his argument disturbs this Court's "considerable discretion to authorize an alternative means of service," *WSOU Investments, LLC v. OnePlus Tech. (Shenzhen) Co., Ltd.*, 2021 WL 2870679, at *2 (W.D. Tex. July 8, 2021), and Josh's motion under Rule 12(b)(5) therefore should be dismissed.

## CONCLUSION

For the reasons set forth above, the CFTC respectfully requests that the Court deny the Cartus' motions to dismiss in their entirety.  In the alternative, the CFTC respectfully requests that the Court grant it permission to amend the Complaint.

---

[20] Should the Court wish to review the Hungarian translation of the Summons and Complaint, or evidence that the translations were received before service was attempted, the CFTC can provide those documents.

Dated:  March 21, 2022                    Respectfully submitted,


                                          */s Benjamin E. Sedrish*_____

                                          Benjamin E. Sedrish
                                          Elizabeth N. Pendleton
                                          Elizabeth M. Streit

                                          Attorneys for Plaintiff
                                          Commodity Futures Trading Commission
                                          525 W. Monroe Street, Suite 1100
                                          Chicago, IL 60661
                                          Tel. (312) 596-0700
                                          Fac. (312) 596-0714
                                          *bsedrish@cftc.gov*
                                          *ependleton@cftc.gov*
                                          *estreit@cftc.gov*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 21, 2022, a copy of the foregoing motion was served on all counsel of record via the Court's CM/ECF electronic filing system.

<u>*s/ Benjamin E. Sedrish*                </u>