**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | **Case No: 1:20-CV-908-RP** |
| **v.** | |
| **JONATHAN CARTU, RYAN MASTEN, LEEAV PERETZ, NATI PERETZ, BLUE MOON INVESTMENTS, LTD., AND BAREIT MEDIA LLC D/B/A SIGNALPUSH,** | |
| **Defendants.** | |

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY
PENALTIES, AND OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC"), an

independent federal agency, alleges as follows:

**I.   SUMMARY**

1.       Beginning in or before May 1, 2013 and continuing to at least April 29, 2018 (the

"Relevant Period"), Defendant Jonathan Cartu ("Cartu"), acting individually and through dozens

of off-shore entities he and others working in coordination with him ultimately owned and

controlled, operated a massive fraudulent "binary options" trading scheme.

2.       First, Cartu, acting in concert with Defendants Leeav Peretz ("Leeav") and Nati

Peretz ("Nati") (together, the "Peretz Brothers"), offered illegal, off-exchange binary option

trading on currency pairs, oil, and other commodities on internet websites through customer-

facing brands they owned and operated including "BeeOptions," "Glenridge Capital," and

"Rumelia" (collectively, the "Cartu Brands").

3.      Cartu and the Peretz Brothers, along with their agents, employees, and representatives who solicited and sold binary options on behalf of the Cartu Brands (the "brokers"), made material misrepresentations and omissions to individuals located in the United States and elsewhere ("customers") in order to entice them to deposit funds to trade binary options.  On the Cartu Brands' websites and in emails, telephone calls, and other communications with customers and prospective customers, Cartu, the Peretz Brothers, and the individual brokers promised "quick" returns of "60-85%," even though the substantial majority of customers lost money.  They falsely stated that the interests of the Cartu Brands were aligned with the interest of customers and failed to disclose that the Cartu Brands (and Cartu and the Peretz Brothers themselves) profited from customer losses.  Further, at the direction of Cartu and the Peretz Brothers, the brokers misrepresented their financial expertise, compensation structure, physical location, and identity.

4.      During at least part of the Relevant Period, Defendants BareIt Media LLC d/b/a SignalPush ("BareIt"), while acting as an unregistered commodity trading advisor ("CTA"), and Ryan Masten ("Masten"), while acting as an unregistered Associated Person ("AP") of a CTA, provided trade signals and/or auto-trader services to customers of the Cartu Brands.

5.      Unbeknownst to customers, beginning on or before September 26, 2015, the binary option transactions offered by the Cartu Brands were executed on an internet-based trading platform (the "Cartu Platform") developed, programmed, and operated by Cartu and Masten, acting through and on behalf of All Out Marketing Limited ("All Out"), an entity owned and controlled by a person acting in coordination with Cartu; Blue Moon Investments, Ltd. ("Blue Moon"), an entity owned and controlled by Cartu; Orlando Union Inc. ("Orlando Union"), an entity owned and controlled another person acting in coordination with Cartu; and

BareIt, with other affiliated entities and individuals.  Customers of the Cartu Brands, and later customers of other binary options brands operated by third-parties, accessed the Cartu Platform through each individual binary brand's website, typically by logging in with their email address and password.

6.      To facilitate the transfer of funds from customers in the United States and elsewhere for illegal, off-exchange binary option transactions, Cartu and his brothers operated Greymountain Management Limited ("Greymountain"), a now-defunct "payment processor" that maintained its principal place of business in Ireland during the Relevant Period.  During the Relevant Period, Cartu and others acting in coordination with him, and their employees and agents, acting through Greymountain and other related entities, processed over $165 million in credit card payments for binary option transactions offered by the Cartu Brands and other brands operated by third parties, including processing over $153 million in credit card payments after August 1, 2015.

7.      Cartu and Masten also used Greymountain to distribute profits generated by the Cartu Platform.  Between September 2014 and January 2017, Cartu received at least $9,292,043 from Greymountain through transfers to off-shore accounts in the name of Blue Moon.  During the same period, two others working in coordination with Cartu each received approximately $9 million via payments from Greymountain to All Out, Orlando Union, and Memox Services Ltd. Further, between July 2015 and January 2017, Masten received at least $1,448,209 from Greymountain through transfers to BareIt.

8.      At least as of June 1, 2016, the Peretz Brothers also received funds generated by and through the Cartu Platform.  Thus, Cartu, the Peretz Brothers, Masten, All Out, Blue Moon,

Orlando Union, and BareIt all profited from the fraudulent transactions executed on the Cartu Platform.

9.      During each stage of their fraudulent binary options scheme, Cartu, the Peretz Brothers, and Blue Moon violated the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and accompanying regulations, 17 C.F.R. pts. 1–190 (2022).  Namely, by this conduct and further conduct described below, these Defendants have engaged in acts and practices in violation of the following:

   a.   Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4 (2022), which prohibit fraud in connection with commodity options transactions;

   b.   Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2022), which prohibit deceptive devices, schemes and/or artifices in connection with, among other things, swaps, and prohibit false statements; and

   c.   7 U.S.C. § 6c(b) and Regulation 32.2, 17 C.F.R. § 32.2 (2022), which prohibit offering or entering into off-exchange transactions in commodity options.

10.     Further, Defendants Masten and BareIt have engaged in acts and practices in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1), which prohibits BareIt from acting as a CTA unless registered as such, and Section 4k(3) of the Act, 7 U.S.C. § 6k(3), which prohibits Masten from acting as an AP of a CTA unless registered as such.

11.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel Defendants'

compliance with the Act and Regulations, and to further enjoin Defendants from engaging in certain commodity options and swaps-related activities.

12.     In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

14.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) because Masten and BareIt are found in and inhabit the Western District of Texas, all Defendants transacted business in this District, and the acts and practices in violation of the Act and Regulations occurred within this District, among other places.  Venue is also proper under 28 U.S.C. § 1391(c)(3) because, on information and belief, Defendants (with the exceptions of Masten and BareIt Media) do not reside in the United States.

### III.   PARTIES

15.     Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") is the independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act and Regulations promulgated thereunder.

A.     **Individual Defendants**

16.     Defendant **Jonathan Cartu** was born in 1983 and is a Canadian citizen.  Upon information and belief, Cartu currently resides in Israel, where he also resided during the Relevant Period.  During at least part of the Relevant Period, and in connection with the acts and practices described herein, Cartu used the alias Jonathan Cartier.  Cartu has never been registered with the Commission in any capacity.

