**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | **Case No: 1:20-CV-908-RP** |
| **v.** | |
| **JONATHAN CARTU, RYAN MASTEN, LEEAV PERETZ, NATI PERETZ, BAREIT MEDIA LLC D/B/A SIGNALPUSH, AND BLUE MOON INVESTMENTS, LTD.,** | |
| **Defendants.** | |

**PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**JONATHAN CARTU'S MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................ iii

BACKGROUND ............................................................................................. 1

ARGUMENT .................................................................................................. 5

   I.   THE FIRST AMENDED COMPLAINT STATES CLAIMS UNDER RULES 8 AND 9(B) ............................................................................................................. 5

A.    The Complaint Satisfies Rule 8 ....................................................................... 6

     1.    The Complaint Alleges that Cartu Acted as Part of a Common Enterprise......... 6

     2.    The Complaint Pleads Control Person Liability ................................... 10

B.    The Complaint Pleads Fraud with Sufficient Particularity ........................... 12

   II.    THIS COURT HAS PERSONAL JURISDICTION OVER CARTU .................... 17

CONCLUSION ............................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 6

*Berry v. Indianapolis Life Ins. Co.*, 2011 WL 3555869 (N.D. Tex. Aug. 11, 2011) ................... 16

*Brown v. Bilek*, 401 F. App'x 889 (5th Cir. 2003) ........................................................ 16

*Brown v. Flowers Indus., Inc.*, 688 F.2d 328 (5th Cir. 1982) ......................................... 19

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ................................................... 20

*Busch v. Buchman, Buchman & O'Brien Law Firm*, 11 F.3d 1255 (5th Cir. 1994) .................... 17

*CFTC v. Allied Mkts. LLC*, 371 F. Supp. 3d 1035 (M.D. Fla. 2019) ................................. 11

*CFTC v. Gibraltar Monetary Corp.*, 2006 WL 1789018 (S.D. Fla. May 30, 2006) ................... 13

*CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311 (S.D. Fla. 2014) ................... 10, 11

*CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317 (S.D. Fla. 2014) ...................... 12

*CFTC v. Johnson*, 408 F. Supp. 2d 259 (S.D. Tex. 2005) ............................................ 11

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) ............................ 12

*CFTC v. Kratville*, 796 F.3d 873 (8th Cir. 2015) .................................................... 11

*CFTC v. Lake Shore Asset Mgmt. Ltd.*, 2007 WL 2659990 (N.D. Ill. Aug. 28, 2007) ................ 9

*CFTC v. Leben*, 2016 WL 7354359 (D.S.C. Aug. 5, 2016) ............................................. 13

*CFTC v. M25 Invests. Inc.*, 2010 WL 769367 (N.D. Tex. Mar. 6, 2010) ............................. 14

*CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321 (11th Cir. 2002) ........................... 10, 12

*CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371 (S.D.N.Y. 2019) .................................... 17, 18

*CFTC v. Total Call Grp., Inc.*, 2012 WL 1642196 (E.D. Tex. Mar. 30, 2012) ....................... 11

*CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29 (D.D.C. 2015) ............................. 8

*CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260 (D. Kan. 2003) ......................... 8

*Cuvillier v. Taylor*, 503 F.3d 397 (5th Cir. 2007) .................................................. 6

*De La Hoya v. Coldwell Banker Mexico, Inc.*, 125 F. App'x 533 (5th Cir. 2005) ........................ 8

*Del Castillo v. PMI Holdings N. Am. Inc.*, 2016 WL 3745953 (S.D. Tex. July 13, 2016)............. 9

*Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008) .................................................. 15

*Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007 (S.D. Tex. 2018) ........................................ 19

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014) ..................................................... 7

*FTC v. Educare Centre Servs., Inc.*, 414 F. Supp. 3d 960 (W.D. Tex. 2019) ....................... 18, 19

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012)....................... 9

*FTC v. On Point Capital Partners LLC*, 17 F.4th 1066 (11th Cir. 2021)....................................... 9

*Gilmour v. Blue Cross & Blue Shield of Ala.*, 2021 WL 1196272 (E.D. Tex. Mar. 30, 2021) .... 15

*Hill v. Aramark Healthcare Mgmt. Servs.*, 2006 WL 8437490 (N.D. Tex. Apr. 20, 2006) ........... 8

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007) ............................................... 5

*In re Venator Materials PLC Litig.*, 547 F. Supp. 3d 624 (S.D. Tex. 2021) ............................... 15

*Kunzweiler v. Zero.Net, Inc.*, 2002 WL 1461732 (N.D. Tex. July 3, 2002)................................. 12

*Lewis v. Fresne*, 252 F.3d 352 (5th Cir. 2001) ........................................................................... 19

*Luv N'care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465 (5th Cir. 2006)................................................ 17

*Miller v. Doe*, 422 F. Supp. 3d 1176 (W.D. Tex. 2019) ................................................................ 6

*Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1993)........................................................................ 10

*Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, 2015 WL 13741905 (N.D. Tex. Feb. 4, 2015)........................................................................................................................................ 17

*Small Ventures USA, LP v. Rizvi Traverse Mgmt., LLC*, 2012 WL 4621130 (S.D. Tex. Oct. 2, 2012)............................................................................................................................................ 19

*Tigue Inv. Co., Ltd. v. Chase Bank of Tex., N.A.*, 2004 WL 3170789 (N.D. Tex. Nov. 5, 2004). 17

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998)............................................................................................................................................ 15

*Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ................................................. 16

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235 (5th Cir. 2008) ........... 20

*Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208 (5th Cir. 1999) ..................................................... 20

*Williams v. WMX Technologies, Inc.*, 112 F.3d 175 (5th Cir. 1997) ........................................... 16

Plaintiff Commodity Futures Trading Commission ("CFTC") submits this memorandum of law in opposition to the Motion to Dismiss filed by Defendant Jonathan Cartu (ECF No. 99). As set forth below, Cartu's arguments are without merit, and the motion should be denied.

