IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:20-CV-908-RP |
| JONATHAN CARTU, RYAN MASTEN, LEEAV PERETZ, NATI PERETZ, BAREIT MEDIA LLC d/b/a SIGNALPUSH, and BLUE MOON INVESTMENTS LTD. | § § § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court is Defendant Jonathan Cartu's ("Cartu") Motion to Dismiss Plaintiff Commodity Future Trading Commission's ("CFTC") First Amended Complaint. (Mot., Dkt. 99). CFTC filed a response, (Dkt. 102), and Cartu filed a reply, (Dkt. 107). Having considered the parties' briefs, the record, and the relevant law, the Court will deny the motion.

## I. BACKGROUND

### A. CFTC's Allegations

CFTC alleges the following facts: Defendant Jonathan Cartu is a Canadian citizen who, according to CFTC, currently resides in Israel. (Am. Compl., Dkt. 93, at 6). From 2013 to 2018, Cartu, along with other Defendants in this action,[1] owned and controlled a massive fraudulent binary options trading scheme. (*Id.* at 1) (the "Cartu Enterprise"). In concert with Defendants Leeav Peretz ("Leeav") and Nati Peretz ("Nati") (collectively, the "Peretz brothers"), Cartu offered illegal, off-exchange binary option trading on currency pairs, oil, and other commodities on internet

---

[1] The instant motion is filed by Cartu only. The case is stayed as to Defendants Ryan Masten and BareIt Media LLC pending resolution of their settlement discussions. (*See* Order, Dkt. 105). Service on the Peretz Defendants and Blue Moon Investments Ltd. is pending. (*See* Order, Dkt. 101).

websites through customer facing brands they owned and operated, including "BeeOptions," "Glenridge Capital," and "Rumelia" (collectively, the "Cartu Brands"). (*Id.*).

Cartu and the individual brokers he ultimately employed, and others acting on his behalf, disseminated—via websites, emails, telephone calls, and other communications—material misrepresentations to individuals in the United States to entice them to deposit funds to trade binary options. (*Id.* at 14–15). Although physically located in Israel, the brokers primarily targeted individuals located in the United States or Canada. (*Id.* at 28). The Cartu Enterprise, acting at Cartu's direction, also used email solicitations or videos created by affiliate marketers to direct potential U.S. customers to use one of the Cartu Brands to open and fund binary options trading accounts. (*Id.* at 14). Customer deposits, if done by credit card, were processed by Greymountain Management Limited, a payment processor partially owned and controlled by Cartu. (*Id.*).

CFTC alleges that brokers acting at the direction of Cartu and the Peretz brothers, who reported to Cartu (*see id.* at 9), made material misstatements to customers and potential customers, including promises of "quick" returns of 60–85%, assurances that the Cartu Brands' interests were aligned with those of customers, and misrepresentations of brokers' financial expertise, compensation structure, locations, and identities. (*Id.* at 22–23.) In addition, brokers and other employees and agents acting on behalf of the Cartu Brands and at Cartu's direction represented to customers and prospective customers that their funds were held in U.S.-regulated financial institutions when in fact they were held in dozens of unregulated offshore entities. (*Id.* at 26–27).

The binary options advertised by the Cartu Enterprise were executed on an internet-based trading platform (the "Cartu Platform") designed, operated, and owned by the Cartu Enterprise, along with defendants Ryan Masten, a resident of this District, and BareIt Media, a Texas limited liability company. (*Id.* at 6–7, 24). Cartu and Masten began developing the Cartu Platform by at least September 2014. (*Id.* at 25) Cartu and Masten built the platform to include deceptive devices that

limited customers' ability to withdraw funds. (*Id.* at 25–27). The platform went live in or around September 2015, after which it was used to offer and execute binary options transactions, track customer information, generate commission reports, and control customer transactions. (*Id.* at 24).

Unbeknownst to customers, the Cartu Brands were the counterparties on each binary options transaction, taking the opposite position on each trade entered by customers. (*Id.* at 16, 23). Cartu and Masten, in concert and through Blue Moon and BareIt, controlled the binary options transactions, and at times, manipulated trades to force customer losses. (*Id.* at 15, 24–25). Moreover, the transactions advertised and purportedly executed were not actual transactions, but merely book entries that gave the appearance of transactions, with no transfer of money from one customer account to another at expiry. (*Id.* at 17). To accomplish this scheme, Cartu used dozens of entities he controlled to open accounts and enter into agreements on behalf of the Cartu Platform, and to transfer and conceal revenue generated by it. (*Id.* at 7–10).

CFTC alleges that Cartu knew and intended that the Cartu Enterprise would target individuals located in the United States. For example, when hiring a new employee for one of the Cartu Brands, Cartu noted that "[w]e operate 24/6 owing to a large amount of our customers being from the United States or Canada." (*Id.* at 18). And on January 4, 2014, Cartu emailed staff members of one of the Cartu Brands to detail a Super Bowl promotion "for our American and Canadian customers." (*Id.*). Indeed, Cartu emailed employees on January 26, 2014 to direct them to "PICK UP THE PHONE AND CALL" certain "USA and Canada customers" who had made recent large deposits. (*Id.*). When engaging affiliate marketers to promote the Cartu Brands, Cartu personally negotiated a discounted rate for enrolling new U.S. customers because "I have so much US . . . ." (*Id.*). In or around June 2015, when Cartu learned that a technical error was impeding signups for customers in the United States, he wrote that "[a]ffiliates . . . couldn't sign up US Customers," then

directed an employee to "confirm that the problem is solved," even suggesting a fix of his own. (*Id.* at 18–19).