17.     Defendant **Ryan Masten** was born in 1985 and is an American citizen.  Masten currently resides in Austin, Texas.  During at least part of the Relevant Period, and in connection with the acts and practices described herein, Masten used the alias Jax Navarro.  Masten has been registered with the Commission as an AP and principal of a CTA since June 13, 2017, and was registered as an AP and principal of an Introducing Broker from approximately May 2017 to March 2018.

18.     Defendant **Leeav Peretz** is from Windsor, Ontario, Canada.  Upon information and belief, Leeav currently resides in Israel.  During the Relevant Period, and in connection with the acts and practices described herein, Leeav used the alias Lee Cole.  Leeav has never been registered with the Commission in any capacity.

19.     Defendant **Nati Peretz** is, like his brother Leeav, from Windsor, Ontario, Canada.  Upon information and belief, Nati currently resides in Israel.  During the Relevant Period, and in connection with the acts and practices described herein, Nati used the alias Steven (or Steve) Grey.  Nati has never been registered with the Commission in any capacity.

B.      **Corporate Defendants**

20.      Defendant **BareIt Media LLC, d/b/a SignalPush,** is a Texas LLC incorporated on March 27, 2012 with its principal place of business in Lakeway, Texas.  BareIt has done business as "SignalPush" since at least October 2, 2012 and has used the website www.signalpush.com.  Throughout the Relevant Period, Masten, along with his wife, has owned and controlled BareIt, and Masten has used BareIt to operate the Cartu Platform, including opening accounts and/or entering into agreements on behalf of the Cartu Platform.  During a portion of the Relevant Period, BareIt and Masten d/b/a SignalPush, offered trade signals and auto-trader services for the Cartu Brands.  BareIt has never been registered with the Commission in any capacity.

21.      Defendant **Blue Moon Investments Ltd**. was incorporated in the Seychelles on December 6, 2012.  Throughout the Relevant Period, Cartu has owned and controlled Blue Moon, and has used it to operate the Cartu Platform, including opening accounts and/or entering into agreements on behalf of the Cartu Platform; and to transfer, hold, and conceal funds obtained in connection with Defendants' fraudulent binary options scheme.  Blue Moon has never been registered with the Commission in any capacity.

C.      **Related Entities and Fictitious Binary Brands**

22.      All Out Marketing Limited was incorporated in the British Virgin Islands on April 16, 2010.  Throughout the Relevant Period, All Out was used to operate the Cartu Platform, including opening accounts and/or entering into agreements on behalf of the Cartu Platform; and to transfer, hold, and conceal funds obtained in connection with Defendants' fraudulent binary options scheme.  All Out has never been registered with the Commission in any capacity.

23.     Greymountain Management Limited was incorporated under the laws of Ireland on May 20, 2014, and entered into liquidation effective July 13, 2017.  Upon information and belief, Cartu invested in, and was a partial owner of, Greymountain.  During the Relevant Period, Greymountain offered payment processing services through various subsidiaries, successor entities and/or fictitious entities, including without limitation SnowCharge and SnowPay.  At various times during the Relevant Period, Greymountain also offered "white label solutions," a type of software product, for the Cartu Brands and other third-party binary option brands.  Greymountain has never been registered with the Commission in any capacity.

24.     Mega Optimization Limited d/b/a MegaCharge ("MegaCharge") was incorporated in Ireland on or around March 24, 2016, and has maintained offices in Dublin, Ireland and, upon information and belief, in Berlin, Germany.  Upon information and belief, Cartu invested in, and is a partial owner of, MegaCharge, and MegaCharge is a subsidiary or successor entity to Greymountain.  MegaCharge has never been registered with the Commission in any capacity.

25.     Memox Services Ltd. ("Memox") was incorporated in England and Wales on July 9, 2012.  On July 31, 2018, Memox changed its name to Slingshot Investments Limited.  Upon information and belief, the company is no longer active.  Memox has never been registered with the Commission in any capacity.

26.     Orlando Union Inc. was incorporated in Belize on October 18, 2010.  Throughout the Relevant Period, Orlando Union was used to operate the Cartu Platform, including opening accounts and/or entering into agreements on behalf of the Cartu Platform; and to transfer, hold, and conceal funds obtained in connection with Defendants' fraudulent binary options scheme and to open accounts and/or enter into agreements on behalf of the Cartu Platform.  Orlando Union has never been registered with the Commission in any capacity

8

27.     Tracy P.A.I. Management Ltd. a/k/a Tracy PAI Management Ltd. ("Tracy PAI") was incorporated in Israel on or before April 16, 2012.  During the Relevant Period, Tracy PAI operated out of an office in Tel Aviv, Israel, and employed the individual brokers who solicited and sold binary options on behalf of the Cartu Brands.  Prior to June 2016, Tracy PAI was owned, operated, and controlled by Cartu and others acting in coordination with him.  On or around June 1, 2016, the Peretz Brothers, who had previously been senior managers at the company, purchased at least a portion of Tracy PAI and took over the business's day-today operations.  Tracy PAI has never been registered with the Commission in any capacity.

28.     UKTVM Limited ("UKTVM") was incorporated in the United Kingdom on October 8, 2012, and dissolved on December 18, 2018.  Upon information and belief, UKTVM provided payment processing services for the Cartu Brands in 2013 and 2014.  UKTVM has never been registered with the Commission in any capacity.

29.     BeeOptions ("BeeOptions") is a binary options brand.  At various times during the Relevant Period, Cartu and others used Tracy PAI and UKTVM, among other entities, to enter into agreements, open accounts, hire individual brokers, and engage in other activities in the name of or on behalf of BeeOptions.

30.     Glenridge Capital ("Glenridge") is a binary options brand.  At various times during the Relevant Period, Cartu and others used Greymountain, Tracy PAI, and UKTVM, among other entities, to enter into agreements, open accounts, hire individual brokers, and engage in other activities in the name of or on behalf of Glenridge.

31.     Rumelia Capital ("Rumelia") is a binary options brand.  At various times during the Relevant Period, Cartu and others used Tracy PAI and UKTVM, among other entities, to

enter into agreements, open accounts, hire individual brokers, and engage in other activities in the name of or on behalf of Rumelia.