## **BACKGROUND**

On March 3, 2023, the CFTC filed the First Amended Complaint ("FAC") against Jonathan Cartu, Ryan Masten, Leeav Peretz, Nati Peretz, Blue Moon Investments, Ltd., and BareIt Media LLC. (ECF No. 93.) The FAC alleges that beginning on or before May 1, 2013, and continuing to at least April 29, 2018 (the "Relevant Period"), Cartu and others used dozens of off-shore entities he and others working in coordination with him owned or controlled to operate a fraudulent binary options scheme. (FAC ¶ 1.) Cartu controlled this collection of companies (the "Cartu Enterprise") and used it to market, offer, and sell binary options on currency pairs, oil, and other commodities to retail customers in the United States and elsewhere through customer-facing brands they owned and operated, including BeeOptions, Glenridge Capital, and Rumelia (the "Cartu Brands"), and "executed" those binary options on a platform Cartu designed and operated that functioned in a manner similar to that of a casino or sportsbook, not a legitimate, regulated exchange. (*Id.* ¶¶ 2, 49–56.)

Cartu and the individual brokers he ultimately employed, and others acting on his behalf, disseminated—via websites, emails, telephone calls, and other communications—material misrepresentations to individuals in the United States to entice them to deposit funds to trade binary options. (*Id.* ¶¶ 3, 49–50, 60.) Although physically located in Israel, the brokers primarily targeted individuals located in the United States or Canada. (*See id.* ¶¶ 3, 102.) The Cartu Enterprise, acting at Cartu's direction, also used email solicitations or videos created by affiliate marketers to direct potential U.S. customers to use one of the Cartu Brands to open and

fund a binary options trading account. (*Id.* ¶¶ 49, 66.) Customer deposits, if done by credit card, were processed by Greymountain Management Limited, a payment processor partially owned and controlled by Cartu. (*Id.* ¶¶ 23, 49, 55, 78.)

Brokers acting at the direction of Cartu and the Peretzes, who reported to Cartu (*see id.* ¶ 27), made material misstatements to customers and potential customers, including promises of "quick" returns of 60–85%, assurance that the Cartu Brands' interests were aligned with those of customers, and misrepresentations of brokers' financial expertise, compensation structure, location, and identity. (*Id.* ¶¶ 3, 81–84.) In addition, brokers and other employees and agents acting on behalf of the Cartu Brands and at Cartu's direction falsely represented to customers and prospective customers that their funds were held in regulated financial institutions when in fact they were held in dozens of unregulated off-shore entities. (*Id.* ¶¶ 96, 97.)

The binary options advertised by the Cartu Enterprise were executed on an internet-based trading platform (the "Cartu Platform") designed, operated, and owned by the Cartu Enterprise, along with defendants Ryan Masten, a resident of this District, and BareIt Media, a Texas limited liability company. (*Id.* ¶¶ 5, 17, 20, 87.) Cartu and Masten began developing the Cartu Platform by at least September 2014. (*Id.* ¶ 89.) Cartu and Masten built the platform to include the deceptive devices that limited customers' ability to withdraw funds. (*Id*. ¶¶ 85–90, 93–96.) The platform went live in or around September 2015, after which it was used to offer and execute binary options transactions, track customer information, generate commission reports, and control customer transactions. (*Id.* ¶¶ 90–92.)

Unbeknownst to customers, the Cartu Brands were the counterparties on each binary options transaction, taking the opposite position on each trade entered into by customers. (*Id.* ¶¶ 58, 83.) Cartu and Masten, in concert and through Blue Moon and BareIt, controlled the binary

options transactions, and at times, manipulated trades to force customer losses. (*Id.* ¶¶ 49, 88.)
Moreover, the transactions advertised and purportedly executed were not actual transactions, but
book entries that gave the appearance of transactions, with no transfer of money from one
customer account to another at expiry. (*Id.* ¶ 59.) To accomplish this scheme, Cartu used dozens
of entities he controlled to open accounts and enter into agreements on behalf of the Cartu
Platform, and to transfer and conceal revenue generated by it. (*Id.* ¶¶ 1, 22–31, 97.)

Cartu knew and intended that the Cartu Enterprise would target individuals located in the
United States. (*See id.* ¶¶ 3, 6, 50.) For example, when hiring a new employee for one of the
Cartu Brands, Cartu noted that "[w]e operate 24/6 owing to a large amount of our customers
being from the United States or Canada." (*Id.* ¶ 65.) And on January 4, 2014, Cartu emailed
staff members of one of the Cartu Brands to detail a Super Bowl promotion "for our American
and Canadian customers." (*Id.* ¶ 62.) Indeed, Cartu emailed employees on January 26, 2014 to
direct them to "PICK UP THE PHONE AND CALL" certain "USA and Canada customers" who
had made recent large deposits. (*Id.* ¶ 63.) When engaging affiliate marketers to promote the
Cartu Brands, Cartu personally negotiated a special rate for U.S. customers because "I have so
much US . . . ." (*Id.* ¶ 67.) In or around June 2015, when Cartu learned that a technical error
was impeding signups for customers in the United States, he wrote that "[a]ffiliates . . . couldn't
sign up US Customers," then directed an employee to "confirm that the problem is solved," even
suggesting a fix of his own. (*Id.* ¶ 69.)