Cartu also made sure the Cartu Enterprise would retain U.S. customers after successful solicitations. In or around April of 2015, he approved a request from a Cartu Brand vice president to send out tablets as incentive rewards for customers in Alabama and California. (*Id.* at 18). When he received word that a customer was having issues transferring money from his BeeOptions account to his California bank account, Cartu directed employees to "take care of this [issue] as quickly as possible." (*Id.*). And even after BeeOptions decided that it was "no longer interested in acquiring [sales] traffic from the USA," Cartu emphasized that this decision applied only to "NEW US registrations," and that nothing should change for existing U.S. clients. (*Id.* at 19).

Cartu appeared to be aware that marketing to customers in the United States could present legal problems for him or the Cartu Enterprise. In the same exchange where he agreed that BeeOptions should not enlist new customers from the United States, Cartu demanded that all communications about the United States be routed through him. (*Id.*). After a customer won a car as a gift, Cartu made sure that the location of the winner would not be advertised "if it was in the United States." (*Id.* at 19). On May 5, 2016, Peretz emailed Cartu to note that BeeOptions had "made it onto cftc list," presumably referring to the Registration Deficient List (commonly known as the "RED List") maintained by the CFTC. (*Id.* at 20). Peretz later shared the RED List and "strongly suggest[ed] ceasing to take any further credit card deposits starting June 1st 2016," and moving all sales agents working for BeeOptions to Glendridge. (*Id.*).

The Cartu Brands generated substantial sums of money. For example, according to an email from Cartu to certain employees, the BeeOptions brand generated over $1.6 million in September 2014 alone. (*Id.*). The Cartu Enterprise operated Greymountain to process the transfer of funds from customers in the United States and elsewhere to the Cartu Brands, and later other binary

options brands, and thereafter to distribute profits. (*Id.* at 3). In aggregate, Greymountain received and processed over $165 million in connection with off-exchange binary options transactions including, according to Cartu's own statements, approximately $100 million from United States individuals. (*Id.* at 27–28). Between September 2014 and January 2017, Greymountain transferred at least $9.2 million to Cartu through Blue Moon Investments, a Seychelles corporation he owned and controlled. (*Id.* at 3, 7).

## B. Procedural History

CFTC filed suit on September 2, 2020. (Compl., Dkt. 1). After repeated extensions, Cartu moved to dismiss CFTC's original complaint for lack of personal jurisdiction, improper venue, and failure to state a claim. (Mot., Dkt. 60). The Court referred the motion to United States Magistrate Judge Dustin Howell, who found that CFTC had not adequately pled facts that would establish personal jurisdiction over Cartu in the United States. (R. & R., Dkt. 77, at 12–15). Before the Court adopted the report and recommendation, CFTC moved for leave to conduct limited discovery on issues related to personal jurisdiction. (Mot., Dkt. 79). Judge Howell granted the motion in part and allowed CFTC to serve requests for production on Cartu and others to determine the extent of Cartu's activities in the country. (Order, Dkt. 84).

On March 3, 2023, CFTC filed its first amended complaint. (Am. Compl., Dkt. 93). CFTC's amended complaint adds several new allegations supporting personal jurisdiction in the United States, such as contracting with U.S. companies, directing employees to make calls into the country, and targeted marketing of high-priority U.S. customers. (*Id.* at 14, 17–18, 20–21). The complaint alleges that Cartu engaged in options fraud in violation of 7 U.S.C. § 6c(b), fraud by deceptive device or contrivance in violation of 7 U.S.C. § 9(1), and sold illegal, off-exchange commodity options in violation of 7 U.S.C. §6c(b). (*Id.* at 34–37).

5

Cartu moves to dismiss the amended complaint for lack of personal jurisdiction, failure to state a claim for fraud under Rule 9, and failure to state a claim more generally under Rule 12(b)(6). (Mot. Dismiss, Dkt. 99).

## II. LEGAL STANDARDS

### A. Rule 12(b)(2)

The Federal Rules of Civil Procedure allow a defendant to assert lack of personal jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(2). On such a motion, "the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). The court may determine the jurisdictional issue "by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.*

But when, as here, the Court rules on the motion without an evidentiary hearing, the plaintiff need only present a *prima facie* case that personal jurisdiction is proper; proof by a preponderance of the evidence is not required. *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). Uncontroverted allegations in a plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor. *Id.* Nevertheless, a court need not credit conclusory allegations, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001) (per curiam).

### B. Rule 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To

survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the [plaintiffs'] grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

The Court will first address Cartu's argument that he is not subject to personal jurisdiction in the United States. Because it finds that jurisdiction exists, the Court will then assess the sufficiency of the claims under Rule 8 and Rule 9.

## A. Personal Jurisdiction

### 1. Rule 4(k)(2)

To establish personal jurisdiction, CFTC must show that Cartu has had "'minimum contacts' with the forum state such that imposing a judgment would not 'offend traditional notions of fair play and substantial justice.'" *Luv N'care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (quoting *Int'l Shoe v. Wash.*, 326 U.S. 310, 316 (1945)). In cases where a state is attempting to exercise extraterritorial jurisdiction over a defendant, the inquiry is whether the defendant has had minimum contacts with the state. *International Shoe Co. v. Washington*, 326 U.S. 310, 315, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Similarly, "when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, L. Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994).[2] Under Rule 4(k)(2), serving a summons establishes personal jurisdiction over a defendant for a claim that arises under federal law if "(A) the defendant is not subject to personal jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P 4(k)(2).  Here, Cartu has resided outside the United States at all relevant times and neither party alleges that he is subject to general jurisdiction in any U.S. state.