## IV.     STATUTORY BACKGROUND

### A.     Prohibitions Against Off-Exchange Options Trading

32.     Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A), defines "swap" to include, among other things, any agreement, contract, or transaction that:  (a) is a put, call, cap, floor, collar, or similar option of any kind; (b) provides for payment dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency; or (c) provides on an executory basis for payments based on the value or level of one or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, without also conveying an ownership interest in any asset or liability.

33.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b), makes it unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity regulated under the Act which is of the character of, or is commonly known to the trade as, inter alia, an "option," "bid," "offer," "put," or "call," contrary to any rule, regulation or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.  Thus, through 7 U.S.C. § 6c(b), Congress has given the Commission jurisdiction and plenary rulemaking authority over all commodity option transactions.

### B.     Prohibitions Against Fraud

34.     The Act and Regulations contains numerous anti-fraud provisions applicable to various categories of entities or transactions.

### i.   Options Fraud

35.   Regulation 32.2, 17 C.F.R. § 32.2 (2022), states in relevant part:

[I]t shall be unlawful for any person or group of persons to offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity option transaction, unless:

(a) Such transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any other swap . . . .

36.   Regulation 32.4, 17 C.F.R. § 32.4 (2022), promulgated under 7 U.S.C. § 6c(b), provides that:

In or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, it shall be unlawful for any person, directly or indirectly:

(a) To cheat or defraud or attempt to cheat or defraud any other person;

(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or

(c) To deceive or attempt to deceive any other person by any means whatsoever.

### ii.   Swaps Fraud

37.   Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate.

38.   Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2022), provides in relevant part, that it shall be unlawful for any person, directly or indirectly:

In connection with any swap . . . to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of materials fact or to omit to state a material fact necessary in order to make the statements made

> not untrue or misleading; (3) Engage, or attempt to engage, in any
> act, practice, or course of business, which operates or would operate
> as a fraud or deceit upon any person . . . .

## C.    Registration Requirements

39.    Section 1a(12) of the Act, 7 U.S.C. § 1a(12), defines a commodity trading advisor or CTA as any person who for compensation or profit, engages in the business of advising others, either directly or through publications, writings or electronic media, as to the value or advisability of trading in any commodity option, among other products.

40.    An "Associated Person" or AP of a CTA is defined in Regulation 1.3, 17 C.F.R. 1.3 (2022), as any person who is associated with a CTA as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:  (i) the solicitation of a client's or prospective client's discretionary account, or (ii) the supervision of any person or persons so engaged.

41.    Section 4m(1) of the Act, 7 U.S.C. § 6m(1), makes it unlawful for any CTA, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CTA.

42.    Section 4k(3) of the Act, 7 U.S.C. § 6k(3), makes it unlawful for any person to associated with a CTA as a partner, officer, employee, consultant or agent (or any other person occupying a similar status or performing similar functions), in any capacity which involves:  (i) the solicitation of a client's or prospective client's discretionary account or (ii) the supervision of any person or persons so engaged, unless such person is registered with the CFTC.

## V.       FACTS

### A.  Overview of Binary Options and Relevant Terms

43.     A binary option is a type of options contract in which the payment depends entirely on the outcome of a discrete event—typically a "yes/no" proposition.  A binary options customer enters into a trade that predicts the price of an underlying asset by a pre-determined date and time, commonly referred to as the "expiration" or "expiry."  The price of the option at expiry is commonly referred to as the "strike price."  Basic binary options involve a prediction as to the direction that the underlying asset's price will take relative to the price of entry, while binary option pairs involve a prediction as to whether one asset will outperform another.

44.     Binary option "brands" sell and market binary options.  Typically, a binary option customer enters into a trade through a trading "platform" accessed through the brand's website.

45.     Frequently, binary option brands rely on "affiliate marketers" to disseminate solicitations to prospective customers through targeted campaigns advising them to open and fund off-exchange binary option trading accounts.  Affiliate marketing is a form of performance-based marketing that is predominantly conducted via email solicitations and promotional materials, including videos, made available on internet websites.  Affiliate marketers may also offer "trade signals" or "auto-trader" functions that purport to assist customers by providing recommendations as to specific trades or automatically executing a trade at so-called opportune market conditions.

46.     Once the customer acquires a binary option, there is no further decision for the holder to make as to whether or not to exercise or trade the binary option, as binary options exercise automatically at expiry.  The expiration date and time are typically determined at the time the customer enters into a binary option trade.

47.     Binary options involve a variety of underlying assets, including currency pairs (e.g., EUR/USD); commodities such as oil, gold, and platinum; equity indices (e.g., the Dow Jones Industrial Index); and stocks (e.g., Google, Nike, etc.).  However, unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset.  Instead, binary options are "cash settled."  When the binary option expires, if the customer has correctly predicted the asset's movement, the customer is "in the money" and entitled to a payout of a pre-determined amount of money.  If the customer has made an incorrect prediction, he or she is "out of the money," loses the premium paid (i.e., the amount of the trade), and gets nothing.

48.     There are only three designated contract markets ("DCMs") currently authorized to offer binary options that are commodity options transactions to retail customers in the United States:  Cantor Exchange LP, Chicago Mercantile Exchange, Inc., and the North American Derivatives Exchange, Inc.  All other entities offering binary options in the United States or to U.S. customers are doing so illegally.

**B.     Overview of the Cartu Enterprise**

49.     Jonathan Cartu, the Peretz Brothers, and Blue Moon engaged in fraudulent activity at each stage of a typical binary option transaction.  Often, a potential U.S. customer first encountered these Defendants after a fraudulent email solicitation or video created and disseminated by an affiliate marketer directed the customer to one of the Cartu Brands to open and fund a binary option trading account.  The customer was then contacted by a broker who solicited the customer to open and fund a trading account with one of the Cartu Brands.  If the customer chose to pay by credit card, those payments were usually charged to and processed by Greymountain, and therefore Greymountain, as opposed to the specific Cartu Brand, would appear as the merchant on the customer's credit card bill.  Customers entered into binary options

trades through the Cartu Brand websites, and those trades were executed on the Cartu Platform. Cartu and Masten, acting through and on behalf of Blue Moon and BareIt, controlled those transactions and, at times, manipulated the results of those trades to force customer losses.  The Cartu Brands and the Cartu Platform shared in the resulting profits.