Cartu also made sure the Cartu Enterprise would retain U.S. customers after successful
solicitations. In or around April of 2015, he approved a request from a Cartu Brand vice
president to send out tablets as incentive rewards for customers in Alabama and California. (*Id.*
¶ 68.) When he received word that a customer was having issues withdrawing money to his

California bank account, Cartu directed employees to "take care of this [issue] as quickly as possible." (*Id.* ¶ 64.) And even after BeeOptions decided that it was "no longer interested in acquiring [sales] traffic from the USA," Cartu emphasized that while BeeOptions did not want "NEW US registrations," nothing should change for existing clients. (*Id.* ¶ 70.)

Cartu appeared to be aware that marketing to customers in the United States could present legal problems for him or the Cartu Enterprise. In the same exchange where he agreed that BeeOptions should not sign up new customers from the United States, Cartu demanded that all communications about the United States be routed through him. (*Id.*) After a customer won a car as a gift, Cartu made sure that the location of the winner would not be advertised "if it was in the United States." (*Id.* ¶ 71.) On May 5, 2016, Peretz emailed Cartu to note that BeeOptions had "made it onto cftc list," presumably referring to the Registration Deficient List (commonly known as the "RED List") maintained by the CFTC. (*Id.* ¶ 74.) Peretz later shared the RED List and "strongly suggest[ed] ceasing to take any further credit card deposits starting June 1st 2016," and moving all sales agents working for BeeOptions to Glendridge. (*Id.* ¶ 75.)

The Cartu Brands generated substantial sums of money. For example, according to an email from Cartu to certain employees, the BeeOptions brand generated over $1.6 million in September 2014 alone. (*Id*. ¶ 78.) The Cartu Enterprise operated Greymountain to process the transfer of funds from customers in the United States and elsewhere to the Cartu Brands, and later other binary options brands, and thereafter to distribute profits. (*Id*. ¶ 6.) In aggregate, Greymountain received and processed over $165 million in connection with illegal, off-exchange binary options transactions including, according to Cartu's own statements, approximately $100 million from United States individuals. (*Id*. ¶¶ 6, 101–02.) Between September 2014 and January 2017, Greymountain transferred at least $9.2 million to Cartu through Blue Moon

Investments, a Seychelles corporation he owned and controlled.  (*Id.* ¶¶ 7, 21.)

The FAC asserts three claims against Cartu under the Commodity Exchange Act ("Act") and accompanying regulations.  Count One alleges that Cartu's conduct amounted to commodity options fraud in violation of 7 U.S.C. § 6c(b), and 17 C.F.R. § 32.4 (2022).  Count Two alleges that Cartu engaged in fraud by deceptive device or contrivance in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) (2022).   Count Four alleges that Cartu sold illegal, off-exchange commodity options in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2 (2022).

## ARGUMENT

Cartu raises three primary arguments in favor of dismissing the FAC.  First, he argues that the FAC fails to state a claim against him under Rule 8.  (Mot.[1] at 14–15.)  Second, he contends the FAC fails to satisfy the heightened pleading standards of Rule 9(b).  (*Id.* at 16–20.) Finally, he contends that the Court lacks personal jurisdiction over him because the CFTC failed to allege that Cartu was responsible for any conduct directed to the United States.  (*Id.* at 4–13.) None of these arguments has merit.

## I.     THE FIRST AMENDED COMPLAINT STATES CLAIMS UNDER RULES 8 AND 9(B)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  In deciding motions brought under this rule, "a court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted).  To survive a motion to dismiss, "a complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual

---

[1] Citations to "Mot." refer to Defendant Jonathan Cartu's Motion to Dismiss, filed on May 19, 2023, as ECF No. 99.

allegations that when assumed to be true 'raise a right to relief above the speculative level.'"
*Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 555 (2007)).  Accordingly, a plaintiff need only "plead[] factual content that allows the
court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] motion to dismiss under 12(b)(6) is viewed
with disfavor and is rarely granted."  *Miller v. Doe*, 422 F. Supp. 3d 1176, 1183 (W.D. Tex.
2019) (Pitman, J.) (quoting *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011)).  Under Rule
9(b), a party must "state with particularity the circumstances constituting fraud or mistake."