In his reply, Cartu argues that Rule 4(k)(2) does not apply because CFTC does not explicitly invoke the Rule as a basis for personal jurisdiction in its complaint. (Def.'s Reply. Dkt. 107, at 8). The Fifth Circuit has instructed that a plaintiff has "the initial burden to plead and prove the

---

[2] As the earlier report and recommendation stated, *Busch* remains binding precedent in the Fifth Circuit, despite disapproval within the Fifth Circuit regarding its holding. (R. &. R., Dkt. 77, at 8 n.1). *See also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) ("Because the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State. This is consistent with the premises and unique genius of our Constitution.") (Kennedy, J., plurality op.).

requisite contacts with the United States and plead Rule 4(k)(2)'s applicability (though no need for 'magic words'), but [has] no burden to negate jurisdiction in every state." *Nagravision SA v. Gotech Int'l Tech. Ltd.*, 882 F.3d 494, 499 (5th Cir. 2018); *see also Thomas v. grundfos, CBS*, 4:18-CV-0557, 2018 WL 6421762 at *1 n.1 (S.D. Tex. Nov. 5, 2018) ("[Plaintiff] had not plead jurisdiction under Federal Rule of Civil Procedure 4(k)(2) as required to invoke that provision.") *adopted*, CV H-18-0557, 2018 WL 6411364 (S.D. Tex. Dec. 6, 2018).

CFTC's amended complaint does not explicitly mention Rule 4(k)(2), and its short description of jurisdiction and venue only expressly references the basis for subject-matter jurisdiction. (Am. Compl., Dkt. 93, at 5). The question, then, is whether CFTC must explicitly spell out "Rule 4(k)(2)" in its complaint to establish personal jurisdiction under the Rule. Under *Nagravision*, plaintiff "has the burden to plead" Rule 4(k)(2)'s applicability. 883 F.3d at 499. However, the opinion clearly states that "magic words" are not required. *Id.* Insisting upon an explicit assertion of "Rule 4(k)(2)" would require the "magic words" that *Nagravision* instructs is unnecessary. While *Nagravision* does require a plaintiff to "plead" Rule 4(k)(2)'s applicability, the Court understands that requirement to mean that a complaint must contain allegations sufficient to demonstrate Rule 4(k)(2)'s applicability—not that a plaintiff must always specifically invoke the Rule on the face of the complaint.[3] Beyond *Nagravision*, it would be impractical to require CFTC to plead jurisdiction in Texas specifically when it is exercising the sovereign power of the United States in federal court. *See S.E.C. v. Softpoint, Inc.*, 2001 WL 43611 at *3 (S.D.N.Y. Jan. 18, 2001) ("It would be anomalous for a federal court adjudicating federally created rights and exercising the sovereign power of the United States to be bound by limitations developed under the fourteenth amendment, which by its own

---

[3] Indeed, *Nagravision* itself did not deal with the explicit text of the plaintiff's complaint, but with the respective pleading burdens that the parties carried. 883 F.3d at 499. The holding of *Nagravision* should be viewed in this context—affirming plaintiff's traditional burden to establish jurisdiction—rather than creating a literal textual requirement.

language applies only to the several states, and not to the federal government.") (cleaned up) (citing 4 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2862, at p. 169 (1990)). Accordingly, the Court finds that CFTC may still establish personal jurisdiction through Rule 4(k)(2) without explicitly mentioning those magic words.

Without yet reaching whether minimum contacts are satisfied, CFTC's complaint meets the requirements of Rule 4(k)(2). CFTC only brings claims under federal law.[4] (Am. Compl., Dkt. 99, at 34–38). Accordingly, the question is whether Cartu has had minimum contacts with the entire United States. *See, e.g.*, *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013). To assess personal jurisdiction, courts examine "(1) whether the defendant . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Luv N' care*, 438 F.3d at 469.

### 2. Minimum Contacts and Purposeful Availment

Cartu argues that he has not purposefully directed his activities to the United States, and that CFTC fails to properly allege any such deliberate availment. (Mot. Dismiss, Dkt. 99, at 6–9). Cartu acknowledges that some of his activities affected individuals in the United States and reached into the country, but states that this was purely the result of conduct broadly targeted towards a global market. (*Id.* at 7). Relying in part on the magistrate judge's previous report and recommendation— which was never adopted by this Court and concerned a different pleading—Cartu notes that such general allegations cannot establish personal jurisdiction.

---

[4] CFTC brings suit under the Commodity Exchange Act, which vests federal district courts with exclusive jurisdiction. 7 U.S.C. § 25(c).

Here, the Court finds that the amended complaint establishes a prima facie case that personal jurisdiction is proper. *Walk Haydel & Assocs., Inc.*, 517 F.3d at 241. First, CFTC has plausibly alleged that Cartu knowingly targeted customers in the United States and operated his businesses with the knowledge that they had substantial customer bases in the country. As just a few salient examples, Cartu directed his employees in an email to "PICK UP THE PHONE AND CALL" a list of high-priority "USA and Canada customers." (Am. Compl., Dkt. 93, at 18). Cartu noted that "[w]e operate 24/6 owing to a large amount of our customers being from the United States or Canada." (*Id.*). Cartu offered a discount rate for new U.S. customers—acknowledging that he already had so many U.S. consumers. (Am. Compl., Dkt. 93, at 18–19). He revised an email sent out by one of his companies to show that they would still "accept and refund credit card transactions in USD." (*Id.* at 20).