50.     Cartu and the Peretz Brothers marketed, offered, and sold binary options to retail customers, including customers in the United States, through one or more internet trading websites, including www.beeoptions.com and www.beeoptions.us (collectively, the "BeeOptions website"); www.glenridgecapital.com (the "Glenridge website"); and www.rumeliacapital.com (the "Rumelia website") (collectively, the "Cartu Brand websites").

51.     At least by May 2014, the Peretz Brothers were responsible for supervising the individual brokers who solicited customers to trade with BeeOptions and, thereafter, Glenridge and/or Rumelia.  At various times during the Relevant Period, Nati supervised the individual brokers responsible for soliciting prospective customers and obtaining an initial deposit and Leeav supervised the individual brokers responsible for soliciting customers to make additional deposits.

52.     During at least part of the Relevant Period, Masten and BareIt also offered trade signals and auto-trading for customers to use when entering into transactions on the Cartu Brand websites.  At least certain customers received an email advising them that the Cartu Brands had a "partnership with a company called SignalPush" that "offer[ed] trade signals and auto-trader services" and directing them to the website www.signalpush.com (the "SignalPush website") to open an account with SignalPush.  Masten registered and operated the SignalPush website.

53.     Between January 2014 and August 2017, MasterCard processed a total of $69,107 in transactions for SignalPush.  Between May 2016 and July 2017, Visa processed a total of $15,855 in transactions for SignalPush.

54.     In addition to the Cartu Brand websites, Cartu and the Peretz Brothers used other websites in connection with their fraudulent binary option trading scheme, including: www.megacharge.com, www.megacharge.net and megaoptimization.com; as well as www.tracypai.com (together, the "Cartu Websites").  At various times during the Relevant Period, Masten was responsible for managing and administering the Tracy PAI website, among others.

55.     Further, Greymountain accepted and processed payments for binary option transactions offered by third parties; and Cartu, along with defendant entities he controlled, offered and accepted binary option transactions through the Cartu Platform with at least ten unique binary option brands, including brands operated by third-parties.

56.     The binary options the Cartu Brands marketed, offered, and sold, were not offered on an authorized DCM.

57.     When offered on a DCM or other regulated exchange, customers on opposite sides of each binary option transaction are typically matched, meaning that for each customer who correctly predicts an asset's price movement and is in the money, there is a customer who made an incorrect prediction and is out of the money.  The binary option exchange earns a commission on the trade, but otherwise has no interest in its outcome.

58.     The binary options marketed, offered, and sold by Cartu and the Peretz Brothers did not operate like those on regulated exchanges.  These Defendants did not connect customers to legitimate binary options exchanges or otherwise match buyers and sellers of binary options.

The Cartu Brands were the counterparties to each transaction and acted in a manner similar to that of a casino or sports book by taking the opposite position on each trade, while the Cartu Platform "executed" the trade and received a percentage of each customer's net deposits.

59. The binary options marketed, offered, and sold by Cartu and the Peretz Brothers are not actual transactions, but rather book entries that gave the appearance of actual transactions. These binary options did not result in the transfer of money from one segregated, customer account to another account at expiry. No funds actually changed hands at the conclusion of any given binary option transaction with the Cartu Brands.

**C.    Operation of the Cartu Brands**

60. During the Relevant Period, Cartu and the Peretz Brothers used a number of different websites and brands to solicit customers in the United States to trade illegal, off-exchange binary options. Beginning in or before April 2013, Cartu, and others acting on his behalf and under his direction, used the BeeOptions website to make such solicitations.

61. Beginning in or around December 2014, Cartu, the Peretz Brothers, and others working in concert with them began soliciting individuals in the United States and elsewhere to trade illegal, off-exchange binary options through the Glenridge website; and beginning in or around January 2015, Cartu and the Peretz Brothers began soliciting individuals in the United States and elsewhere to trade illegal, off-exchange binary options through the Rumelia website. The BeeOptions website expired on May 11, 2017, the Glenridge website expired on April 29, 2018, and the Rumelia website expired on December 24, 2017.

62. Throughout the Relevant Period, Cartu and the Peretz Brothers knew and intended that United States customers would receive their solicitations and use the Cartu Brands to trade binary options. For example, on or about January 4, 2014, Cartu emailed BeeOptions sales staff to note that, "for our American and Canadian customers," BeeOptions would be "featuring a

Super Bowl promotion . . . for the month of January." Indeed, Cartu made it a point of emphasis to market to United States customers. On or about January 26, 2014, Cartu emailed BeeOptions employees a "special database of binary customers," each of whom had purchased at least $50,000 of binary options in the preceding 18 months. He directed the employees to "PICK UP THE PHONE AND CALL THEM," noting that "[t]hese are all USA and Canada customers."

63.     And on or about February 26, 2014, Cartu reviewed an email from a BeeOptions account holder regarding difficulties withdrawing money from his account. The account holder noted that his bank account was located in California. Cartu told BeeOptions employees that they should "take care of this [issue] as quickly as possible."

64.     Cartu and the Peretz Brothers knew that BeeOptions was receiving deposits from United States customers. On or about July 17, 2014, Cartu received an email noting that the bank account details for wire deposits from clients had changed. For United States dollar deposits, the account holder was a United States limited liability company registered in Georgia.

65.     When hiring a new employee at Tracy PAI, Cartu noted that "[w]e operate 24/6 owing to a large amount of our customers being from the United States and Canada."

66.     The Cartu Brands used affiliate marketers to identify potential customers by creating and disseminating fraudulent marketing campaigns that advise prospective customers to open and fund binary option trading accounts. Upon information and belief, Masten and BareIt first became involved with the Cartu Brothers as an affiliate marketer for BeeOptions.

67.     The Cartu Brands retained affiliate marketers expressly intending that they attract customers from the United States. In or around January 2015, Cartu emailed two affiliate marketers to engage them in marketing for BeeOptions. When one affiliate marketer asked to receive $400 for each customer who deposited money with BeeOptions, Cartu responded: "I

will do 400 for non-US for but US only 300.  I have so much US…."  When the affiliate

marketers agreed, Cartu forwarded the email exchange to BeeOptions' Head of Affiliates, asking

him to "set up with these guys."