### A.   The Complaint Satisfies Rule 8

In one paragraph, Cartu argues that the CFTC fails to satisfy the permissive standards of
Rule 8 because the FAC "lump[s] all defendants together."  (Mot. at 15.)  He asserts that the
CFTC does not "identify what specific acts Cartu personally committed that violated United
States law . . . ."  (*Id.*)  Cartu does not identify which elements of the claims against him, if any,
he believes the FAC failed to allege.  Nevertheless, accepting as true the well-pleaded allegations
in the FAC, as the Court must at this stage, establishes that Cartu and the common enterprise he
controlled offered illegal off-exchange binary options and engaged in fraudulent activity in
violation of the Act and Regulations.  The allegations in the FAC are sufficient to "allow the
court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

### 1.   The Complaint Alleges that Cartu Acted as Part of a Common Enterprise

The FAC alleges that Cartu himself took, or directed others to take, actions that violated
the Act and Regulations.  It alleges that Cartu used the individuals and entities involved in the
Cartu Enterprise to offer illegal, off-exchange binary options on commodity interests.  (FAC ¶¶
2, 50, 54, 56–59.)  The FAC also alleges that Cartu, along with Masten, designed the Cartu

Platform that allowed Cartu to take the opposite side of transactions with customers and manipulate trade results.  (*Id.* ¶¶ 5, 49.)  The FAC further alleges that Cartu controlled the Cartu Brands to make these solicitations via brokers, affiliate marketers, and company websites.  (*Id.* ¶¶ 3, 27–31, 60, 61.)  Indeed, Cartu himself negotiated the terms of an affiliate marketer's contract, demanding different prices for U.S. vs. non-U.S. individuals who deposited money with BeeOptions (*id.* ¶ 67), and he directed BeeOptions sales representatives to "PICK UP THE PHONE AND CALL" U.S. and Canadian customers.  (*Id.* ¶ 62.)  When Cartu himself was informed that technical issues were affecting customers, he himself emailed employees to make sure the issues were fixed quickly.  (*Id.* ¶¶ 63, 69, 72.)

Even if these individualized allegations were not sufficient, the FAC also alleges that Cartu acted as part of a common enterprise to carry out his scheme.  The FAC specifically charges Cartu with "acting individually and through dozens of off-shore entities he and others working in coordination with him ultimately owned and controlled," twelve of which are identified in the FAC, and seeks to hold Cartu liable for the actions of this common enterprise. (*Id.* ¶¶ 1, 22–31.)  As the FAC alleges, Cartu elected to use corporate and fictitious entities to offer illegal, off-exchange binary options transactions; hire the individual brokers who, at his direction, made material misrepresentations; operate the Cartu Brand websites; develop and market the Cartu Platform, and use the platform to prevent customer withdrawals; and hold and conceal funds obtained in connection with the fraudulent scheme, among other activities.  (*Id.* ¶¶ 22–31, 49, 54–61, 66, 78–86.)  Cartu should not be permitted to rely on the web of entities he created and controlled to avoid liability, especially where the well-pleaded allegations show that the CFTC is entitled to relief.  *See, e.g.*, *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 637 (6th Cir. 2014) (affirming joint and several liability on common enterprise theory where each

corporate and individual defendant made up a "messy maze of interrelated business entities").[2]

It is well established that when entities and individuals operate as a common enterprise, each may be held jointly and severally liable under the Act for the unlawful acts and practices of other members of the enterprise. *See, e.g.*, *CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003) (individual and others held to be part of a common enterprise where they operated as a "single economic entity"); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 39 (D.D.C. 2015) (granting summary judgment against members of common enterprise). In determining whether a common enterprise exists, courts look to a variety of factors, including whether businesses: "(1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Trade Exch. Network*, 117 F. Supp. 3d at 38–39; *see also FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014) (same).

Here, the detailed factual allegations of the FAC notify Cartu of his role in the fraudulent scheme and establish a common enterprise. Cartu solicited individuals in the United States to trade illegal binary options with the Cartu Brands, each a fictitious binary options brand that the common enterprise controlled through websites Cartu owned and operated. (FAC ¶¶ 2–3, 49–51, 54–56.) The Cartu Brands operated out of a shared office space and had common employees. (*Id.* ¶ 27 ("Tracy PAI operated out of an office in Tel Aviv, Israel, and employed the individual brokers who solicited and sold binary options on behalf of the Cartu Brands.").) Cartu

---

[2] The FAC need not use magic words like "common enterprise" to advance this theory of liability. *See, e.g.*, *Hill v. Aramark Healthcare Mgmt. Servs.*, 2006 WL 8437490, at *3 (N.D. Tex. Apr. 20, 2006) (despite not advancing a common enterprise theory by name, petition adequately notified defendants that plaintiff intended to pursue theories of joint corporate liability); *De La Hoya v. Coldwell Banker Mex., Inc.*, 125 F. App'x 533, 537–38 (5th Cir. 2005) (plaintiffs could rely on single business enterprise theory where complaint referred to all defendants by a single name and alleged they were engaged in joint enterprise even though a single business enterprise theory was not specifically pleaded in the complaint).

used entities he controlled, including Tracy PAI and UKTVM, to hire the brokers who solicited customers on behalf of the Cartu Brands.  (*Id.* ¶¶ 27–31, 60, 78.)  The same brokers, acting at the direction of Cartu and others, made the same marketing pitches, including for example promising returns "between 60-85%."  (*Id.* ¶¶ 80–85.)  Cartu also commingled funds from the binary options enterprise and, with the Peretzes, "used dozens of off-shore entities and accounts to hold, transfer, and conceal funds received from customers of the Cartu Brands . . . ."  (*Id.* ¶¶ 97, 100.)

Thus, the FAC includes detailed allegations establishing the common enterprise.  *See, e.g.*, *FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1083 (11th Cir. 2021) (affirming finding of common enterprise based on common control, shared office space and employees, and commingled funds); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012) (common enterprise pleaded where no dispute that corporate defendants were controlled by same persons and shared the business address and office space); *CFTC v. Lake Shore Asset Mgmt. Ltd.*, 2007 WL 2659990, at *24 (N.D. Ill. Aug. 28, 2007) ("Corporate formalities are not binding when a corporation is part of a common enterprise[.]").  Accordingly, Cartu is liable for the misconduct of the other members of the common enterprise.