Cartu also singled out customers in the United States on several other occasions. Cartu told BeeOptions not to "communicate with [an affiliate] about the US. Refer that all to me please." (*Id.*). When a customer won a luxury car as an incentive for patronizing Cartu's trading scheme, Cartu was asked if the company could post the location of the winner. Cartu responded: "Not if it was in the United States." (*Id.*). In 2016, an employee drafted a template email notice to inform customers that "we can no longer wire funds to USD accounts in the United States." (*Id.* at 20). Cartu revised the email to note that "our company will still accept and refund Credit Card transactions in USD." (*Id.*). On May 11, 2016, Leeav Peretz wrote Cartu an email sharing the CFTC's Registration Deficient List (the "RED List") and suggested that Cartu stop taking further credit card deposits from U.S. customers. (*Id.*).

These contacts were purposeful—Cartu knowingly secured U.S. customers and took affirmative steps to ensure that they remained a part of his trading scheme. Purposeful availment requires a defendant to seek some benefit, advantage or profit by "availing" itself of the jurisdiction.

*See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005). Cartu did precisely that by seeking the advantage and profit of a U.S. customer base. His email instructing employees to call high-priority U.S. customers is a deliberate targeting of the forum. An email to solicit customers in a forum, followed by actual solicitation as part of a years-long prolonged pattern of conduct into the forum state, is insufficient to establish purposeful availment. His statement that they operate "24/6" because of their U.S. and Canadian customers again shows deliberate and repeated availment. Having made profit off substantial and repeated signups in the United States, Cartu should have reasonably anticipated being "haled into" U.S. courts. *Keeton*, 465 U.S. at 781.

One case from the Southern District of New York is particularly helpful. *Commodity Futures Trading Commn. v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371 (S.D.N.Y. 2019). There, the district court analyzed whether it could exercise personal jurisdiction over a non-U.S. defendant, Jeremy Woolfenden, who acted as the Global Head of Emerging Markets for a company that engaged in alleged violations on the foreign exchange market. *Id.* at 375–77. The Court found that several of Woolfenden's activities supported jurisdiction in the United States, including his supervision of brokers in the United States, finding that these contacts were not "random" or "fortuitous" but "the kinds of contacts that arise from a supervisory position." *Id.* at 387 (quoting *Walden*, 571 U.S. at 386).

Cartu attempts to differentiate *TFS-ICAP* on the basis that it was the Peretz brothers—not him—who controlled the U.S. brokers. (Mot. Dismiss, Dkt. 99, at 6–7). This factual statement appears to contradict CFTC's allegations, and while the Peretz brothers certainly supervised the brokers, that does not mean Cartu also took no supervisory position. (*Id.* at 6). Indeed, the complaint suggests otherwise. (Am. Compl., Dkt. 93, at 23 ("At the direction of Cartu and, later, the Peretz brothers, the individual brokers . . . solicited customers to trade binary options with the Cartu brands . . . .")). Because the facts appear to be disputed, the Court finds in CFTC's favor at this

stage. *Panda Brandywine Corp.* 253 F.3d at 869. At any rate, Cartu need not have directly supervised the brokers for jurisdiction to exist. Whether Cartu supervised the supervisors, or supervised the brokers directly, the companies under his control and direction targeted the forum state. *See, e.g.*, *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (finding personal jurisdiction in instance of supervisory control); *McFadin v. Gerber*, 587 F.3d 753, 761 (5th Cir. 2009) ("[T]he actions of an agent may establish minimum contacts over a principal . . . .").[5] Finally, the complaint alleges acts by which Cartu directly targeted the forum, such as suggesting Super Bowl commercials and working "24/6" to serve customers in the country. (Am. Compl., Dkt. 93, at 18). By establishing a corporate scheme that targeted the United States, with brokers who acted at his direction, Cartu purposefully availed himself of the forum.

Beyond Cartu's consumer-facing contacts into the United States, CFTC has also shown availment through the business contracts and transactions Cartu made with the country. The Supreme Court has "upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contracts' in the forum State." *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (quoting *Burger King Corp.*, 471 U.S. at 479–80)). In *Burger King*, the Supreme Court noted the jurisdictional significance of negotiating with an organization within the forum for the "manifold benefits that would derive from" contracting with that organization. 471 U.S. at 479–80 (citing *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647 (1950)).

Here, Cartu contracted with Defendant BareIt Media LLC, a Texas LLC with its principal place of business in Lakeway, Texas. Cartu used BareIt Media and Ryan Matsen, another U.S. resident, as affiliate marketers in its scheme. (Am. Compl., Dkt. 93, at 18). Cartu negotiated the

---

[5] The Court need not decide whether Cartu and his brokers had a principal-agent relationship, in part because the CFTC's complaint illustrates a complex and unusual corporate scheme. What matters is that Cartu supervised the brokers and they acted at his direction under his control.

terms of a contract with BareIt Media and BeeOptions, that specifically included a special rate for customers in the United States who would sign up with the company. (*Id.* at 18–19 ("When one affiliate marketer asked to receive $400 for each customer who deposited money with BeeOptions, Cartu responded, 'I will do 400 for non-US but US only 300. I have so much US . . . .'")). When a technical error impeded signups for customers in the United States, he specifically noted that "[a]ffiliates couldn't sign up US customers" and had technical support confirm that the problem was solved—i.e., that U.S. customers could resume signups. (*Id.* at 19).