68.     In or around April 2015, Cartu approved a request from a BeeOptions vice

president to send out tablets as incentive rewards for customers in Alabama, California, and

Toronto.

69.     In or around June 2015, Cartu was informed that a technical error was impeding

signups for Rumelia accounts for customers in the United States.  He noted that "[a]ffiliates . . .

couldn't sign up US customers," then asked a TracyPAI technical support employee to "confirm

that the problem is solved."  Cartu suggested a technical fix for the problem.

70.     In September 2015, BeeOptions decided that it was "no longer interested in

acquiring [sales] traffic from the USA," but "clients with existing accounts should be able to

redeposit."  When a BeeOptions vice president emailed SpotOption noting this change in policy,

Cartu asked him to "please [not] communicate with Spot about the US.  Refer that all to me

please."  He further noted that it was correct that BeeOptions "just [did not] want NEW US

registrations . . . . Please don't change anything for existing clients."

71.     Cartu also knew that the Cartu Brands should not advertise the fact that they had

customers in the United States.  After a customer won a luxury car as an incentive gift, Cartu was

asked whether the company could post the location of the winner.  Cartu responded:  "Not if it

was in the United States."

72.     Nevertheless, BeeOptions continued to take deposits from U.S. customers for

years.  On or about January 27, 2016, Cartu emailed the Peretz Brothers about an Ohio customer

who had deposited $12,450 in a BeeOptions account but had not received all of the funds he had requested to withdraw.

73.    Certain of the Cartu Brands continued taking deposits of United States dollars at least as late as April 2016.  At that time, the Director of Operations emailed the Peretz Brothers and Cartu, noting that customer service staff would be instructed to inform customers that "we can no longer wire funds to USD accounts in the United States.  Every customer will have to open a EUR account and send us the wire details . . . ."  Leeav Peretz drafted a template communication to customers about the issue, which Cartu revised to note that "our company will still accept and refund Credit Card transactions in USD."

74.    On or about May 5, 2016, Nati Peretz emailed Cartu to note that BeeOptions had "made it onto cftc list," presumably referring to the Registration Deficient List (commonly known as the "RED List") maintained by the CFTC.  Nati asked Cartu and Leeav whether it would be "best to stop taking US clients money and continue to pay out on [BeeOptions]?  [O]r should we shut down BEE for good?"

75.    On or about May 11, 2016, Leeav Peretz wrote Cartu and Nati Peretz an email sharing the CFTC's RED List and "strongly suggest[ing] ceasing to take any further credit card deposits starting June 1st 2016," and moving all sales agents working for BeeOptions to Glenridge.

76.    Beginning in or before July 2013, Masten and his company, BareIt, d/b/a SignalPush, entered into a partnership with Cartu and others to provide trading signals for customers of the Cartu Brands.  An email sent to at least certain BeeOptions customers during the Relevant Period introduced SignalPush as an auto-trading network or "essentially a computer program based on a complex algorithm that works in conjunction with emanating trade signals.

It is able to execute trades on behalf of the trader, at moments of opportune market conditions . . . can be customized according to the trader's desired level of financial risk . . . [and] allows trades to be executed when the trader is away."

77.     BareIt and Masten solicited individuals in the United States and elsewhere to open a SignalPush account and receive trading recommendations from "top notch" "signal providers" for transactions with binary options brands, including the Cartu Brands.  On the SignalPush website, BareIt and Masten represented that they had "interview[ed]" potential signal providers to gain information about "their strategies, amount of clients, [and] money management," reviewed six months of performance records and required "the potential provider submit certain legal documents" before approving them.  Some customers lost money due to trades executed by SignalPush.

78.     The Cartu Brands began using Greymountain for payment processing in or around September 2014.  On October 2, 2014, Cartu sent an email to BeeOptions brokers and other employees of the Cartu Brands informing them that "All of you work for Tracy PAI . . . an online B2B and B2C service provider" that has "taken on a new account, Greymountain Management."  In that same email, Cartu stated that "Tracy PAI broke the $1,500,000.00 target set us by our previous clients and surpassed even $1,600,000.00" and shared his plan to "go out and find us more business to represent.  You can be confident that your fortunes will not rest on one far away company doing unregulated business forever, and neither will mine."

79.     On or before June 1, 2016, the Peretz Brothers purchased Tracy PAI and took over partial ownership of the Cartu Brands.

**D.      Fraudulent Misrepresentations and Deception**

80.     Cartu and the Peretz Brothers have misrepresented the fundamental nature of the

binary option transactions offered to customers on the Cartu Brands' websites and in emails,

telephone calls, and other communications with customers and prospective customers.

81.     Cartu and the Peretz Brothers, along with their employees, agents, and others

acting on their behalf, have misrepresented the profitability of trading binary options with the

Cartu Brands.  When communicating with customers, brokers promised returns "between 60-

85%" and the Cartu Brand websites promoted "knowledgeable account executives who will walk

you through the 5-step process of trading assets online . . . so you can increase your returns up to

85%."

82.     At least in 2016 and 2017 the Glenridge website offered a "warm welcome" to the

brands' customers from "Vincent Glenn, CEO":

> Your fiscal achievement is important to us, therefore you can count
> on Glenridge Capital to help you reach a profitable financial future.
> After all, we know that in order for us to succeed, you must succeed.
> That is why we have become the foremost binary options trading
> platform in the industry. . . .
>
> We understand that the financial market can be a challenge to
> navigate in today's rapidly changing world, thus I left my job as a
> financial broker in order to further develop online trading with a
> team of close colleagues and associates. . . .  With a simple touch of
> a button, you can predict whether an asset will increase (call) or
> decrease (put) by expiry time.  It is so easy, that it is practically
> intuitive.
>
> Further, we take pride in our friendly atmosphere and individual
> attention to traders.  We have created a place where you can build
> relationships as you increase your revenue. . . .  Our knowledgeable
> account executives will walk you through the 5-step process of
> trading assets online with easy to understand language and
> educational opportunities so you can increase your returns up to
> 85%.   Rest assured that [you] will get fast withdrawals with
> conventional   and   alternative   payment   methods   for   your
> convenience.

The Glenridge website did not disclose that binary option transactions were executed on the Cartu Platform, and it did not disclose that the brand was on the opposite side of each transaction and actually benefitted from customer losses.  Further, upon information and belief, Vincent Glenn is entirely fictional.