Cartu does not directly address common enterprise liability in the Motion.  However, he relies on *Del Castillo v. PMI Holdings North America Inc.*, where the court held a fourth amended complaint insufficient when the plaintiffs made only "bald assertions" that the entities "are so intertwined as to be essentially one company" and generally alleged a negligence claim without any factual enhancement.  2016 WL 3745953, at *12–13 (S.D. Tex. July 13, 2016).  Here, in contrast, the FAC contains detailed allegations regarding the overlap between the companies and Cartu, as well as the violative acts committed by Cartu or others acting with him.

### 2.   The Complaint Pleads Control Person Liability

The FAC also pleads that Cartu controlled entities that violated the Act, which is also

sufficient to state a claim.  Under Section 13(b) of the Act, 7 U.S.C. § 13c(b), any person who,

"directly or indirectly, controls any person who has violated any provision of the Act, or any of

the rules, regulations, or orders issued" pursuant to the Act, "may be held liable for such

violation in any action brought by the Commission to the same extent as such controlled person,"

if the CFTC can establish that the controlling person "did not act in good faith or knowingly

induced, directly or indirectly, the act or acts constituting the violation."  The purpose of Section

13(b) is to empower the CFTC to reach individual wrongdoers including those who, as alleged,

here, operate a common enterprise.  *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1334

(11th Cir. 2002) ("A fundamental purpose of Section 13(b) is to allow the Commission to reach

behind the corporate entity to the controlling individuals of the corporation and to impose

liability for violations of the Act directly on such individuals as well as on the corporation

itself.") (quotation omitted); *CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311,

1322–25 (S.D. Fla. 2014) (finding individual defendants controlled their respective companies

and did not act in good faith); *see also Monieson v. CFTC*, 996 F.2d 852, 859–60 (7th Cir. 1993)

(declining to limit Section 13(b) to cases where firm was a "dummy" or "alter ego" of individual

defendant and recognizing statute's broad application to a "person," not merely a firm).

Control person liability attaches where a person "possesse[d] the power or ability to

control the specific transaction or activity upon which the primary violation was predicated, *even

if such power was not exercised*."  *Monieson*, 996 F.2d at 859 (emphasis added).  Here, the FAC

alleges that Cartu not only had the power to control the misconduct, he in fact did so.  (*See, e.g.*,

FAC ¶¶ 50 (Cartu and Masten marketed, offered, and sold binary options), 49 (Cartu controlled

transactions on the Cartu Platform and manipulated trade results), 55 (Cartu offered and accepted binary option transactions through at least ten brands)).  The FAC further alleges that Cartu was involved in day-to-day decision-making, including technical support, solicitation programs, and hiring affiliate marketers and representatives.  (*Id.* ¶¶ 62–71.)  Cartu shared in the revenues generated by the Cartu Platform and "used various entities [he] controlled and owned . . . including Blue Moon . . . to open accounts and enter into agreements on behalf of the Cartu Platform, and to transfer and hold revenue generated through the Cartu Platform."  (*Id.* ¶ 95.)

These allegations, taken as true and in conjunction with the common enterprise allegations described above, adequately allege control person liability.  *See, e.g.*, *CFTC v. Johnson*, 408 F. Supp. 2d 259, 269–70 (S.D. Tex. 2005) (denying dismissal of control person liability where complaint alleged defendant was head of trading desk and responsible for conduct of employees, was aware of the price reporting activities in violation of company policy, and did not take steps to prevent these activities); *cf. CFTC v. Total Call Grp., Inc.*, 2012 WL 1642196, at *9–10 (E.D. Tex. Mar. 30, 2012) (entering default judgment and holding individual defendants liable as control persons where complaint alleged they were the sole principals of defendant entity and were responsible for all of the corporation's acts).

Cartu argues that the CFTC has failed to show that he possessed general control over the entities that carried out the fraud.  But in so doing, he attempts to impose an evidentiary burden on the CFTC that is improper at the pleading stage.  Indeed, all of the cases he cites (Mot. at 21) in support of this proposition are decisions on motions for summary judgment, where the court did not address the pleading standards for alleging control person liability.  *See CFTC v. Kratville*, 796 F.3d 873, 894 (8th Cir. 2015); *CFTC v. Allied Mkts. LLC*, 371 F. Supp. 3d 1035, 1052 (M.D. Fla. 2019); *Hunter Wise*, 1 F. Supp. 3d at 1323.  The FAC alleges that Cartu used

Blue Moon to operate the Cartu Platform, which is alleged to have offered customers illegal, off-exchange binary options and manipulate trades to cause customer losses.  (FAC ¶¶ 21, 85, 91.)  It further alleges that Cartu used TracyPAI, UKTVM, and Greymountain to operate the Cartu Brands, which fraudulently solicited funds from customers for the illegal binary options.  (FAC ¶¶ 27–31, 60, 66.)  At this stage of the litigation, before fact discovery has begun and all inferences must be drawn in favor of the plaintiff, such allegations are sufficient.  *See, e.g.*, *Kunzweiler v. Zero.Net, Inc.*, 2002 WL 1461732, at *13–14 (N.D. Tex. July 3, 2002) (where plaintiff alleged that defendant was a director of corporation and had used his position to obtain a refund, with the "benefit of all reasonable inferences," plaintiff alleged control person status).