In short, Cartu contracted with an American company in relation to his options trading scheme. He did so with the knowledge that a substantial portion of his customer base came from the United States. And Cartu took active steps to ensure that his companies continued to operate and function to facilitate the participation of Americans in his trading options scheme. Therefore, while a contract alone may not establish personal jurisdiction, *see Moncrief Oil Intern. Inc. v. OAO Gazprom*, 481 F.3d 309 (5th Cir. 2007), it substantially supports the CFTC's showing that Cartu purposefully availed himself of jurisdiction in the United States. *See Burger King*, 471 U.S. at 485–86 (noting that courts should "reject any talismanic jurisdictional formulas" and instead examine "whether personal jurisdiction would comport with fair play and substantial justice"). The quality and nature of Cartu's relationship with BareIt Media as an affiliate does not appear to be "random" or "fortuitous" but a purposeful and deliberate method to gain customers in the United States.

Cartu's contacts are sufficiently related to the litigation at issue. In the Supreme Court's most recent statement on personal jurisdiction, it upheld specific jurisdiction for an automobile manufacturer that sold its cars in Montana, even when the specific vehicle at issue was sold in another state. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021). There is no reason to think that Cartu's contacts are any less associated with the forum and litigation than the contacts at issue in *Ford.* Cartu targeted the forum, allegedly defrauding individuals within the

country at their loss and the Cartu's profit. (*See generally* Am. Compl., Dkt. 93, at 25–33). This is directly related to CFTC's allegations of Commodity Exchange Act violations. The victims of his targeting reside in the United States, and there is no doubt that the U.S. government has an interest in protecting Americans from financial fraud. *See Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."); *Calder v. Jones*, 465 U.S. 783 (1984) ("An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.").

Cartu argues that the complaint is "insufficient to demonstrate that the claims against him arise out of or are related to his contacts with the United States." (Mot. Dismiss, Dkt. 99, at 7 (quoting R. &. R., Dkt. 77, at 13)).[6] But the Supreme Court in *Ford* emphasized that this is a disjunctive test, and CFTC need only show that the issues are related, not causal. *Ford*, 141 S. Ct. at 1031. To that end, the Supreme Court noted that the "place of a plaintiff's injury . . . may still be relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit." *Id.* at 1031–32. Cartu should not be surprised that actions to recruit victims of his trading scheme would be connected to litigation involving that exact fraud, especially when those harms occurred in the United States. *See Fed. Trade Commn. v. Educare Ctr. Services, Inc.*, 414 F. Supp. 3d 960 (W.D. Tex. 2019) ("Indeed, the Fifth Circuit has repeatedly held that intentionally directing misrepresentations over the phone to recipients in the forum gives rise to sufficient minimum contacts for specific personal jurisdiction.").

---

[6] The Court need not distinguish between this order and the report and recommendation. That recommendation was effectively mooted by jurisdictional discovery before it could be adopted. More importantly, CFTC's amended complaint is considerably more detailed and specific regarding Cartu's activities in and directed toward the United States.

In his reply, Cartu seeks to differentiate *FTC v. Educare Ctr. Servs.* on the basis that the case dealt with violations of the Telephone Consumer Protection Act ("TCPA"). (Def.'s Reply, Dkt. 107, at 3). He argues that "nothing suggests" that the TCPA's jurisdictional analysis "extends beyond the TCPA, let alone to the Commodity Exchange Act." (*Id.*). This misstates the jurisdictional inquiry. The question is not whether one statute extends jurisdiction more than another, but whether the "relationship among the defendant, the forum, and the litigation" supports jurisdiction. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). In TCPA cases, the contacts with the forum state are directly related to the litigation, because targeting U.S. consumers with deceptive calls is both the action that creates jurisdiction and that violates the law. *See FTC v. Educare Ctr. Servs.*, 414 F. Supp. 3d at 960. But the same is true for Cartu's conduct. He directed his employees to make misstatements to customers, including those in the United States. And he did so knowing that a substantial portion of the victims of his alleged fraud were in the country. (Pl.'s Resp., Dkt. 102, at 19; Am. Compl., Dkt. 93, at 17–18). In short, Cartu's contacts with the forum are directly related to the litigation at issue. *See Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) ("When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes powerful availment.").

## 2. Whether Jurisdiction is Fair and Reasonable

An exercise of personal jurisdiction would not offend traditional notions of fair play or substantial justice. *Walk Haydel & Assocs.*, 517 F.3d at 243. Here, courts examine (1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies. *Burger King Corp.*, 471 U.S. at 477. "If a cause of action for fraud committed against a resident of the forum is directly related to the tortious activities that give rise to personal jurisdiction, an exercise of jurisdiction likely

comports with the due process clause, given the obvious interests of the plaintiff and the forum state." *Wien Air Alaska, Inc.*, 195 F.3d at 215.

As already stated, Cartu's actions that create minimum contacts with the United States are directly related to the alleged torts and regulatory violations committed in the country. Cartu does not seriously dispute this but instead claims that he would incur unreasonable costs in litigating in the United States, that the country lacks a particular interest in the dispute, and nothing makes this forum more convenient. (Mot. Dismiss, Dkt. 99, at 14). As to the first factor, requiring a party to travel into a jurisdiction to litigate is not unfair when he has purposefully harmed individuals there. *See Wien Air Alaska, Inc.*, 195 F.3d at 215 ("[O]nce minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant."). And the United States's interest is clear because "the forum state has a substantial interest in protecting its residents." *Walk Haydel & Assocs., Inc.*, 517 F.3d at 245. Accordingly, because Cartu has minimum contacts with the forum and an exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice, the Court will deny his motion to dismiss on those grounds.