83.     In emails and telephone communications the brokers, along with other employees and agents acting on behalf and at the direction of Cartu and the Peretz Brothers, would falsely represent that their interests were aligned with the interest of customers, when in fact the Cartu Brands were the counterparty to each customer and profited from customer losses.  For example, one broker routinely told customers that "BeeOptions pays me to help you make money."

84.     At the direction of Cartu and, later, the Peretz Brothers, the individual brokers employees who solicited customers to trade binary options with the Cartu Brands and certain other employees used alias or stage names when interacting with customers and prospective customers, including those located in the United States, and would misrepresent their location, educational background, and financial expertise.

85.     Cartu and the Peretz Brothers also used various manipulative or deceptive devices, including so-called "bonuses" and "risk free trades" to entice customers to deposit additional funds and then prevent customers from withdrawing funds.  Cartu and Masten, acting through and on behalf of the various entities they controlled, including All Out, BareIt, Blue Moon, and Orlando Union, designed the Cartu Platform to provide the functionality needed for the Cartu Brands, and other binary option brands, to offer bonuses and risk-free trades.  Cartu and the Peretz Brothers mandated that Cartu Brands' brokers pitch bonuses to customers as being helpful, and informed the brokers that bonuses were actually a tool to keep money in the system by preventing withdrawals and therefore increasing the brand's profits.

86.     As used by Cartu and the Peretz Brothers, the term bonus is misleading as it suggests that it provided a benefit to customers, when in fact the bonus was designed to limit customers' ability to withdraw funds.  Typically, a bonus required customers to trade 30-times the amount of the bonus plus any accompanying deposit (known as the "turnover requirement") before any funds could be withdrawn.  By way of example, if a customer received a $5,000 bonus on a $10,000 deposit with one of the Cartu Brands, that customer would have been required to trade $450,000 (30 x $15,000) before any funds could be withdrawn.  Similarly, a risk-free trade, which was typically offered as a "refund" for trading losses questioned by a customer or to entice an additional deposit, typically had a turnover requirement of 10-times the refunded amount.  The bonuses and risk-free trades offered by the Cartu Brands did not involve the transfer of actual funds to a customer or customer's account.

**E.      Cartu and Masten Developed the Cartu Platform**

87.     At the beginning of the Relevant Period, Cartu and the Peretz Brothers used a trading platform and related software operated by third-parties (the "Spot Platform") to perpetuate the fraudulent binary options scheme.  Customers would access the platform through the Cartu Brands' websites, typically by logging in with their email and password.  The SpotOption customer relationship management or "CRM" software system allowed the Cartu Brands' employees and agents to see customer names and contact information, including their geographic location, as well as the customer's account history, trades attempted, and withdrawal requests.  In at least certain instances, the SpotOption CRM also identified a customer's risk level–i.e., the risk that the customer would meet their turnover requirement and be able to withdraw funds from their account.

88.     Unbeknownst to customers, the results of binary option transactions could be manipulated on the Spot Platform, for example, by changing the strike price of a trade just before

expiry.  For at least part of the Relevant Period, Cartu and/or the Peretz Brothers typically approved requests to alter trading outcomes for customers of the Cartu Brands.

89.     By at least September 2014, Masten and Cartu began developing the Cartu Platform.  Upon information and belief, Masten owned 30% of the Cartu Platform, and Cartu and others owned 70% of the platform.  Masten was the lead developer for the Cartu Platform. Between July 2015 and January 2017, Masten received at least $1,448,209 from Greymountain through transfers to BareIt.  Upon information and belief, those funds represent only a small percentage of the revenue Masten received in connection with the development and operation of the Cartu Platform.  The Cartu Platform went through numerous updates and iterations, and has been referred to at various times during the Relevant Period as the "Glenridge platform" "Novustra Binary Trading Platform" and "Inovesto platform."

90.     On June 18, 2016, a few months before launch, Masten sent an email to Cartu reflecting on the development of the platform, stating "no one thought it would be 1.5 yrs before we got here but we're finally here and moving full steam!  I wish I could of [sic] come on full time long ago."

91.     The Cartu Platform "went live" in or around September 2015.  Thereafter, Defendants used the Cartu Platform to offer and execute binary option transactions, including currency pairs and commodities; to track customer information including deposits; generate commission reports for individual brokers; and control at least certain customer transactions.

92.     On October 11, 2015, only a few weeks into the Platform's operations, Cartu sent an email to Masten stating, "[t]he month goes very well so far in the platform.  We're on track to do a bit over 1.5M which should leave us around 1.2-1.3 net, which would be around $30,000 for

yourself.  May I be so bold as to prematurely congratulate you on what looks to be the beginning of your deliverance?  You've certainly earned it bro."

93.     Unbeknownst to the individuals who traded binary options with the Cartu Brands, the Cartu Platform included functionality to "manage risk" associated with a customer, including by altering the pre-set spread or strike price of a trade and delaying execution of a trade.  It also allowed binary brands to limit a customer's open volume or number of trades, without disclosure to the customer, or to limit the brand's maximum daily loss.  Increasing the risk setting allowed the Cartu Brands (and other third-parties brands that utilized the Cartu Platform) to decrease the number of winning trades, thereby increasing customer loses–and their own profits

94.     By March 2016, at least ten binary options brands offered and entered into illegal, off-exchange binary option transactions with their customers through the Cartu Platform.  Upon information and belief, Greymountain provided payment processing services for all of the brands that utilized the Cartu Platform.

95.     Cartu, Masten, and others shared the revenues generated by the Cartu Platform and used various entities they owned and controlled, most notably All Out, BareIt, Blue Moon, and Orlando Union, to open accounts and enter into agreements on behalf of the Cartu Platform, and to transfer and hold revenue generated through the Cartu Platform.  At least after June 1, 2016, the Peretz Brothers received funds generated by and through the Cartu Platform in connection with their ownership of the Cartu Brands.

96.     In telephone calls and other solicitations, the brokers, as well as other employees and agents acting on behalf of the Cartu Brands and at the direction of Cartu or the Peretz Brothers, among others, falsely represented to customers and prospective customers that their funds were held in regulated financial institutions.