### B.  The Complaint Pleads Fraud with Sufficient Particularity

The FAC charges Cartu with commodity options fraud in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4 (Count One) and fraud by deceptive device or contrivance in violation of 7 U.S.C. § 9(1) and 17 C.F.R. 180.1(a) (Count Two).  Fraud involving commodity options is established when a person:  (1) makes a misrepresentation, misleading statement, or deceptive omission; (2) acts with scienter; and (3) the misrepresentation or omission is material.  *R.J. Fitzgerald*, 310 F.3d at 1328.  As to Count Two, fraud by deceptive device or contrivance will be found where a person:  (1) engages in prohibited conduct (*i.e.*, employs a fraudulent scheme, makes material misrepresentations or omissions, or engages in a fraudulent business practice); (2) in connection with the sale of a commodity in interstate commerce; (3) with scienter.  *CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1347 (S.D. Fla. 2014).  The scienter element requires a showing of reckless or intentional conduct.  *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1007 (N.D. Ill. 2015).

Cartu contends that the FAC fails to satisfy Rule 9(b) because it "fails to provide the 'who, what, when, where and how' with respect to alleged misstatements or improper acts by

Cartu."[3]  (Mot. at 18.)  But the FAC alleges that Cartu controlled and directed the entities and individuals that committed the fraudulent acts, *see supra* at Section I(A), and provides detailed descriptions of the material misstatements they made, and that is sufficient to satisfy Rule 9(b). Many of the charged false statements were made on the Cartu Brands' websites ultimately owned, operated, and controlled by Cartu (FAC ¶¶ 2, 3, 49, 80–82), while others were made in telephone and email solicitations by the individual brokers ultimately employed by Cartu (*id.* ¶ 83).  Among other statements, brokers routinely misrepresented the profitability of trading binary options with the Cartu Brands; told customers that their interests were aligned with the interests of customer, including that "BeeOptions pays me to help you make money"; and falsely stated that customer funds were held in regulated financial institutions.  (*Id.* ¶¶ 81, 83, 96.)  The brokers also failed to disclose that the Cartu Brands were on the opposite side of transactions executed on the Cartu Platform and actually benefited from customer losses.  (*Id.* ¶ 83.)  Taken as true, these allegations sufficiently set forth the details of the scheme and the basic events upon which the fraud is alleged and establish Cartu's liability for fraud through false statements.  *See CFTC v. Gibraltar Monetary Corp.*, 2006 WL 1789018, at *15 (S.D. Fla. May 30, 2006) (holding that defendants' misrepresentations and omissions regarding returns from commodity options established violation of 7 U.S.C. § 6c(b)).

These fraudulent statements also constitute fraud through deceptive device or contrivance in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).  *CFTC v. Leben*, 2016 WL 7354359, at *5 (D.S.C. Aug. 5, 2016) (summary judgment order holding that "[t]he misappropriation of funds and issuance of false information concerning investors' accounts constitute violations of

---

[3] Relying on *Kraft*, Cartu insists that the CFTC be required to allege "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the commodities at issue."  (Mot. at 17.)  *Kraft* is inapposite, as the complaint there involved market manipulation, which is not alleged here.

CEA § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).").  The FAC details additional deceptive devices relating to the binary options trades, specifically the "bonuses" and "risk free trades" offered on the Cartu Platform, and alleges that Cartu not only "designed the Cartu Platform to provide the functionality" needed to execute these devices, but that he also mandated that brokers ultimately employed by the enterprise "pitch bonuses to customers as being helpful" "when in fact the bonus was designed to limit customers' ability to withdraw funds."  (FAC ¶¶ 84–86.)

Cartu relies on *CFTC v. M25 Inv. Inc.*, 2010 WL 769367 (N.D. Tex. Mar. 6, 2010), in support of his assertion that allegations of fraud perpetuated by a common enterprise, as charged here, cannot meet Rule 9(b)'s heightened pleading standard.  The *M25* court granted defendants' motions for a more definite statement where the complaint contained only general allegations that "defendants, directly and through others fraudulent solicited customers" or "defendants concealed their trading losses."  2010 WL 769367, at *3.  Notably, the court recognized that the CFTC "may properly use group pleading to attribute statements to business entities through principles of agency or corporate law and may appropriately group the two entities alleged to be a common enterprise when it is unable to separate the allegations against them," but held that, unlike here, the *M25* complaint "goes too far and combines all defendants and sometimes unspecified representatives."  *Id.* at *4.  In contrast, the FAC contains substantial details regarding Cartu and his place in the scheme.

Next, Cartu faults the FAC for containing only "[v]ague allegations of conduct occurring without as much as identifying a timeframe" for his ongoing fraudulent scheme that lasted approximately five years.  (Mot. at 18.)  But where, as here, "the fraud alleged was complex and occurred over an extended period of time, the requirements of Rule 9(b) are less stringently applied."  *Gilmour v. Blue Cross & Blue Shield of Ala.*, 2021 WL 1196272, at *7 (E.D. Tex.