**B. Rule 8**

Cartu briefly argues that CFTC's complaint fails to meet the pleading requirements under Rule 8. He asserts that the complaint "lump[s] all defendants together" and does not "identify what specific acts Carty personally committed that violated United States law . . . ." (Mot. Dismiss, Dkt. 99, at 15).

*1. Group Pleading*

Although the amended complaint does not always specify which Defendants performed which actions, it does not engage in impermissible group pleading. Here, before any merits discovery has occurred, the complaint details Cartu's actions with sufficient specificity. It states discrete actions that Cartu undertook, including designing the platform that allowed Cartu to take the opposite side

of transactions with customers, directing the Cartu Brands to make solicitations via brokers, negotiating the terms of affiliate marketing contracts, and directing sales representatives to call U.S. customers. (Pl.'s Resp., Dkt. 102, at 6–7). These are specific, individualized actions that show Cartu's participation in the allegedly violative acts. The share of responsibility for specific actions may be determined more precisely at a later stage, but the complaint itself does not engage in impermissible group pleading.

### 2. CFTC Pleads a Common Enterprise

The parties dispute whether CFTC properly alleges a common enterprise. (Pl.'s Resp., Dkt. 102, at 6–8; Def.'s Reply, Dkt. 107, at 4–6). When entities and individuals operate as a common enterprise, each may be held jointly and severally liable under the Act for the unlawful acts and practices of other members of the enterprise. *See, e.g., CFTC v. Wall St. Underground, Inc.*, 281 F. Supp. 2d 1260, 1271 (D. Kan. 2003) (individual and others held to be part of a common enterprise where they operated as a "single economic entity"); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 39 (D.D.C. 2015) (granting summary judgment against members of common enterprise). In determining whether a common enterprise exists, courts look to a variety of factors, including whether businesses: "(1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Trade Exch. Network*, 117 F. Supp. 3d at 38–39; *see also FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014) (same).[7]

The amended complaint meets this test. It alleges that Cartu solicited individuals in the United States to trade binary options with the Cartu Brands, each of which was owned and operated

---

[7] A complaint need not use "magic words" to plead common enterprise liability. *See De La Hoya v. Coldwell Banker Mex., Inc.*, 125 F. App'x 533, 537–38 (5th Cir. 2005) (plaintiffs could rely on single business enterprise theory where complaint referred to all defendants by a single name and alleged they were engaged in joint enterprise even though a single business enterprise theory was not specifically pleaded in the complaint); *Hill v. Aramark Healthcare Mgmt. Servs.*, 2006 WL 8437490, at *3 (N.D. Tex. Apr. 20, 2006) (same).

by Cartu. (Am. Compl., Dkt. 93, at 7–10). It alleges that the Cartu Brands operated a shared office with the same employees. (*Id.* at 9). It alleges that Cartu used these controlled entities to make the same marketing pitch to potential consumers. (*Id.* at 22–23). And it alleges that Cartu comingled funds from the Brands and used "dozens of off-shore entities and accounts to hold, transfer, and conceal funds received from customers of the Cartu brands." (*Id.* at 27–28). These allegations are sufficient for common enterprise liability because they show common control, a shared office and purpose, and comingling of funds. *See, e.g., FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1083 (11th Cir. 2021) (affirming finding of common enterprise based on common control, shared office space and employees, and commingled funds); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012) (common enterprise pleaded where no dispute that corporate defendants were controlled by same persons and shared the business address and office space).

Cartu alleges that CFTC's citations are inapplicable because they do not address "the sufficiency of pleadings at the motion-to-dismiss stage." (Def.'s Reply, Dkt. 107, at 4–5). But the substantive standard for a common enterprise does not depend on a case's procedural stage, and at any rate, CFTC's factual allegations are viewed more—not less—favorably at the pleading stage than summary judgment. The amended complaint contains detailed allegations of Cartu's interaction and control over the Cartu Brands along with the Peretz brothers. Accordingly, at this stage, it has satisfied the test for pleading common enterprise liability.

Finally, Cartu argues that the "CFTC instead seeks to tie Cartu to other corporate entities which it has chosen not to pursue in this litigation, rendering their assertion of joint and several liability irrelevant, and their remaining caselaw similarly inapposite." (Def.'s Reply, Dkt. 107, at 5). But Cartu cites no authority requiring that a complaint name each participant in a common

enterprise as a defendant in order to plead common enterprise liability.[8] Regardless of whether the Cartu Brands are named as defendants, there are sufficient allegations in the pleadings to tie them to Cartu as part of a common enterprise. This is especially true, as here, where the complaint alleges that Cartu used dozens of offshore entities and fictitious names to purposefully conceal his trading scheme and transfer of assets. In this circumstance, naming each entity as a defendant would prove impractical, if not impossible. Overall, the CFTC has sufficiently pled common enterprise liability.

### 3. CFTC Pleads Control Person Liability

Beyond Cartu's own actions, the amended complaint adequately pleads control person liability. CFTC details how Cartu managed and controlled the Cartu Brands, worked to set up the trading platform, and directed brokers and affiliates along with the Peretz brothers. (Am. Compl., Dkt. 93, at 9–10, 17–18). Under Section 13(b) of the Commodity Exchange Act, 7 U.S.C. § 13c(b), any person who, "directly or indirectly, controls any person who has violated any provision of the Act, or any of the rules, regulations, or orders issued" pursuant to the Act, "may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person . . . ." The CFTC must establish that the controlling person "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." 7 U.S.C. § 13c(b).