97.     In fact, Cartu and the Peretz Brothers individually and collectively used dozens of off-shore entities and accounts to hold, transfer, and conceal funds received from customers of the Cartu Brands and other brands that utilized the Cartu Platform, and/or Greymountain's payment processing services.

98.     Credit card companies typically prohibit financial institutions that accept and process credit and debit card transactions from engaging in or supporting activity that is illegal or reflects negatively on the credit card brand.  In order to limit the risk that banks and credit card companies would refuse to transfer customer funds to the Cartu Brands due to suspected fraud, Cartu developed Greymountain as the Cartu Brands' own payment service processor for credit card transactions.

99.     On or around May 20, 2014, a person working in coordination with Cartu caused Greymountain to be incorporated as a single member private company under the laws of Ireland. During the Relevant Period, Greymountain held itself out as providing "customer support, call center agents, graphic design, compliance/ risk management, account management, tech support and affiliation" for "Binary Options brands . . . and other entities operating in the binary options space" including "Tracy PAI, based out of Ramat Gan in Israel."

100.    At various times during the Relevant Period, Cartu and others working in coordination with him opened accounts on behalf of Greymountain in the name of All Out, Blue Moon, Orlando Union, and other entities involved in the fraudulent scheme, and used those accounts to accept, hold, and transfer customer funds in connection with illegal off-exchange binary options transactions.

101.    During the Relevant Period, Greymountain received and processed over $165 million in connection with illegal off-exchange binary options transactions.  Between August 1,

2015 and November 6, 2017, the Greymountain bank account at Allied Irish Bank received deposits totaling $153,627,947.

102.    According to Greymountain, 60% of the transactions it processed were for individuals located in the United States or Canada, along with 20% for individuals in Africa, 10% for individuals in Europe, 5% for individuals in Australia and Oceania, and 5% for individuals in the Commonwealth of Independent States, consisting of post-Soviet republics in Eurasia.

103.    Between January 2014 and August 2017, MasterCard processed a total of $38,334,722 in transactions for Cartu Brands on behalf of U.S. customers.

104.    Between May 2016 and July 2017, Visa processed a total of $19,757,074in transactions for Cartu Brands on behalf of U.S. customers.

### VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.4, 17 C.F.R. § 32.4 (2022)**

**Commodity Options Fraud**

**(Against Jonathan Cartu, Leeav Peretz, Nati Peretz, and Blue Moon Investments, Ltd.)**

105.    The allegations set forth in the paragraphs above are realleged and incorporated herein by reference.

106.    During the Relevant Period, Defendants Jonathan Cartu, Leeav Peretz, Nati Peretz, and Blue Moon Investments, Ltd., in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction, directly and indirectly:  (a) cheated or defrauded, and attempted or cheat and defraud, customers and prospective customers; (b) made or caused to be made to customers and prospective customers

false reports or statements; and (c) deceived or attempted to deceive customers and prospective customers in connection with commodity option transactions, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4. These Defendants did so by engaging in the conduct alleged in the foregoing paragraphs, including by:

    a. Misrepresenting: (1) the risk, cost, and profit potential of binary option transactions offered to customers by the Cartu Brands; (2) that the financial interests of the Cartu Brands were aligned with the customers' financial interest, and failing to disclose that they profited from customer losses; and (3) the financial experience and expertise, as well as the identity and physical location, of their employees and agents; and

    b. Making or causing to be made false reports regarding the binary option transactions offered to customers by the Cartu Brands and executed on the Cartu Platform.

107. Each of these Defendants participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 committed by other Defendants.

108. Cartu has exercised direct and indirect control over Blue Moon and either did not act in good faith or knowingly induced Blue Moon's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Blue Moon's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

109. Each act of: (a) cheating or defrauding, and attempting to cheat and defraud, customers and prospective customers; (b) making or causing to be made to customers and prospective customers false reports or statements; and (c) deceiving or attempting to deceive customers and prospective customers, is alleged as a separate and distinct violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4.

## COUNT TWO

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2022)**

### Fraud by Deceptive Device or Contrivance

**(Against Jonathan Cartu, Leeav Peretz, Nati Peretz, and Blue Moon Investments, Ltd.)**

110.    The allegations set forth in the paragraphs above are realleged and incorporated herein by reference.

111.    The binary option transactions offered by Defendants Jonathan Cartu, Leeav Peretz, Nati Peretz, and Blue Moon Investments, Ltd. are swaps, as defined by Section 1a(47)(A) of the Act, 7 U.S.C. § 1a(47)(A).

112.    During the Relevant Period, these Defendants intentionally or recklessly used or employed, or attempted to use or employ, manipulative or deceptive devices or contrivances in connection with contracts of sale of swaps, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).  These Defendants did so by engaging in the conduct alleged in the foregoing paragraphs, including by:

    a.  Misrepresenting:  (1) the risk, cost, and profit potential of binary option transactions offered to customers by the Cartu Brands; (2) that the financial interests of the Cartu Brands were aligned with the customers' financial interest and failing to disclose that they profited from customer losses; and (3) the financial experience and expertise, as well as the identity and physical location, of their employees and agents;

    b.  Making or causing to be made false reports regarding the binary option transactions offered to customers by the Cartu Brands and executed on the Cartu Platform; and

    c.  Using manipulative and deceptive devices, including bonuses and risk-free trades, to entice customers to deposit additional funds and prevent them from withdrawing funds.

113.    During the Relevant Period, by the conduct alleged in the foregoing paragraphs, these Defendants, directly or indirectly in connection with swaps, intentionally or recklessly:

(a) used or employed, or attempted to use or employ, manipulative devices, schemes, and artifices to defraud; (b) made, or attempted to make, untrue or misleading statements of material facts; (c) omitted to state material facts necessary in order to make statements made not untrue or misleading; and (d) engaged, or attempted to engage, in acts, practices, and courses of business, which operated or would operate as a fraud or deceit upon customers or prospective customers, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

114.   Each of these Defendants participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) committed by other Defendants.