Mar. 30, 2021) (quotation omitted); *see also U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1039 (S.D. Tex. 1998) ("[W]here allegations of fraudulent conduct are numerous or take place over an extended period of time, less specificity is required to satisfy the pleading requirements of Rule 9(b)."). Further, even under the more traditional analysis, the FAC contains sufficient specific allegations of fraud to place Cartu on notice. (*See, e.g.*, FAC ¶ 78 (Oct. 2, 2014 email from Cartu acknowledging earning over $1.6 million through "unregulated business"); *id.* ¶ 82 (quoting misrepresentations on Cartu website for all of 2016 and 2017).)

Cartu also asserts that the FAC does not sufficiently allege that he acted with the requisite scienter. (Mot. at 19–20.) "Alleged facts are sufficient to support . . . an inference [of scienter] if they either (1) show a defendant's motive to commit [] fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008). Here, the FAC alleges that Cartu was an owner of the platform, that the platform was designed to allow him and others to alter trading results to "decrease the number of winning trades, thereby increasing customer losses—and their own profits," and that he received about $9 million in profits through transfers to off-shore accounts. (FAC ¶¶ 7, 87–89, 93.) Allegations that Cartu directed representatives to use fake names and misrepresent their qualifications suggest an awareness that the scheme was unlawful. These allegations establish motive, knowledge, and intent. *See, e.g.*, *In re Venator Materials PLC Litig.*, 547 F. Supp. 3d 624, 663–64 (S.D. Tex. 2021) (scienter alleged where plaintiff alleged defendants received regular reports, and failure to plead precise dates and contents of reports "not necessarily fatal at this juncture where there's a factual basis establishing that underlying specificity exists").

Finally, Cartu erroneously argues that Rule 9(b)'s heightened pleading standard applies to

Count Four, which charges Cartu with offering illegal off-exchange commodity options in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2, because those transactions are alleged to be part of Cartu's fraudulent trading scheme.[4]  (Mot. at 16.)  A charge is said to be "grounded in fraud," and therefore subject to the heightened pleading standard, where a plaintiff alleges "a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim." *Berry v. Indianapolis Life Ins. Co.*, 2011 WL 3555869, at *8 (N.D. Tex. Aug. 11, 2011) (quotations omitted); *see also Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ("[W]here fraud is not an essential element of a claim, only allegations . . . of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).  Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).").

The heightened standard does not apply to Count Four, as the count is premised only on the illegal offering of off-exchange options, not on fraudulent conduct or Cartu's state of mind. (*See* FAC ¶¶ 125–30.)  In other words, even if Cartu had not fraudulently solicited customers and the Cartu Platforms were operated fairly, he would still be liable for offering illegal, off-exchange binary options.  Cartu's citations to the contrary are inapposite because all of the claims in those cases relied on the same set of facts.  *Brown v. Bilek* stands for the uncontroversial proposition that Rule 9(b) applies to fiduciary duty claims predicated on fraud, 401 F. App'x 889, 893 (5th Cir. 2003), a claim which has no analogue here.  Likewise, in *Williams v. WMX Technologies, Inc.*, all of the claims at issue—including securities fraud, wire fraud, mail fraud, and common law fraud—relied exclusively upon the same misrepresentations, which, in any event, were sufficient to satisfy Rule 9(b).  112 F.3d 175, 177 (5th Cir. 1997).  And

---

[4] Although Cartu argues that Rule 9(b) also applies to Count Three (*see* Mot. at 20), Count Three is not alleged against him.  In any event, that count, for failure to register as a commodity trading advisor or associated person of a commodity trading advisor, does not sound in fraud, and Rule 9(b) does not apply.

the remaining precedent Cartu cites cuts against him: "when fraudulent conduct is alleged to underlie a claim for which fraud is a possible—but not necessary—element . . . particularity is only required *to the extent that a plaintiff in fact alleges fraud*." *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, 2015 WL 13741905, at *1 (N.D. Tex. Feb. 4, 2015) (emphasis added). The case on which the court in *Greenberg Traurig* relies for this proposition is even clearer: "Claims of breach of fiduciary duty are subject to Rule 9(b) when the alleged breach consists of fraudulent conduct . . . but not when it consists of nonfraudulent conduct." *Tigue Inv. Co., Ltd. v. Chase Bank of Tex., N.A.*, 2004 WL 3170789, at *2 (N.D. Tex. Nov. 5, 2004). Just so here: the fraud-based allegations against Cartu may have been realleged in setting out the counts against him, but they are not necessary to a finding that he offered illegal, off-exchange binary options. Accordingly, Rule 9(b) does not apply to, or warrant dismissal of, Count Four.

## II.   THIS COURT HAS PERSONAL JURISDICTION OVER CARTU

Cartu argues, pursuant to Rule 12(b)(2), that the Court lacks personal jurisdiction over him. (Mot. § 1.) For a court to have specific personal jurisdiction over a defendant, the defendant must have "'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'" *Luv N'care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (quoting *Int'l Shoe v. Wash.*, 326 U.S. 310, 316 (1945)). Cartu concedes (*see* Mot. at 4–5) that when, as here, a suit is based upon a federal statute providing for nationwide service of process, "the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994); *see also CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 381 (S.D.N.Y. 2019) (applying the same holding to the Act); Fed. R. Civ. P. 4(k)(2) (for claims arising under federal law, personal jurisdiction established if "defendant is not

subject to jurisdiction in any state's courts of general jurisdiction" and jurisdiction consistent

with Constitution).  Courts assessing personal jurisdiction must determine: "(1) whether the

defendant . . . purposely directed its activities toward the forum state or purposely availed itself

of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises

out of or results from the defendant's forum-related contacts; and (3) whether the exercise of

personal jurisdiction is fair and reasonable."  *Id.*

Here, Cartu purposely directed his activities—*i.e.*, the solicitation of customers—to the

United States.  The FAC contains a number of allegations demonstrating that Cartu and the

entities he controlled directed activities to the United States.  As an initial matter, the Cartu

Enterprise contracted with a U.S. resident and U.S. company to effectuate its fraudulent scheme.