CFTC has alleged facts which plausibly show Cartu did in fact control and direct these brands and brokers. In particular, CFTC alleges that Cartu established various offshore entities as part of the "Cartu brands" to effectuate his trading scheme. (Am. Compl., Dkt. 93, at 1).

---

[8] Cartu points to *Lake Shore Asset Mgt. Ltd. v. Commodity Futures Trading Commn*, 511 F.3d 762, 767 (7th Cir. 2007), which held that a preliminary injunction could not apply to participants in a common enterprise who were not named as defendants. The Seventh Circuit's holding rested on the applicability of Rule 65, not the ability to plead a common enterprise. The fact that the circuit court upheld the injunction as to the named defendants, despite knowing that some common enterprise participants were not named, supports CFTC's position. *Id.*

Throughout the complaint, CFTC alleges that the Cartu Brands offered illegal, off-exchange trading options to consumers in the United States. (*See id.* at 14–19). Control person liability attaches where a person "possesse[d] the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Monieson v. CFTC*, 996 F.2d 852, 859–60 (7th Cir. 1993). Not only did Cartu possess the power to control the specific transactions, he actually did so, by marketing, offering, and selling binary options through the Cartu Brands. (Am. Compl., Dkt. 93, at 14–18). Cartu was allegedly involved in the day-to-day management of the company, and CFTC includes several examples of him controlling the direction of the Cartu Brands and their activities. (*See id.*).

At least at the pleading stage, CFTC has alleged sufficient facts to proceed on a theory of control person liability. The key inquiry in the Fifth Circuit is whether the control person had "effective day-to-day control" of the corporation or had "the requisite power to directly or indirectly control or influence corporate policy." *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 195 (5th Cir. 1979), *modified on other grounds on panel reh'g*, 611 F.2d 105 (5th Cir. 1980) (per curiam). The amended complaint sufficiently pleads Cartu's day-to-day control of the Cartu Brands. *See also Kunzweiler v. Zero.Net, Inc.*, 2002 WL 1461732, at \*13–14 (N.D. Tex. July 3, 2002) (where plaintiff alleged that defendant was a director of corporation and had used his position to obtain a refund, with the "benefit of all reasonable inferences," plaintiff alleged control person status); *CFTC v. Johnson*, 408 F. Supp. 2d 259, 269–70 (S.D. Tex. 2005) (denying dismissal of control person liability where complaint alleged defendant was head of trading desk and responsible for conduct of employees, was aware of the price reporting activities in violation of company policy, and did not take steps to prevent these activities).

Cartu argues that there can be no control liability because there is no primary violation. (Def.'s Reply, Dkt. 107, at 6); *see also Southland Securities Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353,

383 (5th Cir. 2004) ("Control person liability is secondary only and cannot exist in the absence of a primary violation."). The facts pled in CFTC's complaint show primary violations of Sections 6(c)(1) and Section 4c(b) of the Act by the Cartu Brands. Moreover, CFTC pleads primary violations through its common enterprise theory, as the Cartu Brands allegedly committed primary violations as part of the enterprise. At bottom, Cartu's arguments appear to rest on the obfuscation of his trading scheme: because CFTC has not identified precisely which entities committed which acts, none of them should be held liable. At the pleading stage, CFTC has alleged primary violations, and does not yet need to untangle the "messy maze of interrelated business entities" before proceeding to discovery. *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 637 (6th Cir. 2014).

## C. Rule 9

Finally, Cartu argues that the amended complaint fails under the heightened pleading standard for fraud under Rule 9. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). CFTC brings claims for commodity options fraud under 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.4, and fraud by deceptive practice or contrivance under 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3), both of which require the agency to "set forth specific facts to support an inference of fraud." *Herrmann Holdings Ltd. v. Lucent Technologies Inc.*, 302 F.3d 552, 564-65 (5th Cir. 2002) (quoting *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)). Fraud involving commodity options is established when a person: (1) makes a misrepresentation, misleading statement, or deceptive omission; (2) acts with scienter; and (3) the misrepresentation or omission is material. *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002). As to Count Two, fraud by deceptive device or contrivance will be found where a person: (1) engages in prohibited conduct (i.e., employs a fraudulent scheme, makes material misrepresentations or omissions, or engages in a fraudulent business practice); (2) in connection with the sale of a commodity in interstate commerce; (3) with scienter. *CFTC v. Hunter*

22

*Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1347 (S.D. Fla. 2014). The scienter element requires a showing of reckless or intentional conduct. *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1007 (N.D. Ill. 2015).

Cartu alleges that the complaint "fails to provide the 'who, what, when, where, and how' with respect to the alleged misstatements or improper acts by Cartu." (Mot. Dismiss, Dkt. 99, at 18). The Court finds that the CFTC's complaint adequately spells out these elements. As to the who, the CFTC alleges that Cartu controlled and directed individuals who committed fraudulent acts on behalf of himself and the Cartu Brands. The amended complaint explicitly names the individuals who Cartu contacted in conjunction with his binary options trading, including his connections with Matsen, BeeOptions, brokers, marketing affiliates, and company websites. (Pl.'s Resp., Dkt. 102, at 6–7; Am. Compl., Dkt. 93, at 9–10, 17–18). The "who" is pled with sufficient particularity.