115.   Cartu has exercised direct and indirect control over Blue Moon and either did not act in good faith or knowingly induced Blue Moon's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Blue Moon's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

116.   Each act of:  (a) using or employing, or attempting to use or employ, manipulative devices, schemes, and artifices to defraud; (b) making, or attempting to make, untrue or misleading statements of material facts; (c) omitting to state material facts necessary in order to make statements made not untrue or misleading; and (d) engaging or attempting to engage, in acts, practices, and courses of business, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

## COUNT THREE

**Violations of Sections 4k(3) and 4m(1) of the Act, 7 U.S.C. §§ 6k(3) and 6m(1)**

**Failure to Register as a CTA (BareIt) and
Failure to Register as an AP of a CTA (Masten)**

117.    The allegations set forth in the paragraphs above are realleged and incorporated herein by reference.

118.    During the Relevant Period, BareIt acted as a CTA by advising customers on trading binary options for compensation or profit.  By engaging in this activity without having registered as a CTA, BareIt violated 7 U.S.C. § 6m(1).

119.    Each use by BareIt of the mails or any means or instrumentality of interstate commerce in connection with its business as a CTA without proper registration, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6m(1).

120.    Masten held and exercised direct and indirect control over BareIt and either did not act in good faith or knowingly induced, directly or indirectly, BareIt's violations of 7 U.S.C. § 6m(1) and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for BareIt's violations of 7 U.S.C. § 6m(1).

121.    During the Relevant Period, Masten was associated with the unregistered CTA BareIt and acted as a partner, officer or agent in a capacity that involved the solicitation of customer or prospective customer accounts and/or solicitation of such persons so engaged, while failing to register with the CFTC as an AP of the CTA, in violation of 7 U.S.C. § 6k(3).

122.    Each act of soliciting a customer or prospective customer's account by Masten, including those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6k(3).

123.    The foregoing acts, omissions, and failures by Masten, and other officers, employees, and agents of BareIt occurred within the course or scope of their employment or office with BareIt.  Pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), BareIt is liable as a principal for its officers, employees, and agents' acts, omissions, and failures, including but not limited to those of Masten, in violation of 7 U.S.C. § 6k(3).

### COUNT FOUR

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2,
17 C.F.R. § 32.2 (2022)**

**Illegal Off-Exchange Commodity Options**

**(Against Jonathan Cartu, Leeav Peretz, Nati Peretz, and Blue Moon Investments, Ltd.)**

124.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

125.    During the Relevant Period, Defendants Jonathan Cartu, Leeav Peretz, Nati Peretz, and Blue Moon have offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to commodity option transactions in interstate commerce.

126.    The commodity options that these Defendants have offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to, were not executed on any registered exchange nor have these Defendants sought registration as an exempt foreign exchange.

127.    Defendants Jonathan Cartu, Leeav Peretz, Nati Peretz, and Blue Moon, by the conduct alleged in the foregoing paragraphs, and by offering to enter into, entering into, confirming the execution of, maintaining a position in, or otherwise conducting activity related

to commodity options, other than on a registered exchange, have violated 7 U.S.C. § 6c(b) and
Regulation 32.2, 17 C.F.R. § 32.2 (2022).

128.    Each of these Defendants participated in the unlawful acts and practices described
in this Complaint and are therefore jointly and severally liable for the violations of 7 U.S.C.
§ 6c(b) and 17 C.F.R. § 32.2 committed by other Defendants.

129.    Cartu has exercised direct and indirect control over Blue Moon and either did not
act in good faith or knowingly induced Blue Moon's violations and is therefore liable, pursuant
to 7 U.S.C. § 13c(b), for Blue Moon's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

130.    Each act of offering to enter into, entering into, confirming the execution of,
maintaining a position in, or otherwise conducting activity related to commodity options, other
than on a registered exchange, is alleged as a separate and distinct violation of 7 U.S.C. § 6c(b)
and 17 C.F.R. § 32.2.

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by
Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to the Court's own equitable powers:

A.      Find that Defendants Jonathan Cartu, Leeav Peretz, Nati Peretz, and Blue
Moon Investments Ltd., violated Sections 4c(b) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(b) and
9(1), and Regulations 32.2, 32.4, and 180.1(a)(1)–(3), 17 C.F.R. §§ 32.2, 32.4, and
180.1(a)(1)–(3) (2022);

B.      Find that Defendants Masten and BareIt violated Sections 4k(3) and 4m(1) of
the Act, 7 U.S.C. §§ 6k(3), 6m(1);

C.      Enter an order of permanent injunction enjoining Defendants Jonathan Cartu,
Leeav Peretz, Nati Peretz, and Blue Moon Investments Ltd., and their affiliates, agents,

servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receives actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6c(b) and 9(1) and 17 C.F.R. §§ 32.2, 32.4, 180.1(a)(1)–(3), and, as to Masten and BareIt, 7 U.S.C. §§ 6k(3) and 6m(1);

   D. Enter an order of permanent injunction prohibiting all Defendants and any of their affiliates, agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from directly or indirectly:

    i. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40);

    ii. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)) for accounts held in the name of any Defendants or for accounts in which any Defendant has a direct or indirect interest;

    iii. Having any commodity interests, traded on any Defendant's behalf;

    iv. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    v. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

    vi. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

    vii.   Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

    E.    Enter an order directing Jonathan Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, BareIt Media LLC d/b/a SignalPush, and Blue Moon Investments Ltd., as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, real and personal property and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and the Regulations as described herein , including pre- and post-judgment interest;

    F.    Enter an order requiring Jonathan Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, BareIt Media LLC d/b/a SignalPush, and Blue Moon Investments Ltd., as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act and the Regulations, as described herein, and pre- and post-judgment interest;

    G.    Enter an order directing Jonathan Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, BareIt Media LLC d/b/a SignalPush, and Blue Moon Investments Ltd., to pay a civil monetary penalty, assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, tit. VII, § 701, 129 Stat. 584. 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act and Regulations, as described herein;

H.     Enter an order requiring Jonathan Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, BareIt Media LLC d/b/a SignalPush, and Blue Moon Investments Ltd., to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I.     Enter an Order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.


Dated:  March 3, 2023

Respectfully submitted,

*/s Benjamin E. Sedrish*

Elizabeth N. Pendleton
Benjamin E. Sedrish
Elizabeth M. Streit

Attorneys for Plaintiff
Commodity Futures Trading Commission
525 W. Monroe St
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
*ependleton@cftc.gov*
*bsedrish@cftc.gov*
*estreit@cftc.gov*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 3, 2023, a copy of the foregoing First Amended Complaint was served on all counsel of record via the Court's CM/ECF electronic filing system.

<u>*/s Benjamin E. Sedrish*</u>