(FAC ¶¶ 4, 49, 66, 76.)  More directly, Cartu and others acting on his behalf directed emails,

telephone calls, and other communications containing material misrepresentations to U.S.

individuals to entice them to deposit funds to purportedly trade binary options.  (*Id.* ¶ 3.)  Cartu

himself emailed sales staff about a promotion being offered to U.S. and Canadian customers, and

on or about January 26, 2014, emailed employees directing them to "PICK UP THE PHONE

AND CALL" a list of high-priority "USA and Canada customers."  (*Id.* ¶ 62.)  To continue

promoting the Cartu Enterprise, Cartu signed off on sending incentive awards to U.S. customers

in Alabama and California.  (*Id.* ¶ 68.)  Cartu directly negotiated the terms of a contract with an

affiliate marketer that included special rates for U.S. customers signed up by the affiliate

marketer.  (*Id.* ¶ 67.)  And when technical errors affected the ability to sign up or retain U.S.

customers, Cartu got involved, directing employees to address those areas.  (*Id.* ¶¶ 63, 69.)

These allegations are sufficient to allege that Cartu purposely directed his conduct to the

United States.  *FTC v. Educare Centre Servs., Inc.*, 414 F. Supp. 3d 960, 970 (W.D. Tex. 2019)

("By alleging that [defendant] caused [co-defendant company's] telemarketing calls to U.S. consumers, Plaintiffs alleged that [defendant] purposefully availed himself of the privilege of conducting significant activity in the United States."); *see also Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001) (minimum contacts established where defendant sent documents to Texas and "participated in a telephone conversation" and "failed to correct allegedly false statements made by [a co-defendant] during that phone call"); *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332–34 (5th Cir. 1982) (single long distance phone call to forum sufficient for personal jurisdiction where call constituted intentional tort); *Fintech Fund, FLP v. Horne*, 327 F. Supp. 3d 1007, 1019–21 (S.D. Tex. 2018) (call and emails directed to Texas company sufficient for personal jurisdiction); *Small Ventures USA, LP v. Rizvi Traverse Mgmt., LLC*, 2012 WL 4621130, at *5 (S.D. Tex. Oct. 2, 2012) (defendants demonstrated minimum contacts where they "dialed the phone numbers of Plaintiff's representatives and directed emails to the email accounts of the Houston company" containing misrepresentations).

Cartu focuses on the lack of allegations that he personally called U.S. customers and made material misrepresentations.  (Mot. at 8.)  But, as set forth above and in Section I(A)–(B), the FAC adequately alleges that (1) Cartu controlled the web of companies he used to effectuate his scheme, (2) Cartu directed employees and agents working for the Cartu Enterprise to make misstatements to customers, and (3) Cartu directed those agents and representatives to engage in activity targeting the United States, including both solicitations to engage in illegal binary options transactions and fraudulent misstatements or omissions.  *See, e.g.*, *Educare*, 414 F. Supp. at 976 (allegations that defendant controlled the "acts and practices" of a co-defendant, combined with specific allegations about what the co-defendant did, were sufficient).  Cartu notably glosses over the email in which he directed employees to "PICK UP THE PHONE AND CALL"

customers in the United States to solicit investments, or Cartu's involvement in crafting solicitations or incentive awards offered to U.S. customers.

Exercise of jurisdiction over Cartu does not "offend traditional notions of fair play and substantial justice." *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 243 (5th Cir. 2008). To determine whether jurisdiction offends fair play and substantial justice, courts examine five factors:  (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). As a proxy for balancing those factors, the Fifth Circuit has held that "[i]f a cause of action for fraud committed against a resident of the forum is directly related to the tortious activities that give rise to personal jurisdiction, an exercise of jurisdiction likely comports with the due process clause, given the obvious interests of the plaintiff and the forum state." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (personal jurisdiction over German citizen permissible because "once minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant"); *Walk Haydel*, 517 F.3d at 245 (holding the presumption applicable in case involving fraud and breach of attorney-client relationship because "the forum state has a substantial interest in protecting its residents"). Here, the U.S. customer injuries alleged were proximately caused by the unlawful conduct, and jurisdiction is appropriate.

## CONCLUSION

For the reasons set forth above, the CFTC respectfully requests that the Court deny the Cartu's motion in its entirety.

Dated:  June 29, 2023     Respectfully submitted,


          */s Benjamin E. Sedrish*_____

          Benjamin E. Sedrish
          Elizabeth N. Pendleton
          Elizabeth M. Streit

          Attorneys for Plaintiff
          Commodity Futures Trading Commission
          77 W Jackson Blvd., Suite 800
          Chicago, IL 60604
          Tel. (312) 596-0700
          Fac. (312) 596-0714
          *bsedrish@cftc.gov*
          *ependleton@cftc.gov*
          *estreit@cftc.gov*

21

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on June 29, 2023, a copy of the foregoing motion was served on all counsel of record via the Court's CM/ECF electronic filing system.

<u>*s/ Benjamin E. Sedrish*</u>