As to the "what," the amended complaint explains in detail the false statements made by brokers on behalf of Cartu, as well as the misrepresentations of brokers regarding the profitability of the binary options. (Am. Compl., Dkt. 93, at 22–25). It details Cartu's development of the trading platform and the specific steps that Cartu took to ensure the platform's continued operations. (*Id.* at 24–27). Cartu argues that none of CFTC's allegations "come close to suggesting that he engaged in any fraud, misrepresentation, or the like." (Mot. Dismiss, Dkt. 99, at 19). And the complaint details how Cartu managed and controlled the Cartu brands, worked to set up the trading platform, and directed brokers and affiliates along with the Peretz brothers. (Am. Compl., Dkt. 93, at 9–10, 17–18). Moreover, as discussed *infra* Section III.B.2, Cartu's actions were part of a common enterprise with the Cartu brands that fell under his control. These allegations are sufficient to describe "what" actions were fraudulent. The amended complaint notes several material misrepresentations, including false statements about expected returns, pseudonyms to conceal identities, and failure to disclose that the Cartu Brands could take the opposite position of trades. (*See id.* at 15–24).

Cartu next argues that there is no "when" because CFTC's allegations span a period of years with few specific references to exact dates of acts. (Mot. Dismiss, Dkt. 99, at 18). However, when "alleged fraud was complex and occurred over an extended period of time, the requirements of Rule 9(b) are less stringently applied." *Gilmour v. Blue Cross & Blue Shield of Ala.*, 2021 WL 1196272, at *7 (E.D. Tex. Mar. 30, 2021) (quotation omitted); *see also U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1039 (S.D. Tex. 1998) ("[W]here allegations of fraudulent conduct are numerous or take place over an extended period of time, less specificity is required to satisfy the pleading requirements of Rule 9(b)."). CFTC alleges a period of fraudulent conduct stemming from 2013 to 2018 involving a complex fraudulent trading scheme. And the amended complaint provides a detailed timeline of these events from the creation of Cartu's trading platform up to its apparent peak in 2016 and 2017. (Am. Compl., Dkt. 14–28). This timeframe, combined with specific references to the approximate dates of actions that Cartu took to enable his alleged violations, is sufficient to establish the "when" of Rule 9.

Similarly, the "where" and "how" are satisfied. As to the where, the complaint alleges the locations of the various platforms, brands, affiliates, and corporate structures that Cartu used to effectuate his alleged fraud. (*Id.*). Likewise, the "how" is detailed through descriptions of Cartu's alleged fraud, including misrepresentations to consumers of the trading's profitability and by putting the Cartu Brands on the opposite site of transactions executed on the Cartu platform. (*Id.* at 21–24).

Next, Cartu argues that the complaint is void of facts that show he acted with the requisite scienter. (Mot. Dismiss, Dkt. 93, at 19–20). "Alleged facts are sufficient to support . . . an inference [of scienter] if they either (1) show a defendant's motive to commit [] fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant.*" Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Cartu's motive to commit fraud is

apparent, and CFTC pleads facts that show his conscious behavior. Cartu owned the trading platform, which allowed him to decrease the number of winning trades to increase his own profits. (Am. Compl., Dkt. 93, at 23–25). The motive to commit fraud is clear because Cartu directly profited off the customer's losses. (*Id.*). Moreover, the Cartu Brands—which Cartu allegedly controlled—used fake names and aliases to misrepresent various aspects of their platforms, suggesting awareness of the potential fraud. (*Id.*). This is not, as Cartu claims, a "group pleading" of scienter, because CFTC has shown Cartu's individual motives for committing fraud.

Last, Cartu argues that the heightened Rule 9 standard applies to Count Four, which charges Cartu with offering illegal off-exchange commodity options in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2. (Mot. Dismiss, Dkt. 99, at 16 n.6). A charge is considered to be "grounded in fraud," and therefore subject to the heightened pleading standard, where a plaintiff alleges "a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim." *Berry v. Indianapolis Life Ins. Co.*, 2011 WL 3555869, at *8 (N.D. Tex. Aug. 11, 2011) (quotations omitted); *see also Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) ("[W]here fraud is not an essential element of a claim, only allegations . . . of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).").

While Cartu's operation of illegal off-exchange commodity options did allegedly facilitate fraud, they are not predicated on or grounded in fraud. Rather, offering off-exchange options is a distinct regulatory violation, and would be actionable regardless of whether Cartu committed any other fraudulent acts. "[W]hen fraudulent conduct is alleged to underlie a claim for which fraud is a possible—but not necessary—element . . . particularity is only required to the extent that a plaintiff in fact alleges fraud." *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, 2015 WL 13741905, at *1 (N.D. Tex. Feb. 4, 2015); *see also Tigue Inv. Co., Ltd. v. Chase Bank of Tex., N.A.*, 2004 WL 3170789, at

*2 (N.D. Tex. Nov. 5, 2004) ("Claims of breach of fiduciary duty are subject to Rule 9(b) when the alleged breach consists of fraudulent conduct . . . but not when it consists of nonfraudulent conduct."). Here, the allegations of fraud are not necessary to show that Cartu offered illegal, off-exchange binary options. Accordingly, the heightened Rule 9 standard does not apply to Count Four, and CFTC properly states a claim for operating illegal off-exchange options under Rule 8.

## IV. CONCLUSION

For the reasons given above, **IT IS ORDERED** that Cartu's Motion to Dismiss, (Dkt. 99), is **DENIED**.

**SIGNED** on August 15, 2023.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE